8 pages

MEYERS LAW GROUP, P.C.
MERLE C. MEYERS, ESQ. CA Bar #66849
EDIE WALTERS, ESQ. CA Bar #262730
MICHELE THOMPSON, ESQ. CA Bar #241676
44 Montgomery Street, Suite 1010
San Francisco, CA 94104
Telephone: (415) 362-7500
Facsimile: (415) 362-7515

Prospective Counsel for
FOOD SERVICE MANAGEMENT, INCORPORATED,
Debtor

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| In re<br><br>FOOD SERVICE MANAGEMENT, INCORPORATED<br><br>Debtor. | Case No. 09-40066<br><br>Chapter 11<br><br>MLG-001<br><br>Date: September 22, 2009<br>Time: 8:45 a.m.<br>Place: U.S. Bankruptcy Court<br>Courtroom No.35<br>501 "I" Street, Sixth Floor<br>Sacramento, California<br>Judge: Hon. Christopher M. Klein |

**DECLARATION OF ABE ALIZADEH IN SUPPORT OF DEBTOR'S MOTION FOR APPROVAL OF USE OF CASH COLLATERAL ON AN INTERIM AND FINAL BASIS**

I, ABE ALIZADEH, declare:

1. I am one of the principals of Food Services Management, Inc. the debtor and debtor-in-possession in the above-captioned chapter 11 case ("FSM" or the "Debtor").

2. I am over the age of 18 years and have personal knowledge of each of the facts stated herein below, except as otherwise stated below, and would testify thereto if called upon to do so in a court of law.

3. FSM filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code on September 18, 2009 (the "Petition Date").

1

24048 20052

LAW OFFICES
MEYERS LAW GROUP, P.C.
44 MONTGOMERY STREET, SUITE 1010
SAN FRANCISCO, CALIFORNIA 94104

4. On the same date, three affiliates of FSM, Central Valley Food Services, Inc. ("Central"), Kobra Associates, Inc. ("Kobra") and Sierra Valley Restaurants, Inc. ("Sierra") (collectively with the Debtor, the "JIB Debtors") also filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

5. The Debtor proposes to use cash collateral (and entry of order in substantially the same form as attached hereto as **Exhibit "A"**) in which three secured lenders, City National Bank National ("CNB") and Bank of Arizona ("NBA"), (collectively, the "Secured Lenders"), assert interests, namely the cash proceeds of all cash, accounts receivable and inventory held by the Debtor as of the petition date herein, in order to pay expenses of the Debtor in accordance with a projected budget as attached hereto as **Exhibit "B"**. Payment of those expenses, including certain prepetition employee wages and postpetition obligations owing to vendors, is critical to the preservation and value of the estate's primary asset – the enterprise operations of the Debtor's 14 Jack in Box restaurants (collectively, the "Restaurants") located in Central and Northern California.

6. The Debtor is wholly owned by me.

7. I have has worked in Jack In The Box restaurants for over 30 years, first as an employee and then as a franchisee. I now operate the second most Jack In The Box restaurants in the nation and have received numerous awards over the course of his career, including Franchisee of the Year in 2006 and 2007, by Franchise Times, and 2007 Top 200 Restaurant Franchisees by Franchise Monitor.

8. CNB is owed approximately $7,800,000 and asserts security interests in particular assets, including equipment, inventory and accounts receivable, related to 12 of the Restaurants (the "CNB Collateral Restaurants"), as well as assets related to restaurants owned by one or more affiliates of the Debtor that are also debtors-in-possession before this Court. The Debtor also owes approximately $1,204,000 to NBA, which asserts security interests in similar assets related to 2 other Restaurants (the "NBA Collateral Restaurants").

24048 20052

9. FSM, the Debtor, was formed in March 1988 and was created to operate restaurants developed from ground up only, with its first restaurant located in Roseville, California. The Debtor now operates a total of 14 stores from Redding to Galt, California.

10. The Debtor's business, along with its affiliates, is the operation of seventy (70) Jack In The Box restaurants throughout Central California. The Debtor and its affiliates employ approximately 2,075 full-time and hourly employees, and their combined annualized revenues are approximately $92,500,000.

11. The JIB Debtors are indebted to four secured lenders, National Bank of Arizona ("NBA"), City National Bank ("CNB"), Irwin Franchise Capital ("Irwin") and Mechanics' Bank, (the "Secured Lenders") in an aggregate amount of more than $40,000,000. In addition, the Debtor and its affiliates owe roughly $18,000,000 in unsecured debt.

12. Of the Secured Lenders, NBA, CNB and Irwin assert security interests in the inventory and equipment in specific restaurants owned and operated by the JIB Debtors. No two lenders are secured by the same restaurant, and all three of the lenders assert claims against two or more of the JIB Debtors.

13. The Debtor's present annualized revenues are approximately $39,925.500.00 and the overall annualized revenues of the JIB Debtors together is approximately $92,535,600.00. For the last fiscal year, ending December 31, 2008, the JIB Debtors reported net income in the amount of $5,691,516.00 on a consolidated basis. As of the Petition Date, the JIB Debtors owed approximately $17,890,000.00 in unsecured debt owed to hundreds of suppliers, vendors and tax authorities.

14. In February 2008, the Central, the Debtor and Kobra entered into two loan agreements with CNB to obtain additional working capital and open additional restaurants (collectively, together with related notes and security agreements, the "CNB Loan Agreements").

15. Obligations owing under the CNB Loan Agreements are secured by liens encumbering all inventory and equipment, among other assets, of thirty Jack in the Box franchise restaurants, one of which is owned and operated by the Kobra. The remaining twenty-nine restaurants are owned and operated by the Debtor and Central.

24048 20052

16. CNB also made additional loans to Kobra and Central secured by an interest in 18 other Jack in the Box franchise restaurants.

17. As of the Petition Date, CNB was owed approximately $16,375,800 by the JIB Debtors, on a consolidated basis.

18. In 2005 and 2006, the Debtor entered into three loan agreements with NBA to obtain additional working capital and open additional restaurants: (1) Loan No. 9002, in the amount of $7,950,000, between the Debtor and NBA; (2) Loan No. 9003, in the amount of $9,347,000, between the Debtor and NBA; and (3) Loan No. 9001, in the amount of $3,200,000, between me and Austin Wallestad, as borrowers, and NBA, as lender (collectively, together with related notes and security agreements, the "NBA Loan Agreements").

19. The Debtor, Kobra Alizadeh and I each executed guarantees in favor of NBA.

20. Obligations owing under the NBA Loan Agreements are secured by eight commercial security agreements executed at various times by the Debtor, FSM, me and Austin Wallestad. Mr. Wallestad owns 25 percent of the stock of Central and Sierra. Those security agreements grant to NBA liens encumbering all inventory and equipment, among other assets, of 28 Jack in the Box franchise restaurants, 2 of which are the NBA Collateral Restaurants owned and operated by the Debtor. The remaining 27 restaurants are owned and operated by Kobra and Sierra.

21. NBA also made additional loans to Kobra and Sierra secured by an interest in seven other Jack in the Box franchise restaurants. As of the Petition Date, NBA was owed approximately $18,000,000, by the Debtor, Kobra and Sierra jointly.

22. The Debtor, and Kobra Alizadeh (my sister) and I each executed guarantees in favor of NBA with respect to obligations owing under Loans Nos. 9002 and 9003.

23. In June 2004, the Debtor entered into a series of loan agreements with Irwin: Loans nos. 007-0018405-100 through 110, each loan in the amount of $440,000, and Loan no. 18602-102 (collectively, together with related notes and security agreements, the "Irwin Loan Agreements"). Under the Irwin Loan Agreements, Irwin was granted liens encumbering all inventory and equipment, among other assets, of 12 Jack in the Box franchise restaurants, owned and operated by Sierra and Kobra.

24048 20052

24. As of the Petition Date, Irwin was owed approximately $3,700,000, by the Kobra and Sierra jointly.

25. FSM, Kobra Alizadeh and I each executed guarantees in favor of Irwin with respect to obligations owing under the Irwin Loan Agreements.

26. As of the Petition Date, the Debtor employed approximately 26 full-time salaried employees and approximately 300 hourly employees. In 2008, the Debtor realized roughly $20 million in gross revenues. In this fiscal year, the Debtor has realized approximately $10,000,000 in gross revenues.

27. The JIB Debtors have historically been profitable and independently viable, having reported net income of more than $18,500,000 in the last three reported fiscal years. However, a sizeable portion of the JIB Debtors' income has been used in recent years to subsidize operating losses in certain real estate ventures that are affiliates of the JIB Debtors. Those affiliates are now debtors in separate chapter 11 cases pending in the Sacramento Division, where a chapter 11 trustee has been appointed, and although all such uses of the JIB Debtors' income has long since ended, the prior use of funds left the JIB Debtors with insufficient cash flow and delinquencies owing to its own creditors.

28. Among other delinquencies, the JIB Debtors are in default to the California State Board of Equalization (the "BOE"), for several millions of dollars of unpaid sales taxes. As a result, on September 16, 2009, the BOE revoked the JIB Debtors' provisional licenses to operate their 70 restaurants franchises, and advised the JIB Debtors that those licenses would be reinstated only upon the commencement of chapter 11 cases. The JIB Debtors were therefore compelled to close all of their restaurants temporarily until chapter 11 petitions could be filed.

29. The JIB Debtors then filed their chapter 11 petitions as quickly as possible, on September 18, 2009, in order to avoid further substantial disruption and harm to the restaurants' operations and enterprise value.

30. In November 2005, Central entered into a loan agreement with Mechanics Bank (the "Mechanics Loan") for funds to construct a Jack in Box franchise located Oakhurst, California.

24048 20052

31.     The Mechanics Loan is collateralized by a security interest in the certain equipment located on the premises of the Oakhurst franchise. To the best of the Debtor's knowledge, Mechanics Bank does not assert any interests in the cash collateral of the JIB Debtors.

32.     Vistar Corporation and its affiliates (collectively, "Vistar") assert a lien under the Perishable Agricultural Commodities Act, or PACA, against all of the JIB Debtors' assets, including cash collateral, in the amount of $282,912.53, senior to the secured claims of NBA, CNB, Irwin and Mechanics. That priority may be disputed by other lenders, and may be disputed by the JIB Debtors as well. Vistar also asserts a greater secured claim against certain assets other than cash collateral.

33.     The Budget has been prepared on a conservative basis, including imposition of a 10% discount of expected revenues in order to account for the possibility of continued revenue losses occasioned by the JIB Debtors' recent disruptions in operations.

34.     As set forth in the Budget, the Debtor estimates that it will produce net positive cash flow from its continued operations, after full payment of all postpetition expenses, so that none of the secured claimants' collateral (taking into account replacement liens) will be diminished by such use.

35.     The Debtor's anticipated expenses proposed to be paid during those period include, among other items, the following expected costs.

36.     Normal store-level operating costs, such as payroll, supply purchases, rent and franchise fees;

    A.     Wages and benefits earned by the Debtor's employees prior to the Petition Date, to the extent coming due after the Petition Date and equal to or less than priority claims that would otherwise accrue to those employees, subject to approval by the Bankruptcy Court which will be sought by separate motion;

    B.     General and administrative expenses incurred by the Debtor in the ordinary course of business; and

    C.     Interim fees and expenses earned by the Debtor's substitute counsel, Meyers Law Group (up to $50,000.00 per month prorated among all four JIB Debtors), and the Debtor's independent restructuring officers from Focus Management Group (up to $25,000.00

24048 20052

per month prorated among all four JIB Debtors), subject to Court approval under Section 331 of the Bankruptcy Code which will be sought by separate motions.

37. At least on an interim basis, the Debtor does not propose to segregate the cash collateral that it holds by individual secured claimants. Particularly in the short term, this is not practicable or necessary, because, given the Debtor's projected positive cash flow, each of the secured claimants will hold collateral by virtue of their replacement liens that are greater than the amount of cash collateral expended by the Debtor.

38. Since the commencement of the Debtor's chapter 11 case, the Debtor has initiated cash collateral discussions with CNB, Irwin, Vistar and NBA. CNB and Irwin have fully cooperated with the Debtor and have provisionally consented to the use of their cash collateral for limited purposes within their respective restaurants, including limited cash advances to hourly employees in order to avoid personal and catastrophic losses to those employees by virtue of delay in funding of their paychecks. NBA has refused to provide similar consents, and Vistar is at present considering the Debtor's request.

39. Absent immediate authority to use cash collateral on an interim basis, the Debtor and its estate will suffer irreparable harm, in the disruption of normal operations of the Restaurants.

40. The Debtor's ability to fund it continued operations as projected in the Budget is vital to the maintenance of the Debtor's value and that of the JIB Debtors' enterprise as a whole. Without the Debtor's proposed funding, its going-concern value is likely to be substantially and irretrievably diminished, as restaurants are required to close again, losing customers, employees, suppliers and other important partners in the enterprise.

I declare under penalty of perjury that the foregoing is true and correct, and that this declaration was executed on September 21, 2009 at Roseville, California.

/s/ Abe Alizadeh
ABE ALIZADEH

7

24048 20052