FILED
September 30, 2009
CLERK, U.S. BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA
0002124509

John R. Clemency (AZ Bar No. 009646)
Todd A. Burgess (AZ Bar No. 19013)
GALLAGHER & KENNEDY, P.A.
2575 East Camelback Road
Phoenix, Arizona 85016-9225
Telephone:  (602) 530-8000
Facsimile:  (602) 530-8500
Email:  john.clemency@gknet.com
        todd.burgess@gknet.com

Attorneys for National Bank of Arizona, N.A.

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF CALIFORNIA
SACRAMENTO DIVISION

| | |
|---|---|
| In re:<br><br>FOOD SERVICE MANAGEMENT, INC.,<br><br>Debtor. | Chapter 11<br><br>Case No. 2:09-bk-40066<br><br>**OBJECTION BY NATIONAL BANK OF ARIZONA, N.A. TO DEBTOR'S MOTION FOR USE OF CASH COLLATERAL AND RESERVATION OF RIGHTS**<br><br>Hearing Date: October 2, 2009<br>Hearing Time: 10:00 a.m. |

National Bank of Arizona, N.A. ("NBA"), a secured creditor and party in interest in the above-captioned Chapter 11 case of FOOD SERVICE MANAGEMENT, INC. ("Food Service" or "Debtor") files this objection in response to the Debtor's Motion for Approval of Use of Cash Collateral on an Interim and Final Basis (the "Cash Collateral Motion"). Pursuant to the Cash Collateral Motion, the Debtor seeks to use cash and cash equivalents that constitute the cash collateral of NBA (the "NBA Cash Collateral") to pay post-petition operating and other expenses of the Debtor. Following an emergency interim hearing on the Cash Collateral Motion, NBA consented to limited use of NBA Cash Collateral until October 2, 2009, pursuant to the terms of an agreed interim order

negotiated with the Debtor and other secured creditors. However, to date, the agreed interim order has not been entered by the Court.

NBA is informed that on September 29, 2009, the United States Trustee, in accordance with the Court's September 22, 2009 *sua sponte* ruling that a Chapter 11 trustee be appointed for the Debtor, has selected Ms. Beverly McFarland (the "Trustee") of the Beverly Group to serve as Chapter 11 Trustee for the Debtor. NBA anticipates that the Trustee will seek to continue the business of the Debtor in an effort to preserve the going concern value of the Debtor's assets for the benefit of all creditors. However, because the Trustee only recently was selected, NBA and the Trustee have not had an opportunity to discuss, other than in a very cursory fashion, cash collateral and other important issues relevant to the Debtor's estate.

Accordingly, NBA files this objection to provide the Court, the Trustee, and other creditors with notice of NBA's lien interests in the case, notice of NBA's objection to any use of NBA Cash Collateral, absent appropriate adequate protection of NBA's lien interests and financial controls, and to reserve and preserve all of its rights and remedies with respect to cash collateral and other issues pending further proceedings before the Court.

In further support of this objection, NBA states as follows:

### The NBA Loans and Collateral

1. On or about August 30, 2005, Kobra Associates, Inc. ("Kobra"), as borrower, and NBA, as lender, entered into that certain Business Loan Agreement, a true and correct copy of which is attached hereto as Exhibit "A" and is incorporated herein by reference (as amended, modified or supplemented, the "2005 Kobra Loan Agreement") providing for a loan to Kobra (the "2005 Kobra Loan"), commonly referred to as "Loan No. 9002," evidenced by the issuance by Kobra to NBA of that certain Promissory Note in the original principal amount of $7,950,000.00, dated August 30, 2005, a true and

correct copy of which is attached hereto as Exhibit "B" and is incorporated herein by this reference (the "2005 Kobra Note").

2.  On or about August 17, 2006, Kobra, as borrower, and NBA, as lender, entered into that certain Business Loan Agreement, a true and correct copy of which is attached hereto as Exhibit "C" and is incorporated herein by reference (as amended, modified or supplemented, the "2006 Kobra Loan Agreement," collectively with the 2005 Kobra Loan Agreement, the "Kobra Loan Agreements") providing for a loan to Kobra (the "2006 Kobra Loan," and collectively with the 2005 Kobra Loan, the "Kobra Loans"), commonly referred to as "Loan No. 9003," evidenced by the issuance by Kobra to NBA of that certain Promissory Note in the original principal amount of $9,347,000.00, a true and correct copy of which is attached hereto as Exhibit "D" and is incorporated herein by this reference (the "2006 Kobra Note," and collectively with the 2005 Kobra Note, the "Kobra Notes").

3.  On or about June 20, 2006, Abolghassem Alizadeh and Austin F. Wallestad, collectively, as borrower, and NBA, as lender, entered into that certain Business Loan Agreement, a true and correct copy of which is attached hereto as Exhibit "E" and is incorporated herein by reference (as amended, modified or supplemented, the "Alizadeh/Wallestad Loan Agreement") providing for a loan to Abolghassem Alizadeh and Austin F. Wallestad (the "Alizadeh/Wallestad Loan"), commonly referred to as "Loan No. 9001," evidenced by the issuance by Abolghassem Alizadeh and Austin F. Wallestad, jointly and severally, to NBA of that certain Promissory Note in the original principal amount of $3,200,000.00, a true and correct copy of which is attached hereto as Exhibit "F" and is incorporated herein by this reference (the "Alizadeh/Wallestad Note").

4.  The Kobra Notes are secured by:

    a.  That certain Commercial Security Agreement dated as of November 19, 2004 by and among Food Service, as grantor, Kobra, as borrower, and NBA, as lender, which granted to NBA a security

2241990v1/56018-0007      - 3 -

interest in Equipment and Inventory located at the listed locations and personal property as more fully described therein, including but not limited to the debtors' Franchise Agreements, a true and correct copy of which is attached hereto as Exhibit "G" and is incorporated herein by this reference;

b. That certain Commercial Security Agreement dated as of August 30, 2005 by and among Kobra, as grantor, and NBA, as lender, which granted to NBA a security interest in Equipment and Inventory located at the listed locations and personal property as more fully described therein, including but not limited to the debtors' Franchise Agreements, a true and correct copy of which is attached hereto as Exhibit "H" and is incorporated herein by this reference;

c. That certain Commercial Security Agreement dated as of August 17, 2006 by and among Austin F. Wallestad and Abolghassem Alizadeh, as grantors, Kobra, as borrower, and NBA, as lender, which granted to NBA a security interest in Equipment and Inventory located at the listed locations and personal property as more fully described therein, including but not limited to the debtors' Franchise Agreements, a true and correct copy of which is attached hereto as Exhibit "I" and is incorporated herein by this reference;

d. That certain Commercial Security Agreement dated as of August 17, 2006 by and among Kobra, as grantor, and NBA, as lender, which granted to NBA a security interest in Equipment and Inventory located at the listed locations and personal property as more fully described therein, including but not limited to the debtors' Franchise Agreements, a true and correct copy of which is attached hereto as Exhibit "J" and is incorporated herein by this reference;

    e.  That certain Commercial Security Agreement dated as of August 17, 2006 by and among Food Service, as grantor, Kobra, as borrower, and NBA, as lender, which granted to NBA a security interest in Equipment and Inventory located at the listed locations and personal property as more fully described therein, including but not limited to the debtors' Franchise Agreements, a true and correct copy of which is attached hereto as Exhibit "K" and is incorporated herein by this reference.

  The commercial security agreements securing the Kobra Notes, as amended, modified, or supplemented (designated as Exhibits G through K herein), are hereinafter collectively referred to as the "Kobra Security Agreements". The Equipment, Inventory, and personal property, including but not limited to the debtors' Franchise Agreements, in which a security interest was granted by the Kobra Security Agreements is collectively referred to herein as the "Kobra Collateral."

  5.  The Alizadeh/Wallestad Note is secured by:

    a.  That certain Commercial Security Agreement dated as of June 20, 2006 by and among Austin F. Wallestad and Abolghassem Alizadeh, as grantors, and NBA, as lender, which granted to NBA a security interest in Equipment and Inventory located at the listed locations and personal property, including but not limited to the debtors' Franchise Agreements, as more fully described therein, a true and correct copy of which is attached hereto as Exhibit "L" and is incorporated herein by this reference;

    b.  That certain Commercial Security Agreement dated as of June 20, 2006 by and among Kobra, as grantor, Austin F. Wallestad and Abolghassem Alizadeh, as borrower, and NBA, as lender, which granted to NBA a security interest in Equipment and Inventory

|   |   |   |
|---|---|---|
| 1 |   | located at the listed locations and personal property, including but |
| 2 |   | not limited to the debtors' Franchise Agreements, as more fully |
| 3 |   | described therein, a true and correct copy of which is attached hereto |
| 4 |   | as Exhibit "M" and is incorporated herein by this reference; |
| 5 | c. | That certain Commercial Security Agreement dated as of June 20, |
| 6 |   | 2006 by and among Food Service, as grantor, Austin F. Wallestad |
| 7 |   | and Abolghassem Alizadeh, as borrower, and NBA, as lender, which |
| 8 |   | granted to NBA a security interest in Equipment and Inventory |
| 9 |   | located at the listed locations and personal property, including but |
| 10 |   | not limited to the debtors' Franchise Agreements, as more fully |
| 11 |   | described therein, a true and correct copy of which is attached hereto |
| 12 |   | as Exhibit "N" and is incorporated herein by this reference. |

The commercial security agreements securing the Alizadeh/Wallestad note, as amended, modified, or supplemented (designated as Exhibits L through N herein) are hereinafter collectively referred to as the "Alizadeh/Wallestad Security Agreements". The Equipment, Inventory, and personal property, including but not limited to the debtors' Franchise Agreements, in which a security interest was granted by the Alizadeh/Wallestad Security Agreements is collectively referred to herein as the "Alizadeh/Wallestad Collateral" (collectively with the Kobra Collateral, the "Collateral").

6. NBA perfected its security interest in and to the Collateral by filing with the California Secretary of State's office:

  a. That certain UCC-1 Financing Statement on September 23, 2005, at file no. 05-7043048394, a true and correct copy of which is attached hereto as Exhibit "O" and is incorporated herein by this reference;

        b.     That certain UCC-1 Financing Statement on September 7, 2006, at file no. 06-7084284079, a true and correct copy of which is attached hereto as Exhibit "P" and is incorporated herein by this reference;

        c.     That certain UCC-1 Financing Statement on December 13, 2004, at file no. 04-7008928402, a true and correct copy of which is attached hereto as Exhibit "Q" and is incorporated herein by this reference;

        d.     That certain UCC-1 Financing Statement on July 17, 2006, at file no. 06-7078450209, a true and correct copy of which is attached hereto as Exhibit "R" and is incorporated herein by this reference.

The aforementioned UCC-1 financing statements are hereinafter collectively referred to as the "Financing Statements".

    7.     On or about August 17, 2006, Food Service executed that certain Commercial Guaranty in favor of NBA agreeing, among other things, to absolutely and unconditionally guarantee payment of Guarantor's Share, as defined in the Commercial Guaranty, of all outstanding sums due under the Kobra Notes (as amended, modified or supplemented, the "Food Service Guaranty"), a true and correct copy of which is attached hereto as Exhibit "S" and is incorporated herein by this reference. Among other things, the Food Service Guaranty provides that Food Service's guaranty is one of payment and not of collection.

    8.     On or about August 17, 2006, Abolghassem Alizadeh executed that certain Commercial Guaranty in favor of NBA agreeing, among other things, to absolutely and unconditionally guarantee payment of Guarantor's Share, as defined in the Commercial Guaranty, of all outstanding sums due under the Kobra Notes (as amended, modified or supplemented, the "Abolghassem Guaranty"), a true and correct copy of which is attached hereto as Exhibit "T" and is incorporated herein by this reference. Among other things, the Abolghassem Guaranty provides that it is a guaranty of payment and not of collection.

9. On or about August 17, 2006, Kobra Alizadeh (collectively with Food Service and Abolghassem Alizadeh, "Guarantors") executed that certain Commercial Guaranty in favor of NBA agreeing, among other things, to absolutely and unconditionally guarantee payment of Guarantor's Share, as defined in the Commercial Guaranty, of all outstanding sums due under the Kobra Notes (as amended, modified or supplemented, the "Kobra Alizadeh Guaranty," collectively with the Food Service Guaranty and Abolghassem Guaranty, the "Kobra Guaranties"), a true and correct copy of which is attached hereto as Exhibit "U" and and incorporated herein by this reference. Among other things, the Kobra Alizadeh Guaranty provides that it is a guaranty of payment and not of collection.

10. NBA also required Abolghassem Alizadeh's spouse, Shari Kranig, to execute (i) that certain Acknowledgement/Disclaimer of Spouse's Sole and Separate Property executed November 17, 2004; (ii) that certain Acknowledgement/Disclaimer of Spouse's Sole and Separate Property executed August 30, 2005; (iii) that certain Acknowledgement/Disclaimer of Spouse's Sole and Separate Property executed August 4, 2006 (collectively, the "Spousal Disclaimer"), in which Shari Kranig stated her understanding that the list of property attached to the Spousal Disclaimer was the sole and separate property of Abolghassem Alizadeh's and disclaimed and released any interest she may have had in said property. A true and correct copy of the Spousal Disclaimer, including the attached list of Abolghassem Alizadeh's separate property, is attached hereto as Exhibit "V" and is incorporated herein by reference.

11. Collectively, without limitation, the Kobra Loan Agreement, Kobra Notes, Kobra Security Agreements, Kobra Guaranties, Spousal Disclaimer, and Financing Statements are sometime referred to hereinafter as the "Kobra Loan Documents."

12. Collectively, without limitation, the Alizadeh/Wallestad Loan Agreement, Alizadeh/Wallestad Note, Alizadeh/Wallestad Security Agreements, Spousal Disclaimer,

and Financing Statements are sometime referred to hereinafter as the "Alizadeh/Wallestad Loan Documents."

### Defaults Under Kobra Loan Agreements

13. On October 23, 2008, NBA declared an Event of Default under the Kobra Loan Agreements. Among other things, Kobra failed to make required payments of principal and interest due under the Kobra Notes.

14. In the Kobra Default Letters, NBA made demand upon Kobra to pay on or before October 30, 2008 all outstanding amounts due and owing under the Kobra Notes. The defaults declared were not cured, and Kobra remains in default of its obligations under the Kobra Loan Agreement.

15. On November 7, 2008, NBA sent a Notice of Intent to Exercise Remedies letter to Kobra (the "Kobra Notice of Intent to Exercise Remedies Letters"), the borrower under the Kobra Notes, for each of the Kobra Notes informing Kobra that NBA intended to exercise its remedies, including, but not limited to, "the right to file an action against Borrower to collect all amounts due and owing under the Loan Documents and to seek appointment of a receiver." NBA has elected to declare the entire principal balance and all accrued and unpaid interests under the Kobra Notes to be immediately due and payable.

16. NBA also delivered a copy of the Kobra Default Letters and Kobra Notice of Intent to Exercise Remedies Letters to the Guarantors and to the Franchisor under the secured Franchise Agreements.

17. No payment has been made by Kobra or the Guarantors and the outstanding indebtedness under the Kobra Loans remains due and owing.

### Defaults Under Alizadeh/Wallestad Loan Agreement

18. On October 23, 2008, NBA declared an Event of Default under the Alizadeh/Wallestad Loan Agreement. Among other things, Abolghassem Alizadeh and

Austin F. Wallestad failed to make required payments of principal and interest due under the Alizadeh/Wallestad Note.

19. In the Alizadeh/Wallestad Default Letter, NBA made demand upon Abolghassem Alizadeh and Austin F. Wallestad to pay on or before October 30, 2008 all outstanding amounts due and owing under the Alizadeh/Wallestad Note. The defaults declared were not cured, and Abolghassem Alizadeh and Austin F. Wallestad remain in default of their obligations under the Alizadeh/Wallestad Loan Agreement.

20. On November 7, 2008, NBA sent a Notice of Intent to Exercise Remedies to Abolghassem Alizadeh and Austin F. Wallestad (the "Alizadeh/Wallestad Intent to Exercise Remedies Letter"), the borrowers under the Alizadeh/Wallestad Note, informing Abolghassem Alizadeh and Austin F. Wallestad that NBA intended to exercise its remedies, including, but not limited to, "the right to file an action against Borrower to collect all amounts due and owing under the Loan Documents and to seek appointment of a receiver." NBA has elected to declare the entire principal balance and all accrued and unpaid interests under the Alizadeh/Wallestad Note to be immediately due and payable. Notice of such default(s) and election was also provided to the Franchisor under the secured Franchise Agreements.

21. No payment has been made by Abolghassem Alizadeh and Austin F. Wallestad and the outstanding indebtedness under the Alizadeh/Wallestad Loan remains due and owing.

**Other Default Events**

22. The Alizadeh/Wallestad Loan Agreement and each of the Kobra Loan Agreements affirmatively obligated the Borrowers to, *inter alia*:

    a. Maintain its books and records including its records concerning the Collateral at the business address identified in the Loan Agreement;

    b. Promptly inform Lender in writing of all material adverse changes in Borrower's financial condition;

c.  Promptly inform Lender in writing of all existing and threatened litigation, claims, investigations, administrative proceedings or similar actions affecting Borrower or any Guarantor which could materially affect the financial condition of Borrower or the financial condition of any Guarantor;

d.  Permit Lender to examine and audit Borrower's books and records at all reasonable times;

e.  Furnish Lender with such financial statements and other related information at such frequencies and in such detail as Lender may reasonably request;

f.  Furnish such additional information and statements as Lender may request from time to time;

g.  Use all loan proceeds solely for Borrower's business operations, unless specifically consented to the contrary by Lender in writing;

h.  Pay and discharge when due all of its indebtedness and obligations, including without limitation, all assessments, taxes, governmental charges, levies and liens, of every kind and nature, imposed on Borrower or its properties, income, or profits, prior to the date on which penalties would attach, and all lawful claims that if unpaid, might become a lien or charge upon any of Borrower's properties, income or profits;

i.  Permit employees or agents of Lender at any reasonable time to inspect any and all Collateral for the Loan or Loans and Borrower's other properties and to examine or audit Borrower's books, accounts and records and to make copies and memoranda of Borrower's books, accounts and records, whether in possession of Borrower or a third party;

| | | |
|---|---|---|
| 1 | j. | Maintain on an unconsolidated basis a minimum debt coverage ratio |
| 2 | | of at least 1.20:1.0; |
| 3 | k. | Maintain on an unconsolidated basis a maximum ratio of term debt |
| 4 | | (not subordinated) to EBITDA ratio of at least 5.50:1.0 beginning |
| 5 | | with fiscal year end 2006; and |
| 6 | l. | Provide to lender annual corporate and personal financial statements, |
| 7 | | tax returns and related documents. |

23. NBA is informed and believes and thereon alleges that the Debtors have breached the Alizadeh/Wallestad Loan Agreement and Kobra Loan Agreements as follows, *inter alia*:

    a. Debtors moved their principal place of business without notifying NBA. NBA recently discovered that the business address identified in the Loan Documents as the business address (2251 Douglas Blvd., Suite 120, Roseville, CA) is completely vacant;

    b. There have been material adverse changes in Borrower's financial condition, and Borrowers have failed to notify NBA of such;

    c. Existing and threatened litigation, claims, investigations, administrative proceedings or similar actions affecting Borrower or any Guarantor exist which could materially affect the financial condition of Borrower or the financial condition of any Guarantor, and Borrowers have failed to notify NBA of such;

    d. Despite repeated requests, Debtors have failed and refused, and continue to fail and refuse, to permit NBA to examine and audit Debtors' books and records at all reasonable times;

    e. Despite repeated requests, Debtors have failed and refused, and continue to fail and refuse, to furnish NBA with such financial

statements and other related information at such frequencies and in such detail as NBA has reasonably requested;

f. Despite repeated requests, Debtors have failed and refused, and continue to fail and refuse, to furnish such additional information and statements as NBA has requested;

g. Debtors have failed to use all loan proceeds solely for Borrower's business operations, and no consent to the contrary has been given by NBA in writing;

h. Debtors have failed to pay and discharge when due all of its indebtedness and obligations, including without limitation, all assessments, taxes, governmental charges, levies and liens, of every kind and nature, imposed on Borrower or its properties, income, or profits, prior to the date on which penalties would attach, and all lawful claims that if unpaid, might become a lien or charge upon any of Borrower's properties, income or profits;

i. Despite repeated requests, Debtors have failed to permit employees or agents of Lender at any reasonable time to inspect any and all Collateral for the Loan or Loans and Borrower's other properties and to examine or audit Borrower's books, accounts and records and to make copies and memoranda of Borrower's books, accounts and records, whether in possession of Borrower or a third party;

j. Debtors have failed to maintain on an unconsolidated basis a minimum debt coverage ratio of at least 1.20:1.0, with respect to the Kobra Loan Agreements;

k. Because Debtors have failed and refused, and continue to fail and refuse, to furnish NBA with its balance sheets at such frequencies and in such detail as NBA has reasonably requested, NBA is unable

to determine whether Debtors have maintained on an unconsolidated basis, a maximum ratio of term debt (not subordinated) to EBITDA ratio of at least 5.50:1.0 beginning with fiscal year end 2006; and

l. Despite repeated requests, Debtors have failed to provide to lender annual corporate and personal financial statements, tax returns and related documents.

24. NBA is informed and believes, and on that basis alleges, that Debtors Kobra, Abolghassem Alizadeh, and Austin Wallestad made an unauthorized transfer of property, which is part of the Collateral, to Sierra Valley Restaurants, Inc., sometime after August 11, 2006. Sierra Valley Restaurants therefore possesses an unauthorized ownership interest in the Collateral.

25. Debtors have failed and continue to fail to cure any and all outstanding defaults under the Kobra Loan Documents and Alizadeh/Wallestad Loan Documents.

26. NBA is informed and believes, and on that basis alleges, since their default, Debtors have and continue to use Collateral for purposes other than making the payments required under the Kobra Loan Documents and Alizadeh/Wallestad Loan Documents.

27. NBA is informed and believes, and on this basis alleges, that Debtors are using funds for purposes other than debt service and the ongoing operation of the business.

28. As of September 21, 2009, the outstanding balance on the 2005 Kobra Loan totaled $6,964,842.08 plus accruing interest, late fees, attorneys' fees, costs and other charges recoverable under the 2005 Kobra Loan Documents, which includes $6,047,657.94 of unpaid principal, $810,585.27 of accrued, unpaid interest, and $106,598.87 of accrued, unpaid late fees. Interest continues to accrue from and after September 21, 2009 at a per diem rate of $3,023.82.

29. As of September 21, 2009, the outstanding balance of the 2006 Kobra Loan totaled $9,357,415.19 plus accruing interest, late fees, attorneys' fees, costs, and other

charges recoverable under the 2006 Kobra Loan Documents, which includes $8,079,794.56 of unpaid principal, $1,131,248.53 of accrued, unpaid interest, and $146,372.10 of accrued, unpaid interest. Interest continues to accrue from and after September 21, 2009 at a per diem rate of $4,039.89.

30. As of September 20, 2009, the outstanding balance of the Alizadeh/Wallestad Loan totaled $3,154,644.09 plus accruing interest, late fees, attorneys' fees, costs, and other charges recoverable under the Alizadeh/Wallestad Loan Documents, which includes $2,729,780.85 of unpaid principal, $372,766.58 of accrued, unpaid interest, and $52,096.66 of accrued, unpaid late fees. Interest continues to accrue from and after September 20, 2009 at a per diem rate of $1,364.89.

## Objection and Reservation of Right

31. NBA previously agreed to limited use of NBA Cash Collateral, requested on an emergency basis by the Debtors, to allow the Debtor's Jack In The Box restaurants to remain open and continue operating through the October 2, 2009 continued hearing regarding use of cash collateral, subject to certain terms and conditions reflected in a form of Interim Cash Collateral Order negotiated between the Debtor, NBA, other secured creditors, and PACA claimants. The form of Interim Cash Collateral Order has not yet been entered by the Court, and it is unknown whether or not the Debtor lodged the order.

32. Provided that a Chapter 11 trustee is appointed immediately, in accordance with the Court's prior ruling, and takes control of all cash and all business operations of the Debtors immediately, NBA would agree to continued limited use of NBA Cash Collateral for a period of up to 30 days under the same terms and conditions agreed to by NBA in the previously negotiated Interim Cash Collateral Order, pending a further continued hearing, provided that: (i) NBA is provided with an accounting of the actual amount of cash used by the Debtor from the Petition Date through October 2, 2009; (ii) the Debtor's amended cash collateral budget is further vetted to the satisfaction of NBA

2241990v1/56018-0007

- 15 -

to eliminate all proposed expenditures that are not directly related to the actual operation of the Jack In The Box restaurants, i.e., food, supplies, utilities, wages, insurance, etc.; (iii) daily cash reports for each of the stores subject to NBA's liens are provided to NBA on a daily basis going forward; and (iv) cash for each of the Debtor's stores is accounted for and segregated on a store-by-store basis.

33. NBA reserves all of its rights, remedies, claims, and defenses with respect to all matters. Nothing contained herein should be deemed to prejudice, impair, waive, modify, estop or otherwise affect any rights, contentions, or remedies of NBA, including, but not limited to, the right to seek: (i) relief from the automatic stay under 11 U.S.C. § 362; (ii) relief in the event that Debtor(s) use cash collateral contrary to the express provisions of the Interim Cash Collateral Order; (iii) dismissal or conversion of this case under 11 U.S.C. § 1112; or (iv) any other relief available under the Bankruptcy Code.

34. The statements contained herein shall not constitute an admission that NBA's interests in the NBA Cash Collateral are being adequately protected. NBA reserves the right to seek other or further adequate protection and to object to the use of cash collateral in the future. Nothing contained herein shall constitute a waiver or modification of the terms of the Kobra Loan Documents or the Alizadeh/Wallestad Loan Documents.

RESPECTFULLY SUBMITTED this 30th day of September, 2009.

GALLAGHER & KENNEDY, P.A.

By /s/ Todd A. Burgess
John R. Clemency
Todd A. Burgess
2575 East Camelback Road
Phoenix, Arizona 85016-9225

Attorneys for National Bank of Arizona, N.A.

| | |
|---|---|
| 1 | Copy of the foregoing electronically filed this 30th day of September, 2009 and served via ECF Electronic Notification on all Parties that have entered an appearance in the Debtor's bankruptcy case. |
| 2 | |
| 3 | |
| 4 | |
| 5 | |
| 6 | |
| 7 | |
| 8 | |
| 9 | |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |
| 26 | |