FILED
September 30, 2009
CLERK, U.S. BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA

0002124850

Alan G. Tippie (CA Bar No. 89587)
  atippie@sulmeyerlaw.com
Elissa D. Miller (CA Bar No. 120029)
  emiller@sulmeyerlaw.com
**SulmeyerKupetz**
A Professional Corporation
333 South Hope Street, Thirty-Fifth Floor
Los Angeles, California 90071-1406
Telephone: 213.626.2311
Facsimile: 213.629.4520

Attorneys for City National Bank

## UNITED STATES BANKRUPTCY COURT

## EASTERN DISTRICT OF CALIFORNIA, SACRAMENTO DIVISION

In re

FOOD SERVICE MANAGEMENT, INC.,

Debtor.

Case No. 2:09-bk-40066 CK

Chapter 11

**CONDITIONAL OBJECTION OF CITY NATIONAL BANK TO MOTION FOR APPROVAL OF USE OF CASH COLLATERAL**

DATE: October 2, 2009
TIME: 10:00 a.m.
PLACE: Courtroom No. 35
  501 "I" Street, Sixth Floor
  Sacramento, CA 95814

**COMES NOW** City National Bank, a national banking association ("CNB"), and submits its conditional objection to the Motion for Approval of Use of Cash Collateral (the "Motion") filed by the Debtor Central Valley Food Services, Inc. ("CVFS"), and the Motion for Approval of Use of Cash Collateral (the "Motion") filed by the Debtor Food Service Management, Inc. ("FSM")(collectively, CVFS and FSM shall be referred to as the "Debtors" and in some instances, the "Borrowers"), and in support thereof represents as follows:

/ / /

/ / /

[AGT\BANKR\529836.2]

A. On September 18, 2009 (the "Petition Date"), CVFS and FSM each filed a voluntary petition for relief under chapter 11 of title 11, United States Code ("Bankruptcy Code"), as referenced above, commencing the within cases (each such case shall hereinafter be referred to as the "Case").

B. CVFS owns and operates restaurants under a franchise agreement with Jack in the Box, Inc. ("JIB"). FSM also owns and operates restaurants under a franchise agreement with JIB. Abolghassem Alizadeh (also known as Abe Alizadeh), is a principal of the Borrowers and Guarantor ("Alizadeh").

C. Borrowers entered into that certain Loan and Security Agreement with CNB dated as of June 15, 2005 (the "Loan Agreement" or "Loan"). In connection therewith, and concurrent with the execution of the Loan, Borrowers executed a term note in the amount of Fifteen Million Dollars ($15,000,000) in favor of CNB (the "Note"), in which Borrowers jointly and severally agreed to pay to CNB all such sums of principal and interest due and owing under the Note.

D. Concurrent with, and as a condition of, the Loan, CNB received a guaranty from Alizadeh that guaranteed payment of amounts owing under the Loan and the Note, pursuant to a General Continuing Guaranty executed June 15, 2005 (hereinafter, the "Guaranty").

E. As a condition of the Loan, Borrowers granted CNB security interests in, and CNB filed valid UCC-1 Financing Statements with the California Secretary of State relating to personal property of Borrowers as described in the Loan Agreement (collectively, the "Personal Property"). Financing Statements were also recorded in the offices of the County Recorders in which the individual stores are located. CNB was also granted a security interest in certain real property leasehold interests and fixtures owned by FSM (collectively, the "Leaseholds"). Such pledge of real property leasehold interests was reflected in eleven (11) leasehold real estate deeds of trust (the "Leasehold Deeds of Trust") that were timely and properly recorded in the offices of the County Recorders in which each of the real property leasehold interests was and is located.

F.  Collectively, the Personal Property and the Leaseholds represent 30 restaurants at various locations in the State of California, which restaurants are operated by Borrowers under franchise agreements with JIB (the "Lender Restaurants" or the "Collateral"). In accordance with the terms of the Loan, the funds advanced by CNB to Borrowers were to be used exclusively to refinance certain indebtedness then owed by Borrowers to GE Franchise Capital, to replace obsolete and worn-out equipment at any of the 30 restaurants then in existence, to purchase equipment for, and develop future restaurant operations owned by, Borrowers, to pay trade debt for the 30 restaurants due and owing as of February, 2008, and to develop or remodel Jack in the Box restaurants in which CNB was granted a security interest (the "Lender Restaurants"). Austin F. Wallestad, an individual ("Wallestad"), Kobra Alizadeh, an individual ("Kobra"), Kobra Associates, Inc., a California corporation and an affiliate co-owned by Guarantor ("Kobra Associates"), Borrowers and Sierra Valley Restaurants, Inc., a California corporation ("SV Restaurants") (collectively, "Lessee and Franchisee") collectively own and operate 71 Jack In The Box restaurants, of which CNB has a first-priority perfected security interest in, among other things, the 30 Lender Restaurants, including, without limitation, the assets comprised thereof.

G.  At the request of Borrowers, CNB and Borrowers (1) executed an "Amendment No. 1 to Loan Documents" dated as of December 29, 2005 ("Amendment No. 1"), and an Amended and Restated Term Note ("Amended Note 1"), whereby CNB agreed to increase the maximum amount of the Term Loan Line of Credit to $16,800,000, (2) executed an "Amendment No. 2 to Loan Documents" dated as of May 2, 2007, ("Amendment No. 2"), whereby CNB agreed to amend, among other things, the terms of the prior Agreement, as amended, that required Borrowers to provide CPA-reviewed year end financial statements to CNB, and (3) executed an "Amendment No. 3 to Loan Documents" dated as of February 1, 2008 ("Amendment No. 3"), and a Second Amended and Restated Term Note in the principal amount of $20,500,000 dated as of February 1, 2008 ("Amended Note 2"), whereby CNB agreed to make additional Term Loans of up to

$7,263,033 in total. At that time, the then outstanding principal balance of advances made to Borrowers by CNB in the aggregate was $12,786,967, thus increasing the total available under the Term Loan Line of Credit to $20,500,000.

H. From and after November 1, 2008, Borrowers defaulted on the Loan by, among other things, failing to pay principal and interest payments when due, and failing to submit financial information and other information reasonably requested by CNB and which Borrowers were obligated to provide, pursuant to the terms of the Loan Documents (as defined below).

I. On November 12, 2008, CNB gave written notice of default to Borrowers that included, among other things, notice of failure to provide required financial information, notice of failure to pay taxes, and notice of failure to pay principal and interest when due. One month later, on December 12, 2008, CNB issued to Borrowers a second written notice of default and demanded that Borrowers cure such defaults. CNB also notified Borrowers that as a result of Borrowers' defaults, CNB would invoke the Default Rate (as defined in the Loan Documents). On December 26, 2008, CNB gave the third written notice of default to Borrowers and to Guarantor, which notice included, without limitation, demanding payment of all amounts outstanding to CNB and canceling the LIBOR interest rate option.

J. Despite CNB's demands, neither Borrowers nor Guarantor cured the defaults under the Loan Documents or paid the amounts owing to CNB. By reason thereof, interest at the Default Rate, in an amount equal to the Prime Rate plus 5.5% per annum, has been accruing under the Note, as amended, since December 18, 2008, and CNB has accelerated the balance due and declared all amounts due and owing under the Loan Documents.

K. Subsequent to the written notices of default as described above, and as of January 13, 2009, CNB was notified by JIB that Borrowers failed to make full payment of royalties, marketing fees and rents due, totaling $1,128,292.37 as of such date. JIB now contends that the unpaid balance owing as of September 8, 2009 by FSM is

$1,432,477.22 and by CVFS is $226,493.23. Pursuant to the Loan Documents, Borrowers are to remain at all times in compliance with the JIB franchise agreements that relate to the Lender Restaurants. The Debtor, on the one hand, and JIB, on the other hand, entered into that certain Forbearance Agreement dated as of January 13, 2009 (the "Original JIB Forbearance Agreement"), which was amended by that certain Amendment to and Ratification of Forbearance Agreement dated February 12, 2009 (the "JIB 1st Forbearance Amendment") and that certain Second Amendment to and Ratification of Forbearance Agreement dated March 13, 2009 (the "JIB 2nd Forbearance Amendment"). The Original JIB Forbearance Agreement, as modified by the JIB 1st Forbearance Amendment, the JIB 2nd Forbearance Amendment, and any and all further modifications, amendments, restatements, are collectively referred to herein as the "JIB Forbearance Agreement".

L.  In January, 2009, Guarantor also informed CNB that he and the entities he controls, including Borrowers, owe significant amounts in sales tax for the 71 Jack in the Box restaurants under the Guarantor's control, which includes the Lender Restaurants, and that as a result thereof, Lessee and Franchisee, which includes, without limitation, Borrowers, have failed to maintain valid sellers' permits issued by the California State Board of Equalization ("SBE") to engage in the food service business in California. The failure to pay sales tax, and the results therefrom, are also breaches of the Loan Documents.

M.  In August, 2009, Borrowers and Guarantor advised CNB that Borrowers entered into an understanding with SBE in connection with approximately $4,746,000 in obligations representing sales taxes plus interest and penalties owed by Borrowers, Kobra Associates and Sierra Valley Restaurants, Inc. ("SVRI") as of such date, pursuant to which (1) Borrowers, Kobra Associates and/or SVRI agreed to make payments of $225,000 per week, of which $55,000 shall be applied to past outstanding balances and $170,000 shall be applied to current period sales tax obligations, as well as such other amounts as agreed to by Borrowers and SBE from time to time (the amounts of which

shall be subject to the Budget (as defined below)), (2) SBE agreed that it will not take any enforcement action with respect to Borrowers and/or Guarantor (the "Original SBE Forbearance Letter"); and (3) Borrowers shall have their sellers' permits from the SBE promptly reinstated. Due to the failure of Borrowers to make payment in accordance with such Forbearance Letter, the SBE terminated the sellers' permits of Borrowers resulting in the commencement of these Cases. Subsequent to commencement of the Cases, the Debtors report that new permits were issued to the then debtors in possession.

N. Prior to the commencement of the Cases, Borrowers and Guarantor requested that CNB forebear from enforcing defaults under the Loan Documents. As a result, Borrowers and Guarantor, on the one hand, and CNB, on the other hand, entered into that certain Forbearance Agreement dated as of March 31, 2009 (the "Forbearance Agreement"), pursuant to which CNB agreed to forbear from exercising its rights and remedies under the Loan Documents and/or pursuant to applicable law until the earlier to occur of an event of default (as defined thereunder) or August 31, 2009 (the "Forbearance Maturity Date"). That forbearance agreement expired by its own terms on August 31.

O. At the time of commencement of the Cases, the parties were negotiating an amendment to that Forbearance Agreement but, prior to the execution thereof, the Debtors commenced the within Cases.

P. As of the petition date, the amount owing under the Loan Agreement to CNB is not less than $16,375,806.07 of principal, plus accrued and unpaid interest and late charges to which CNB is entitled under the Loan Documents, and as yet to be determined attorneys' fees and costs incurred in connection with enforcement of the defaults under the Loan Documents.

Q. All income, issues, profits, and proceeds generated from the Collateral (the Lender Restaurants) represent the cash collateral of CNB, and CNB has demanded sequestration of such income, issues, profits, proceeds and any other income derived from its Collateral, as well as an accounting from the Debtor of its usage or escrowing of

any funds, proceeds or income of its Collateral.

R. For the first three days of the Case, Debtor used the Cash Collateral of CNB with consent given by CNB for limited purposes. Thereafter, and on Tuesday, September 22, a hearing was held on the Motion to authorize the further use of Cash Collateral, which resulted in the order that was entered by the Court on September 30, 2009 ("Cash Collateral Order"). At the September 22 hearing, the Court set a further hearing on the Motion for October 2, 2009. At the same time, the Court on its own motion ordered the appointment of a chapter 11 trustee for the Cases. The person selected by the Office of the United States Trustee to preside over these Cases is Beverly McFarland of the Beverly Group. CNB is willing to give its consent to the continued use of such Cash Collateral, subject to the terms and conditions described below.

**NOW THEREFORE**, CNB wishes to work with the trustee to negotiate a stipulation for the use of Cash Collateral that allows the businesses to operate so long as the position of CNB is not adversely impacted and there is no diminishment in the value of its collateral.

1. <u>Budget Expenses and Payments</u>. In that regard, CNB requires that any order approving the use of cash collateral provide for the payment of the following items:

   a. Food and supply purchases necessary for the operations of the Lender Restaurants;

   b. Post petition payroll and payroll taxes;

   c. Post petition rent;

   d. Post petition franchise fees;

   e. The balance to be paid to CNB towards satisfaction of its secured claim.

2. <u>Protections</u>. In addition to the protections afforded in the current Cash Collateral Order, CNB requests the following additional protections:

a. **Findings.** The Bankruptcy Court must find that all of the Debtor's obligations and indebtedness owing to CNB, including, but not limited to, all loans or advances made to the Debtor pursuant to the Loan Documents, have been extended by CNB in good faith, are valid, enforceable and secured by a valid, continuing, perfected, unavoidable, enforceable, first priority security interest in the Collateral.

b. **No Liens Priming the Pre-Petition or Post Petition Liens.** Debtor and Trustee must waive the right to prime either the Pre-petition or Post-Petition Liens of CNB under section 364(d)(1) of the Bankruptcy Code.

c. **Liens Senior to Certain Other Liens.** The Post-Petition Liens shall not be subject to, made *pari passu* with, or subordinated to (i) any lien or security interest that is avoided and preserved for the benefit of the Debtor and its estate under section 551 of the Bankruptcy Code, (ii) any other lien or security interest pursuant to section 364(c) or (d) of the Bankruptcy Code or otherwise, or (iii) except for tax or other liens entitled to priority by statute ("Permitted Priority Liens"), any other liens arising after the Petition Date, including any liens or security interests granted in favor of any federal, state, municipal, or other governmental unit, commission, board, or court for any liability of the Debtor.

d. **Prohibition of Use of Cash Collateral.** No Cash Collateral or Post-Petition Collateral may be used (i) to object, contest, or raise any defenses to, the validity, perfection, priority, extent, or enforceability of any amount due or lien created under the Loan Documents, or the liens or claims granted in the Cash Collateral Order, (ii) to assert any action for preferences, fraudulent conveyances, other avoidance power claims or any other any claims, counterclaims, or causes of action, objections, contests, or defenses against CNB, or its respective agents, affiliates, representatives, attorneys or advisors, in respect of the Loan Documents, (iii) to prevent, hinder or otherwise delay CNB's assertion, enforcement, or realization on the Cash Collateral or the Post-Petition Collateral in accordance with the Cash Collateral Order, (iv) to seek to modify any of the rights granted to the CNB under the Cash Collateral Order or under the Loan Documents,

(v) to pay any monies, compensation or otherwise to insiders of the Debtor; or (vi) to pay any amount on account of any claims arising prior to the Petition Date, unless such payments on account of such pre-petition claims are approved by Court order or are consistent with the Budget.

  e. **Limitation on Charging Expenses Against Collateral**. No expenses of administration of the Case or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under any chapter of the Bankruptcy Code, shall be charged against or recovered from the Collateral pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law.

  f. **Preservation of Rights**. Anything to the contrary contained in the Cash Collateral Order, it shall constitute an "Event of Default" under this Cash Collateral Order and a termination of the right to use Cash Collateral if (1) the Trustee fails in any way to perform the terms and conditions of the Cash Collateral Order, (2) there is a further default in the terms and conditions of the Loan Documents, (3) if the Trustee seeks, or if there is entered, (i) any modifications or extensions of the Cash Collateral Order without the prior written consent of CNB in its sole discretion, and no such consent shall be implied by any other action, inaction or acquiescence by CNB, (ii) an order dismissing the Case, (iii) any plan of reorganization not supported by CNB, or (iv) any motion involving the sale of substantially all of the Debtor's assets that does not provide for the full payment of all claims of CNB, (4) if the Trustee is in default under the terms of a separate order for use of cash collateral in the CVFS case (the "CVFS Order"), or (5) the Case is converted to Chapter 7 under the Bankruptcy Code.

  g. **Dismissal of Case**. If an order dismissing the Case under section 1112 of the Bankruptcy Code or otherwise is at any time entered, such order shall provide that (x) the Section 507(b) Claim, security interests, and replacement security interests granted to CNB pursuant to the Cash Collateral Order shall continue in full force and effect and shall maintain their priorities as provided in the Cash Collateral Order until the CNB claims have been paid and satisfied in full (and that such Section 507(b) Claim,

security interests, and replacement security interests shall, notwithstanding such dismissal, remain binding on all parties in interest) and (y) subject to the provisions of section 350 of the Bankruptcy Code, the Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the claims, liens, and security interests or replacement security interests referred to in (x) above. Termination shall be effective immediately upon the occurrence of any of the above specified Events of Default without prior notice or an opportunity to cure.

        h.      **Survival.** Except as expressly provided in the Cash Collateral Order, the Post-Petition Liens, the Section 507(b) Claim and all other rights and remedies of CNB granted by the provisions of the Cash Collateral Order shall survive, and shall not be modified, impaired or discharged by the entry of an order converting the Case to a case under chapter 7, dismissing the Case, or by any other act or omission, nor shall the Post-Petition Liens, or any of the other rights and remedies of CNB granted by the provisions of the Cash Collateral Order be modified, impaired or discharged by the entry of an order confirming a plan of reorganization in the Case. The terms and provisions of the Cash Collateral Order shall continue to have full force and effect in the Case, in any successor case, or in any superseding chapter 7 case under the Bankruptcy Code, and the Post-Petition Liens, and all other rights and remedies of CNB granted by the provisions of the Cash Collateral Order shall continue in full force and effect until the CNB claims have been paid and satisfied in full.

        Notwithstanding the foregoing, CNB reserves its right to approve the budget that the Trustee proposes to utilize as a basis for the use of Cash collateral.

DATED: September 30, 2009      **Sulmeyer**Kupetz
                                                 A Professional Corporation

                                                 By: /s/ Alan G. Tippie
                                                     Alan G. Tippie
                                                     Attorneys for City National Bank

| In re: | CHAPTER 11 |
|---|---|
| FOOD SERVICE MANAGEMENT, INC., Debtor. | CASE NUMBER: 2:09-bk-40066 CK |

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is: 333 South Hope Street, Thirty-Fifth Floor, Los Angeles, California 90071-1406.

A true and correct copy of the foregoing document described as **"CONDITIONAL OBJECTION OF CITY NATIONAL BANK TO MOTION FOR APPROVAL OF USE OF CASH COLLATERAL"** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d), and **(b)** in the manner indicated below:

**I. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** - Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On _____, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the e-mail address indicated below:

☐ Service Information continued on attached page.

**II. SERVED BY U.S. MAIL OR OVERNIGHT MAIL (indicate method for each person or entity served):** On September 30, 2009, I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follow. *Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.*

The Honorable Christopher M. Klein
U.S. Bankruptcy Court
501 "I" Street, Sixth Floor
Sacramento, CA 95814

☐ Service Information continued on attached page.

**III. SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL (indicate method for each person or entity served):** Pursuant to F.R.Civ.P.5 and/or controlling LBR, on September 30, 2009, I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method ) by facsimile transmission and/or email as follows. *Listing the judge here constitutes a declaration that personal delivery on the judge will be completed no later than 24 hours after the document is filed.*

- Antonia.Darling@usdoj.gov
- alice@capcitylaw.com
- BAB@JMBM.com
- beverlygroup@att.net
- Bill.Hoffman@trigild.com
- dfitzgerald@ffwplaw.com
- dginter@downeybrand.com
- dkirkman@wkblaw.com
- hausermouzes@sbcglobal.net
- James.Wong@GT.com
- jdavidson@avantadvisory.com
- john.clemency@gknet.com
- John_Wells@mechbank.com
- jstang@pszjlaw.com
- Judy.C.Hotze@usdoj.gov
- Larry.Brammer@boe.ca.gov
- MALEVINSON@Orrick.com
- matthew@capcitylaw.com
- michael.tucker@fticonsulting.com
- mjustice@trainorfairbrook.com
- MMeyers@mlg-pc.com
- mthompson@mlg-pc.com
- myang@wkblaw.com
- phillip.rudolph@jackinthebox.com
- rbk@jmbm.com
- R.Riiska@focusmg.com
- sheaton@downeybrand.com
- svictor@dsi.biz
- tarostegui@trainorfairbrook.com
- Teresa.B.Field@usdoj.gov

---

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

January 2009
[KFOX\FORMS\529849.1]

F 9013-3.1

| In re: | CHAPTER 11 |
|---|---|
| FOOD SERVICE MANAGEMENT, INC., Debtor. | CASE NUMBER: 2:09-bk-40066 CK |

☐ Service Information continued on attached page.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| September 30, 2009 | Kathleen Fox | *[signature]* |
|---|---|---|
| Date | Type Name | Signature |

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

January 2009
[KFOX\FORMS\529849.1]

F 9013-3.1