FILED

December 30, 2009

CLERK, U.S. BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA

0002317296

**32**

WINSTON & STRAWN LLP
Richard A. Lapping (SBN: 107496)
rlapping@winston.com
David A. Honig (SBN: 160721)
dhonig@winston.com
Marcus Colabianchi (SBN: 208698)
mcolabianchi@winston.com
101 California Street
San Francisco, CA 94111-5802
Telephone:     (415) 591-1000
Facsimile:     (415) 591-1400

Attorneys for Chapter 11 Trustee
BEVERLY N. MCFARLAND

# UNITED STATES BANKRUPTCY COURT

## EASTERN DISTRICT OF CALIFORNIA, SACRAMENTO DIVISION

| | |
|---|---|
| In re: | **Case No. 09-40066** |
| FOOD SERVICE MANAGEMENT, INC. et al.,[1] | Chapter 11 |
| Debtors. | **(Jointly Administered with Case Nos. 09-40068, 09-40212, and 09-40214)** |
| ☐ Affects Food Service Management, Inc. | DC No.  WS-14 |
| ☐ Affects Kobra Associates, Inc. | |
| ☐ Affects Sierra Valley Restaurants, Inc. | Date:     January 14, 2010 |
| ☐ Affects Central Valley Food Services, Inc. | Time:     10:00 a.m. |
| ☒ Affects All Debtors | Dept.:    C |

**TRUSTEE'S MOTION FOR APPROVAL OF BIDDING PROCEDURES AND FORMS OF NOTICE IN CONNECTION WITH GOING-CONCERN SALE OF SUBSTANTIALLY ALL OPERATING ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS PURSUANT TO 11 U.S.C. § 363, AND RELATED ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS PURSUANT TO 11 U.S.C. § 365**

---

[1] The Debtors in these proceedings are:  Food Service Management, Inc., Kobra Associates, Inc., Sierra Valley Restaurants, Inc., and Central Valley Food Services, Inc.

LA:259441

# TABLE OF CONTENTS

| | | Page |
|---|---|---|
| I. | JURISDICTION | 2 |
| II. | BACKGROUND | 2 |
| | A. The JIB Debtors' Bankruptcy Filing | 2 |
| | B. The JIB Debtors' Business | 2 |
| | C. National Franchise Sale, Inc.'s Retention And Sales Process | 3 |
| III. | RELIEF REQUESTED | 4 |
| | A. Bidding Procedures | 5 |
| | B. Stalking Horse Bidder Protections | 20 |
| | C. Notice of Sale Hearing, Auction, Bidding Procedures, and Objection Dates | 21 |
| | D. Cure Amount Notices and Related Procedures | 22 |
| IV. | DISCUSSION | 24 |
| | A. The Bidding Procedures (Including the Stalking Horse Bidder Protections) Are Fair, Reasonable, and in the Best Interests of the JIB Debtors' Estates | 24 |
| | B. The Sale Will Be Free of Liens Pursuant to Bankruptcy Code § 363(f) | 25 |
| | C. The Trustee Should Be Authorized to Offer Stalking Horse Bidder Protections to Induce Qualified Bidders to Make Qualified Bids for the Assets | 26 |
| V. | NOTICE | 27 |

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

i

LA:259441

# TABLE OF AUTHORITIES

Page(s)

**CASES**

Calpine Corp v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.),
   181 F.3d 527 (3d Cir. 1999) ...................................................................................27

In re 995 Fifth Ave. Assocs., L.P.,
   96 B.R. 24 (Bankr. S.D.N.Y. 1989)........................................................................26

In re America West Airlines, Inc.,
   166 B.R. 908 (Bankr. D. Ariz. 1994) ......................................................................26

In re APP Plus, Inc.,
   223 B.R. 870 (Bankr. E.D.N.Y. 1998) ....................................................................27

In re Bethlehem Steel Corp.,
   2003 U.S. Dist. LEXIS 12909 (S.D.N.Y. 2003)......................................................27

In re Hupp Indus.,
   140 B.R. 191 (Bankr. N.D. Ohio 1992) ...................................................................26

In re Johns-Manville Corp.,
   60 B.R. 612 (Bankr. S.D.N.Y. 1986).......................................................................24

In re Quintex Entertainment, Inc.,
   950 F.2d 1492 (9th Cir. 1991) .................................................................................24

In re S.N.A. Nut Company,
   186 B.R. 98 (Bankr. N.D. Ill. 1995) ........................................................................24

Official Committee of Subordinated Bondholders v. Integrated Resources, Inc. (In re
   Integrated Resources, Inc.),
   147 B.R. 650 (S.D.N.Y. 1992) ...........................................................................24, 26

Summit Land Co. v. Allen (In re Summit Land Co.),
   13 B.R. 310 (Bankr. D. Utah 1981) .........................................................................24

**STATUTES**

11 U.S.C. §§ 101 *et seq.* .............................................................................................1

11 U.S.C. § 105(a) ....................................................................................................1, 2

11 U.S.C. § 363 ...................................................................................................1, 2, 27

11 U.S.C. § 363(b) .....................................................................................................24

11 U.S.C. § 363(f) .................................................................................................25, 26

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

ii

LA:259441

11 U.S.C. § 363(k) ...................................................................................9, 12, 19

11 U.S.C. § 365 ........................................................................................1, 2

11 U.S.C. § 365(k) ........................................................................................24

11 U.S.C. § 1109 ...........................................................................................11

28 U.S.C. § 157 ..............................................................................................2

28 U.S.C. § 157(b)(2) ......................................................................................2

28 U.S.C. § 1334 .............................................................................................2

28 U.S.C. § 1408 .............................................................................................2

28 U.S.C. § 1409 .............................................................................................2

Fed. R. Bankr. P. 2002 .................................................................................1, 2

Fed. R. Bankr. P. 2002(l) ...............................................................................21

Fed. R. Bankr. P. 6004 ...........................................................................1, 2, 24

Fed R. Bankr. P. 6004(f)(1) ............................................................................24

Fed. R. Bankr. P. 6006 ...............................................................................1, 2

**OTHER AUTHORITIES**

3 Collier on Bankruptcy § 363.03[7] (15th ed. 2002) .............................25, 27

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

LA:259441

Beverly N. McFarland, in her capacity as Chapter 11 Trustee (the "Trustee") for Food Service Management, Inc. ("FSM"), Sierra Valley Restaurants, Inc. ("Sierra"), Central Valley Food Services, Inc. ("Central"), and Kobra Associates, Inc. ("Kobra," and together with FSM, Sierra, and Central, the "JIB Debtors"), submits this motion (the "Motion") for an order under sections 105(a), 363, and 365 of the Bankruptcy Code,[1] and Rules 2002, 6004, and 6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"):

(a) approving bidding procedures (the "Bidding Procedures") in connection with the going-concern sale(s), free and clear of liens, claims, encumbrances, and interests (collectively, the "Sale"),[2] of substantially all of the JIB Debtors' operating assets, including the 70 Jack in the Box restaurants owned and operated by the JIB Debtors, and the Assigned Contracts (defined below) (collectively, the "Assets"), including authorizing and scheduling an overbid auction (the "Auction") in connection with the Sale;

(b) approving procedures pursuant to which the JIB Debtors may become obligated, in connection with the Trustee's entry into asset purchase agreement(s) with one or more third parties prior to the Auction, to pay a break-up fee to such third party and to provide other customary "stalking horse" overbid protections (collectively, the "Stalking Horse Bidder Protections"), in each case in accordance with the terms and conditions of such asset purchase agreement(s);

(c) approving procedures to determine, and the form and manner of notice with respect to, the amounts to be paid and actions to be taken to cure defaults, if any, under the executory contracts and unexpired leases to be assumed by the applicable JIB Debtors and assigned to the purchaser(s) of such JIB Debtors' assets (collectively, the "Assigned Contracts") in connection with the Sale;

(d) approving the form and manner of notices of the proposed Sale, the Bidding Procedures, the Auction, and the Sale Hearing; and

(e) scheduling a hearing to consider approval of the Sale (the "Sale Hearing").

In support of this Motion, the Trustee relies on the Declaration of Beverly McFarland

---

[1] 11 U.S.C. §§ 101 et seq.
[2] There may, and will likely be more than a single Sale of the Assets. The Trustee reserves the right to conduct additional Sales consistent with the procedures ordered by the Court.

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

LA:259441

("McFarland Declaration") filed concurrently herewith and on such other and further evidence as may be filed and served prior to, or presented during the hearing on, the Motion. In further support of this Motion, the Trustee respectfully represents as follows:

## I.

## JURISDICTION

1. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory predicates for the relief requested herein are sections 105(a), 363, and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, and 6006.

## II.

## BACKGROUND

**A.    The JIB Debtors' Bankruptcy Filing**

2. On September 18, 2009 (the "Petition Date"), each of the JIB Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

3. On September 30, 2009, the Court entered an order approving the acting United States Trustee's appointment of the Trustee in each of the JIB Debtors' chapter 11 cases (the "Cases"). On October 2, 2009, the Trustee's appointment became effective upon delivering the requisite bonds to the Office of the United States Trustee ("UST").

4. On or about December 7, 2009, the UST formed the Official Committee of Unsecured Creditors in these Cases (the "Committee").

**B.    The JIB Debtors' Business**

5. The JIB Debtors own 70 Jack in the Box stores (collectively, "JIB Stores") throughout Central and Northern California, which they operate under franchise agreements with Jack in the Box, Inc. ("JIB Corporate"). With over 1,850 employees, the JIB Debtors operate the JIB Stores through multiple real property leases, franchise agreements with JIB Corporate, and food, equipment, repair, service, and supply contracts and other relationships with vendors and lenders. The JIB Debtors' business is a complex, cash-intensive operating business, with an average of approximately $7 million in cash receipts per month.

2

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

## C. National Franchise Sale, Inc.'s Retention And Sales Process

6. On or about October 26, 2009, the Trustee retained National Franchise Sales, Inc. ("NFS") as her financial and M&A advisor who performed very well on a similar sale for this Trustee on a large Taco Bell franchise bankruptcy case in the Northern District of California. NFS has become the industry leader in franchise business brokerage by successfully assisting franchisees and franchisors in the acquisition and sales of their businesses, since 1978. NFS has facilitated numerous transactions ranging from the sale of a single-unit franchise to multi-unit sales involving over 100 units. Additionally, NFS assists in the asset recovery of non- or under-performing franchise businesses in bankruptcy, receivership, foreclosure, or default. Since being retained in the Cases, NFS has been actively engaged in identifying and contacting potential purchasers, organizing the Sale process, assisting potential bidders in the conduct of due diligence, and conducting other activities designed to maximize the value of the Assets. On November 20, 2009, the Court entered an order approving the Trustee's retention of NFS effective as of October 26, 2009.

7. Since its retention by the Trustee, NFS has reviewed certain information and documents related to the proposed Sale of the Assets, has provided advice regarding the Bidding Procedures, and has begun the process of marketing the Assets for sale.

8. As disclosed in the NFS's employment application, NFS will charge the greater of:

(a) A commission of $15,000.00 per JIB Store sold in the Sale; or

(b) A payment of 5% of the aggregate consideration to be paid in the Sale.

9. The Trustee shall also reimburse NFS for its reasonable and documented out-of-pocket expenses incurred in connection with the services provided to the Trustee.

10. NFS has requested payment of its advisory fees upon the later of (a) the consummation of the Sale and (b) entry of a final order of this Court approving the payment of such compensation to NFS.

11. The proposed Bidding Procedures have been developed with the objective of promoting active bidding that will result in the highest and best offer that the marketplace can sustain for the Assets, with consideration to current economic conditions.

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

LA:259441

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

12.     In addition, it is the Trustee's opinion and considered business judgment that there is an urgent need to commence the sale process as soon as possible so that the Sale can be completed by the end of March, 2010.  Two major components of the Assets are the real property leases and the franchise agreements.  The real property leases must be assumed by April 16, 2010 (subject to this Court granting the Trustee's motion to extend the deadline to that date) and the franchisor, which is the lessor of 51 of the sites, has advised that it will not consent to any further extension of the statutory deadline.  The franchise agreements all have fixed expiration dates and there is no assurance that the franchisor will consent to a new or renewed franchise as the agreements expire.  Thus, the value of the franchise agreements potentially diminishes with any delay.

13.     Notwithstanding the filing of the Motion, the Trustee remains open to consideration of a timely filed feasible plan of reorganization in lieu of a sale.  However, based on analysis by the Trustee of the JIB Stores and the JIB Debtors that own them and analysis by the Trustee's professionals, a plan does not appear to be feasible, and no such plan has been proposed by any party as of the date of this Motion.

### III.

### RELIEF REQUESTED

14.     By this Motion, the Trustee respectfully requests entry of an order (a) approving the Bidding Procedures in connection with the Sale of substantially all of the Assets, free and clear of liens, claims, interests and encumbrances – either in a single transaction or multiple sale transactions (including authorizing and scheduling the Auction in connection with the Sale); (b) approving the procedures pursuant to which the Trustee may seek authority from this Court to become obligated, in connection with the Trustee entering into an asset purchase agreement with a third party prior to the Auction, with respect to the Stalking Horse Bidder Protections, in each case in accordance with the terms and conditions of such asset purchase agreement; (c) approving the form and manner of notices of the proposed Sale, the Bidding Procedures, the Auction and the Sale Hearing; (d) approving the procedures to determine and the form and manner of notice with respect to, the amounts to be paid and actions to be taken to cure defaults, if any, under the Assigned

LA:259441

Contracts in connection with the Sale, and (e) scheduling the Sale Hearing and related deadlines for filing a sale motion and objections thereto.

**A.     Bidding Procedures**

15.     The Trustee desires and is making substantial effort to receive the greatest value arising from the Sale. The Trustee believes it imperative that she promptly move forward with approval and implementation of the Bidding Procedures. The Bidding Procedures were developed to promote active bidding that will result in the highest and best offer the marketplace can sustain for the Assets. Moreover, the Bidding Procedures reflect the Trustee's objective of conducting an Auction in a controlled, yet fair and open environment that fosters interest in the Assets by bidders who are the most financially qualified, motivated, and likely to close a transaction.

16.     Accordingly, the Trustee proposes the following Bidding Procedures to govern the Sale of the Assets:

(i)     <u>Sale Process</u>. NFS will continue assisting the Trustee in identifying and contacting potential purchasers, organizing the sale process, assisting potential bidders in the conduct of due diligence, and conducting other activities designed to maximize the value of the Assets.

(ii)     <u>Bidding Process</u>. The Trustee shall, in the exercise of her business judgment, with the assistance of NFS and after consultation with the entities that provided the JIB Debtors' prepetition senior secured credit facilities (collectively, the "<u>Secured Lenders</u>") and the Committee:

(a)     determine the remaining steps to be completed (including the timing in respect of such steps) for the marketing and Sale of the Assets;

(b)     determine whether any person is a Qualified Bidder (as defined below);

(c)     determine whether a Qualified Bidder has made a Qualified Bid (as defined below); and

(d)     negotiate any offer set forth in a Qualified Bid (collectively, the "<u>Bidding Process</u>").

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

5

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

(iii)  <u>Confidentiality; Qualified Bidders</u>.  Before participating in the Bidding Process, each interested party (a "<u>Potential Bidder</u>") must deliver to the Trustee or her designee an executed confidentiality agreement (the "<u>Confidentiality Agreement</u>") in form and substance satisfactory to the Trustee.  Upon its delivery of the requisite documents and information, and upon establishing Demonstrated Ability – all as described below – such bidder shall become a "<u>Qualified Bidder</u>".

(iv)  <u>Qualified Bid</u>.  A letter of intent received from a Qualified Bidder will constitute a "<u>Qualified Bid</u>" only if such letter of intent:

(a)  is supported by all of the Qualified Bid Documents delivered on or before the Bid Deadline (each as defined below);

(b)  meets all of the Qualified Bid Requirements (as defined below); and

(c)  is accompanied by the Qualifying Deposit (as defined below).

(v)  <u>Qualified Bid Documents and Bid Deadline</u>.  In order to participate in the Bidding Process, each Qualified Bidder must deliver the following documents (collectively, the "<u>Qualifying Bid Documents</u>") to NFS by no later than 12:00 noon (PST), on January 28, 2009 (the "<u>Bid Deadline</u>")[3]:

(a)  a written offer in the form described below, stating that: (I) such Qualified Bidder offers to purchase all, substantially all, or some portion of the Assets upon the terms and conditions set forth in a proposed asset purchase agreement ("<u>APA</u>"), marked to show all proposed revisions to the form APA designated by the Trustee; and (II) such Qualified Bidder's offer is irrevocable and shall remain open until the closing of a Sale pursuant to a Qualified Bid;

(b)  if the written offer provides for the purchase of more than one JIB Store, the written offer must specify the price offered for each JIB Store;

---

[3] The Trustee may extend the Bid Deadline once or successively but is not obligated to do so.  If the Trustee extends the Bid Deadline, she shall promptly provide notice of the extension to all parties that have shown interest in submitting a bid in accordance with the terms described herein.

LA:259441

(c) subject to the preceding paragraph, in the event the written offer provides for the purchase of any fee (ownership) interest in real property owned by parties other than the JIB Debtors ("Third-Party Real Property"), the offer must separately state (1) the price offered for the Assets and (2) the price offered for such Third-Party Real Property;

(d) (I) the most current signed and dated audited and latest unaudited financial statements (the "Financial Information") of such Qualified Bidder, or (II) if the Qualified Bidder is an entity formed for the purpose of purchasing the subject Assets then: (x) the Financial Information of the equity holder(s) of the Qualified Bidder, or such other form of financial disclosure as may be required by and is acceptable to the Trustee; and (y) the written commitment of such equity holder(s) to be responsible for the Qualified Bidder's obligations in connection with the purchase of the subject Assets, or (III) such other documents and information acceptable to the Trustee which evidences the Qualified Bidder's ability to consummate the purchase transaction contemplated in its offer, including adequate assurance of future performance under the Assigned Contracts;

(e) copies of recent statements of bank accounts, CDs, stock accounts, or lines or letters of credit showing proof of adequate liquidity;

(f) evidence of the Qualified Bidder's ability to consummate the transaction, either in the form of existing capitalization, a commitment for financing that is subject to no conditions or contingencies other than the entry of the Bankruptcy Court's order approving and authorizing the Trustee's sale to the Qualified Bidder, or as otherwise required by the Trustee in her sole discretion;

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

7

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

(g)     a written statement that such bidder is not, and will not be, a person or entity with whom the Trustee is restricted from doing business under the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, H.R. 3162, Public Law 107-56 (commonly known as the "USA Patriot Act") and Executive Order Number 13224 on Terrorism Financing, effective September 24, 2001, and regulations promulgated pursuant thereto (collectively, "Anti-Terrorism Laws"), including, without limitation, persons and entities named on the Office of Foreign Asset Control Specially Designated Nationals and Blocked Persons List. Additionally, all sources of cash will be fully disclosed to Trustee prior to the close of escrow, including any and all funds provided by a foreign national individual or entity of another country other than the United States of America;

(h)     a signed and completed Jack in the Box Franchise Application, Authorization & Release form, and such other application materials as may be requested by JIB Corporate, along with a resume of business and professional experience of the proposed franchisee, operator, equity holder(s) and officers of the Qualified Bidder;

(i)     written disclosure of any connections, agreements, or understandings between such Qualified Bidder and (i) the Trustee, (ii) the JIB Debtors or their respective affiliates and insiders, or (iii) JIB Corporate; and

(j)     a statement that the Qualified Bidder's offer is irrevocable until twenty-four hours after any closing or consummation of the sale of the Assets included in the Bid to any party;

(k)     a statement regarding the proposed closing date of the transaction; and

(l)     any other documents as the Trustee or NFS may reasonably request.

8

(vi) <u>Qualified Bid Requirements</u>. In addition, a bid may be considered a Qualified Bid only if it satisfies the following requirements (collectively, the "<u>Qualified Bid Requirements</u>"):

(a) such bid must demonstrate to the Trustee, in her sole discretion, that any necessary financing can be obtained within acceptable time constraints;

(b) such bid must contemplate closing the Sale by not later than March 18, 2009 (subject to the Court's entry of an order on or prior to that date approving the Bidding Procedures);

(c) such bid may not be subject to confirmatory due diligence by the Qualified Bidder;

(d) such bid must state the legal name of the Qualified Bidder and a corresponding tax identification number;

(e) such bid must set forth and allocate the proposed consideration to be provided in exchange for any current assets of the JIB Debtors (including, without limitation, inventory, accounts receivable, prepaid expenses and deposits) that such bidder seeks to acquire;

(f) absent consent of the Trustee, the Secured Lenders, and the Committee, the consideration payable under such bid (other than the assumption of liabilities) shall be all cash; and

(g) if such bid (other than a credit bid pursuant to Section 363(k) of the Bankruptcy Code) is on terms different than the Stalking Horse Purchase Agreement (as defined below), the bidder shall submit to the Trustee (I) a detailed description of the differences, and (II) a proposed form of asset purchase agreement marked to show the differences between its proposed asset purchase agreement and the Stalking Horse Purchase Agreement.

(vii) <u>Demonstrated Ability</u>. Once a Potential Bidder submits the Qualifying Bid Documents and satisfies the Qualified Bid Requirements, the Trustee shall determine whether the

9

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

Potential Bidder is a "<u>Qualified Bidder</u>." To make such a determination, the Trustee may share the Qualifying Bid Documents and other information and materials submitted by the Potential Bidder with the affected creditors, JIB Corporate, and other interested parties in these Cases, subject to appropriate confidentiality agreements. A Potential Bidder may qualify as a Qualified Bidder only if the Potential Bidder demonstrates its ability to consummate the transactions contemplated under the terms of the Qualified Bid and demonstrates adequate assurance of future performance under all leases and other contracts to be assumed by the Potential Bidder in connection with the Sale contemplated thereby. The Trustee may decline to recognize a Potential Bidder as a Qualified Bidder if the Trustee determines that the Potential Bidder lacks the ability to timely consummate the purchase of some or all of the Assets sought to be acquired by the Potential Bidder.

(viii)     The Trustee may take into account several subjective factors in determining, in her sole discretion, who will be a Qualified Bidder. The Trustee may approve as many or as few Qualified Bidders as she deems appropriate for an active and productive sale process. The Trustee may also take into account the requirements or concerns of the Bankruptcy Court, JIB Corporate, the Committee, the Secured Lenders, and other parties in interest.

By way of example and not limitation, the Trustee will require that, in order to be deemed a Qualified Bidder, (i) the Potential Bidder shall have the ability to pay all cash, in the form of a certified cashier's check or wire transfer, for the offer made, and (ii) if the Potential Bidder intends to obtain acquisition and/or working capital financing to fund the proposed transaction, then the Potential Bidder shall demonstrate to the Trustee that all such financing can be obtained within the time allotted in the APA and the Bidding Procedures for consummating the transaction.

(ix)     Additionally, among other considerations solely within the discretion of the Trustee, a Potential Bidder must meet the following requirements to be considered a Qualified Bidder seeking to acquire Jack in the Box Franchise or License Agreement(s):

(a)     A minimum net worth of $1,500,000, of which at least $750,000 is liquid as a general guideline. For a small transaction there may be some flexibility, while for larger transactions the requirements will

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

10

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

likely be much greater to be commensurate with the proposed transaction;

    (b)    No more than 8 individual shareholders per buying entity;

    (c)    None of the individuals involved in the acquisition may have ownership of competing brands, either in the United States or abroad, including all burger concepts & similar competitors; and

    (d)    The Potential Bidder, or an operating partner with an equity interest in the acquiring partnership or entity, must have substantial fast food restaurant management experience.

    (x)    Within five (5) business days after the Potential Bidder delivers the Qualifying Bid Materials, the Trustee shall notify the Potential Bidder in writing whether the Potential Bidder is a Qualified Bidder or whether the Trustee has declined to recognize a Potential Bidder as a Qualified Bidder.

    (xi)    <u>Additional Bidder Qualifying Material by the Trustee; Qualification Disputes</u>. The Trustee and her financial and legal advisors (collectively, "<u>Advisors</u>") shall be entitled to review personal information and Financial Information (collectively, "<u>Qualifying Materials</u>") from each Potential Bidder. Notwithstanding any other provision herein, failure by a Potential Bidder to comply with and provide satisfactory responses to reasonable requests for Qualifying Materials shall be a basis for the Trustee to determine that a bid made by such potential bidder is not a Qualified Bid.

    Any party in interest (as described in Section 1109 of the Bankruptcy Code), other than a bidder, shall have standing to challenge any Potential Bidder's compliance with the Qualified Bidder and Qualified Bid requirements, and may move the Bankruptcy Court for an order waiving any such requirements if such waiver is in the best interest of the bankruptcy estates. No bidder shall have standing to challenge another prospective bidder's compliance with such qualification requirements or raise arguments concerning the relative value or certainty of a competing bid. Any dispute regarding a prospective bidder's compliance with the qualification requirements shall be resolved by the Bankruptcy Court at or prior to the auction.

LA:259441

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

(xii)  <u>Qualifying Deposits</u>.  Except for any credit bidder under section 363(k) of the Bankruptcy Code, all Qualified Bidders (including, without limitation, any Stalking Horse Bidder) must, in order to become a Qualified Bidder, no later than the Bid Deadline, remit a certified or cashier's check or wire transfer in the amount of $10,000.00 per JIB Store to be acquired (the "<u>Qualifying Deposit</u>") payable to the order of the Trustee or her designee (collectively, the "<u>Escrow Agent</u>") (provided, that the Trustee may require that the Qualifying Deposit be increased with respect to any proposed acquisition of Third-Party Real Property) to be placed in an escrow account (the "<u>Escrow Account</u>") pending closing of the Sale.

(xiii)  <u>Negotiation of Stalking Horse Purchase Agreement</u>.  At any time after all Qualified Bids have been received, the Trustee may enter into (a) one or more asset purchase agreements (each, a "<u>Stalking Horse Purchase Agreement</u>") with a Qualified Bidder or Bidders (each, a "<u>Stalking Horse Bidder</u>") with respect to all, substantially all or some portion of the Assets (a "<u>Stalking Horse Bid</u>").  Any and all Stalking Horse Purchase Agreements shall be subject to the approval of the Bankruptcy Court except that any Break-Up Fee and other Stalking Horse Bidder Protections (defined below) agreed to by the Trustee that conform with these Bidding Procedures shall be binding without further Bankruptcy Court approval.  Any Qualified Bidder seeking to be selected as a Stalking Horse Bidder must submit a bid that complies with the requirements for a Qualified Bid.

Within 24 hours after the Trustee identifies the Qualified Bidder as the Stalking Horse Bidder, she shall notify such Qualified Bidder(s) of her decision.  Within two (2) business days of such notice, each such Stalking Horse Bidder shall increase its Qualifying Deposit to an amount equal to $20,000 per JIB Store to be acquired, paid to the order of the Escrow Agent (provided, that the Trustee may require that the Qualified Bidder further increase its deposit with respect to any proposed acquisition of Third-Party Real Property) (collectively with the Qualifying Deposit, the "<u>Good Faith Deposit</u>").

Failure by a Qualified Bidder to provide the increased deposit as required above shall result in forfeiture of the Qualifying Deposit.

A Qualified Bidder that has been selected by the Trustee and has the increased Good Faith Deposit, as described above will become the "Stalking Horse Bidder," and its Bid will become the "Stalking Horse Bid," with respect to the Assets addressed by such Stalking Horse Bid. The Stalking Horse Bidder will be entitled to be paid a $2,500 break-up fee (per JIB Store) if another bidder's competing bid is accepted at the Auction for such Assets described in the Stalking Horse Purchase Agreement. The break-up fee will only be paid to a Stalking Horse Bidder at the time of the closing of the Sale to the successful overbidder with respect to the Assets included in the Stalking Horse Bid. The effectiveness of any asset purchase agreement and each term thereof, other than the payment of any break-up fee(s) in accordance with the Stalking Horse Bidder Protections, is subject to the Bankruptcy Court's approval.

Promptly upon execution of any Stalking Horse Purchase Agreement, the Trustee shall file a copy of such Stalking Horse Purchase Agreement and a motion to approve the Sale with the Court with service thereof on the parties set forth in Paragraph 44 of this Motion. The Trustee shall seek expedited approval from the Court of any bidder protections granted in the Stalking Horse Purchase Agreement that do not conform to the Stalking Horse Bidder Protections. The Trustee hereby requests that the Court schedule a hearing to consider approval of the Sale at the earliest date and time convenient for the Court.

(xiv)    Auction Process. The Stalking Horse Bid shall be subject to the Trustee's right to accept a superior bid made at the Auction, subject to subject to Bankruptcy Court approval and applicable Stalking Horse Bidder Protections. To the extent the Trustee receives one or more Qualified Bids in addition to the Stalking Horse Bid, the Trustee will, unless otherwise ordered by the Court, conduct an Auction with respect to the subject Assets. Such Auction will commence on a date to be determined in consultation with the Secured Lenders and the Committee and at a location to be determined by the Trustee. The time and place of the Auction shall be provided in writing to all Qualified Bidders. The Auction will be held in person; provided, however, that the Trustee reserves the right, in her sole discretion, to allow telephonic and/or video conference participation by certain bidders.

Except as otherwise ordered by the Bankruptcy Court or approved by the

13

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

Trustee in her sole discretion, only Qualified Bidders, representatives of JIB Corporate, the Secured Lenders, the Committee, counterparties to Assigned Contracts to be transferred to the purchaser in connection with the proposed sale, and other persons whose attendance is expressly requested by the Trustee and her Advisors, will be entitled to attend, participate and be heard at the Auction.

The Trustee may, in her sole discretion, elect not to hold an Auction if no Qualified Bid is received by the Bid Deadline.

(xv)    <u>Auction Overbid Protections</u>.  The Trustee anticipates that the Stalking Horse Purchase Agreement will provide that the initial overbid of the Stalking Horse Bid (the "<u>Initial Overbid</u>") will be in an amount that is greater than or equal to the sum of --

(a)    the aggregate amount of (A) the purchase price set forth in the Stalking Horse Purchase Agreement, (B) the Break-up Fee (as defined below), and (C) and $25,000.00 (the "<u>Initial Overbid Increment</u>"); <u>plus</u>

(b)    the value to the JIB Debtors of the assumption of any assumed liabilities; <u>plus</u>

(c)    all other consideration to the JIB Debtors under the Stalking Horse Purchase Agreement; <u>minus</u>

(d)    all other obligations to be satisfied by the JIB Debtors under the Stalking Horse Purchase Agreement

(collectively, the "<u>Stalking Horse Bidder Protections</u>").  Thereafter, each subsequent overbid (the "<u>Subsequent Overbids</u>" and, collectively with the Initial Overbid, each an "<u>Overbid</u>") shall be in increments of not less than the Overbid Increment (as defined below).

(xvi)    <u>Bidding Increments</u>.  Subject to the additional requirements for the Initial Overbid set forth above, each subsequent Overbid will be made in increments (the "<u>Overbid Increment</u>") of not less than $10,000 higher than the immediately preceding bid.  Each Overbid shall be, in the business judgment of the Trustee, on substantially the same or better terms and conditions, taken as a whole, as those set forth in the Stalking Horse Bid, calculated on the basis of total consideration to the JIB Debtors pursuant to such Overbid.

14

LA:259441

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

(xvii)   <u>Further Requirements</u>.  Any Qualified Bidder may elect to submit one or more bids at the Auction, <u>provided</u> that such bid satisfies the following requirements:

(a)     the bid must be on substantially the same or better terms and conditions as those set forth in the applicable Stalking Horse Purchase Agreement;

(b)     the bid must not include provisions for a break-up fee, or other provisions similar to the Stalking Horse Bidder Protections; and

(c)     the bid must otherwise satisfy the requirements of a Qualified Bid.

The incremental value of any Overbid(s) submitted by the Stalking Horse Bidder shall be "cash only" and shall not be deemed to include any credit with respect to the amount of the Break-up Fee.  No person, including, without limitation, any Stalking Horse Bidder, may object to any bid on the grounds that after deduction of the Break-up Fee, such bid is not the highest and best bid.

(xviii)   <u>Auction Procedures</u>.  At the Auction, Qualified Bidders shall have the right to (i) submit further bid(s) on the conditions described above, along with a markup against the Stalking Horse Purchase Agreement, provided they participate in each round of bidding (i.e., in order to make further bids, the Qualified Bidder must participate in each round of bidding), and (ii) at any time, request that the Trustee announce, subject to any potential new bids, the then current highest or best bid and, to the extent any Qualified Bidder so requests, use reasonable efforts to clarify any and all questions the Qualified Bidder may have regarding the Trustee's announcement of the then current highest or best bid.

(xix)   <u>Selection Criteria</u>.  Upon conclusion of the Auction, the Trustee shall review the Qualified Bid(s) on the basis of, among other things, the following: (i) the amount of the Qualified Bid(s); (ii) the form of the proposed transaction (i.e. any improvement in the terms set forth in the Stalking Horse Purchase Agreement); (iii) the number, type and nature of any changes to the Stalking Horse Purchase Agreement; (iv) the extent to which such modifications are likely to delay closing of the Sale and the cost to the JIB Debtors of such modifications or delay; (v) the likelihood of the bidder's ability to close a transaction and the timing thereof; (vi) the net value

LA:259441

provided to the JIB Debtors, taking into account the Stalking Horse Bidder Protections, and such other aspects of the Qualified Bids as determined by the Trustee. The Trustee may reject any Qualified Bid that the Trustee, after consultation with the Secured Lenders and the Committee, determines to be: (A) inadequate or insufficient; (B) not in conformity with the requirements of applicable law or these Bidding Procedures; or (C) contrary to the best interest of the JIB Debtors, their estates and their creditors. The Trustee will, in her sole discretion, select the highest or otherwise best bid(s) with respect to the Assets addressed thereby (each a "Successful Bid") in the exercise of her business judgment.

(xx)    Notice to JIB Corporate. JIB Corporate has asserted that under its prepetition agreements with the JIB Debtors, JIB Corporate holds a right of first refusal (a "ROFR") that would allow JIB Corporate to match any offer for the Assets. The Trustee has not conceded the validity or enforceability of the asserted ROFR. However, immediately upon selecting the Successful Bid(s), the Trustee shall provide notice of the terms of such Successful Bid(s) to counsel to JIB Corporate by communication in open court, facsimile transmission, or email. JIB Corporate shall have a period of twenty four (24) hours from the time of such notice to match any Successful Bid on exactly the same terms upon which such Successful Bid was made. To the extent JIB Corporate fails to match a Successful Bid within this period, JIB Corporate shall be deemed to have forever waived and relinquished any ROFR on the Assets to which such Successful Bid relates. To the extent JIB Corporate matches a Successful Bid, it shall be subject to the requirements and obligations of Successful Bidders (as defined below) set forth below, and its matching bid shall be subject to Bankruptcy Court approval.

(xxi)    Designation of Successful Bidder; Additional Deposits. Within two (2) business days of being declared the maker of a Successful Bid (the "Successful Bidder"), the Successful Bidder shall increase its Qualifying Deposit or Good Faith Deposit, as the case may be, to an amount equal to (a) the greater of five percent (5%) of the aggregate purchase price proposed in its Successful Bid, or (b) $25,000.00 per JIB Store to be acquired, paid to the order of the Escrow Agent (provided, that the Trustee may require that the Successful Bidder further increase its deposit

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

16

with respect to any proposed acquisition of Third-Party Real Property (collectively with the Qualifying Deposit and the Good Faith Deposit, if any, the "Successful Bidder Deposit").

///

Failure by a Successful Bidder to provide the increased Successful Bidder Deposit as required above shall result in forfeiture of all previous Qualifying and Good Faith Deposits.

Upon receipt of a Successful Bidder Deposit, the Trustee shall present the subject Successful Bid to the Bankruptcy Court for approval at the Sale Hearing, which is expected to be held approximately twenty-one (21) calendar days after receipt of such Successful Bidder Deposit.

The Closing of the transactions contemplated by the final asset purchase agreement shall occur no later than ten (10) calendar days after Bankruptcy Court approval, unless extended in writing by the Trustee.

(xxii) Return of Qualifying and Good Faith Deposits. All Qualifying and Good Faith Deposits described above shall be retained by the Trustee, and all Qualified Bids will remain open, notwithstanding the Bankruptcy Court's approval of a sale pursuant to the terms of a final asset purchase agreement to a Successful Bidder, until two (2) business days after the closing of the transaction to the Successful Bidder, but in any event not later than thirty (30) calendar days after the Sale Hearing without the consent of the relevant Qualified Bidder(s). However, the Trustee will return all Qualifying and Good Faith Deposits within eight (8) business days after the Auction if the Trustee, in her sole discretion, determines that a Qualified Bid is not viable as a back up bid.

The Successful Bidder Deposit shall be non-refundable if the Bankruptcy Court approves the sale of Assets to the Successful Bidder pursuant to the terms of the Successful Bidder's final asset purchase agreement, regardless of whether the Successful Bidder closes the transaction. In the event the Bankruptcy Court approves the sale but the Successful Bidder fails to close the transaction, the Successful Bidder Deposit shall be non-refundable and retained by the Trustee free and clear of any claims or interests of the Successful Bidder.

LA:259441

(xxiii) <u>Backup Bids and Related Matters</u>. In the event a declared Successful Bidder fails to timely perform any of its obligations as set forth above or pursuant to the Bankruptcy Court-approved definitive agreements executed by such Successful Bidder:

///

(a) The declared Successful Bidder shall forfeit all deposits made to the Escrow Account without regard to the JIB Debtors' ultimate damages occasioned by such failure; such deposits shall be applied to the JIB Debtors' damages, if any, and shall not constitute liquidated damages; and, notwithstanding the foregoing, the Trustee, the JIB Debtors and the bankruptcy estates shall retain all other rights, remedies, claims, counterclaims, and defenses, including the right to seek equitable or injunctive relief.

(b) One or more backup bidders (including, without limitation, the Stalking Horse Bidder) (each, a "<u>Back-up Bidder</u>") with respect to any Assets shall keep its final and highest bid open pending the closing of the transaction incorporating the declared Successful Bid with respect to such Assets, and its deposit shall remain in the Escrow Account. Upon the consummation of the transaction represented by the declared Successful Bid, the deposit(s) of the Back-up Bidders shall be returned. In the event that the transaction represented by the declared Successful Bid is not consummated within ten (10) calendar days of the Closing Date (as defined in the relevant APA), the Trustee shall select a Back-up Bidder for such assets which, subject to the terms of subparagraph (c) below, shall be declared the Successful Bidder without further order of the Bankruptcy Court, and such bidder shall be required to consummate the transaction contemplated in its bid within fourteen (14) calendar days thereof. Any such replacement Successful Bidder who fails to timely perform shall forfeit all deposits

18

LA:259441

made without regard to the JIB Debtors' ultimate damages occasioned by such failure; such deposits shall be applied to the JIB Debtors' damages, if any, and shall not constitute liquidated damages; and, notwithstanding the foregoing, the Trustee, the JIB Debtors and the bankruptcy estates shall retain all other rights, remedies, claims, counterclaims, and defenses, including the right to seek equitable or injunctive relief.

(c)     The Trustee, after consultation with the Secured Lenders and the Committee, may grant any declared Successful Bidder additional time to perform and, to the extent necessary, extend the Closing Date; provided, however, that any extension beyond ten (10) calendar days shall be pursuant to an order of the Bankruptcy Court.

(xxiv)  Addition to and/or Modification of Bidding Procedures.  The Trustee shall have the right to adopt such other rules for the Bidding Process as, in the Trustee's business judgment after consultation with the Secured Lenders and the Committee, will better promote the goals of the Bidding Process and which are not inconsistent with any of the provisions of these Bidding Procedures, the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and any applicable order of the Bankruptcy Court.

(xxv)   Communications to Secured Lenders; Credit Bids.  The Secured Lenders and the Committee shall be provided with copies of all material communications between bidders and the Trustee (including professionals and other representatives of all such parties) with respect to bids on the Assets.  The Bidding Procedures shall be without prejudice to the rights of the Secured Lenders to make credit bid(s) pursuant to Section 363(k) of the Bankruptcy Code, in combination with or without a non-credit bid.  In the event that a Sale to the Secured Lenders is consummated pursuant to a credit bid, any applicable Break-Up Fee shall be payable just as with any other bidder.

(xxvi)  Cash Collateral.  Prior to the hearing on this Motion, the Trustee will undertake to obtain the consent of the Secured Lenders to the use of their cash collateral for the payment of any Break-Up Fee.

19

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

17.     The Trustee submits that implementation of the Bidding Procedures will facilitate bidding for the Assets and maximize their value for the benefit of the JIB Debtors' estates and their creditors.  At this juncture, the Trustee does not believe that approval of the Bidding Procedures will inhibit bidding on the Assets.  On the contrary, the Trustee respectfully submits that approving the Bidding Procedures is in the best interest of the JIB Debtors, their estates, and their creditors by providing a structure for all interested parties to formulate bids for the Assets and participate in the Sale process on an equal footing.  The Trustee believes that the failure to implement the Bidding Procedures in this unstable economy would jeopardize the JIB Debtors' ability to maximize the value of their assets to the detriment of the JIB Debtors' estates and creditors.

**B.     Stalking Horse Bidder Protections**

18.     In order to provide the Trustee with the flexibility to induce Qualified Bidders to expend time and resources, and to procure the benefits of securing a Stalking Horse Bid, the Trustee submits that it is necessary to grant customary limited protections for Stalking Horse Bidders in the form of the Break-Up Fee and the other Stalking Horse Bidder Protections.  The Trustee therefore requests that, in recognition of the Stalking Horse Bidders' role in supporting a transaction, and to encourage interested parties to serve as a Stalking Horse Bidder:

a.     <u>Break-Up Fee</u>.  In the event a Stalking Horse Bidder is not the Successful Bidder with respect to the Assets addressed by its Stalking Horse Bid, the Stalking Horse Bidder shall be entitled to receive from the JIB Debtors' bankruptcy estates, upon the consummation of a transaction with respect to such Assets by such other Successful Bidder, a cash payment of $2,500 per JIB Store included in such Stalking Horse Bid (the "<u>Break-Up Fee</u>"); <u>provided</u>, that no Break-Up Fee shall be payable to the Stalking Horse Bidder if it overbids an Initial Overbid, or breaches its obligations under its Stalking Horse Bid without having its performance excused under the terms thereof.

LA:259441

19.     Absent expedited Court review and approval of these core provisions of the Stalking Horse Purchase Agreement, the Trustee submits that the Sale may not result in the JIB Debtors obtaining the highest and best bid for its Assets.[4]

**C.      Notice of Sale Hearing, Auction, Bidding Procedures, and Objection Dates**

20.     At the hearing on this Motion, the Trustee will seek to set the "<u>Sale Hearing</u>" for a date to be determined after consultation with the Secured Lenders and the Committee, with an objection deadline falling one week before the Sale Hearing (the "<u>Sale and Assignment Objection Deadline</u>").

21.     Not later than three (3) court days after the entry of an Order approving the Bidding Procedures (the "<u>Bidding Procedures Order</u>"), the Trustee will cause notice of the Auction and the Sales Hearing, in a form substantially similar to the form filed contemporaneously herewith as <u>Exhibit A</u> (the "<u>Auction and Sale Notice</u>"), together with a copy of the Bidding Procedures Order, to be sent by first-class mail, postage-prepaid, to:  (a) counsel to the Committee; (b) all entities that, to the knowledge of the Trustee, claim any interest in or lien on the Assets; (c) all parties to potential Assigned Contracts (to the extent they have then been identified); (d) all governmental taxing authorities that have, or as a result of the Sale of the Assets may have, claims, contingent or otherwise, against the JIB Debtors; (e) all parties that have filed requests for notice under Bankruptcy Rules 2002 and/or 9010(b); (f) the Office of the United States Trustee; and (g) to the extent practicable, all entities that have, within the past 12 months, expressed to the JIB Debtors or the Trustee an interest in purchasing the Assets.

22.     Not later than five (5) court days after the entry of the Bidding Procedures Order, the Trustee shall cause the Auction and Sale Notice to be published, pursuant to Bankruptcy Rule 2002(l), in (a) The Sacramento Bee, (b) The Fresno Bee, and (c) The Wall Street Journal.  Such publication notice shall constitute sufficient and proper notice to any other interested parties, including those whose identities are unknown to the Trustee.

---

[4] As indicated above, promptly upon execution of any Stalking Horse Purchase Agreement, the Trustee shall file a copy of such Stalking Horse Purchase Agreement with the Court.  To the extent that any proposed Stalking Horse Bidder Protections embodied in such Stalking Horse Purchase Agreement materially differ from the Stalking Horse Bidder Protections set forth in this Motion, the Trustee shall provide interested parties with notice clearly setting forth the terms of such proposed Stalking Horse Bidder Protections, and shall seek this Court's expedited approval thereof.

21

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

LA:259441

23.     The Trustee requests that objections, if any, to the Sale of the Assets must: (i) be in writing; (ii) comply with the Bankruptcy Rules and the Local Rules; (iii) be filed with the Clerk of the Bankruptcy Court and be served so as to be received no later than the Sale and Assignment Objection Deadline on: (a) counsel to the Trustee; (b) counsel to the Committee; (c) counsel to the Secured Lenders; and (d) the Office of the United States Trustee. The failure of any person to timely file its objection shall be a bar to the assertion, at the Sale Hearing or thereafter, of any objection to the consummation of the Sale of the Assets, including the transfer of the Assets free and clear of any and all liens, claims, interests, and encumbrances (other than permitted encumbrances provided for expressly in the Stalking Horse Purchase Agreement or such other purchase agreement as may be entered into with the Successful Bidder).

24.     The Sale Hearing may be adjourned from time to time without further notice to creditors or other parties in interest other than by announcement of such adjournment before the Court or on the Court's calendar on the date scheduled for the hearing.

**D.      Cure Amount Notices and Related Procedures**

25.     To facilitate the sale, assumption, and assignment of any Assigned Contracts, the Trustee will serve, not later than three (3) days after the entry of the Bidding Procedures Order, via first class mail, a notice (the "Cure Amount Notice"), in substantially the form filed contemporaneously herewith as Exhibit B, on each non-Debtor counterparty (each a "Counterparty") to a potential Assigned Contract. If the Stalking Horse Bidder is not the Successful Bidder, and such Successful Bidder seeks to have certain Assigned Contracts assumed or assigned as part of an alternative transaction, the Trustee will provide Financial Information for the Successful Bidder to all Counterparties to such Assigned Contracts immediately following the Auction via facsimile, Federal Express, or email.

26.     The Trustee will attach to the Cure Amount Notice her calculation of the undisputed cure amount, if any, that she believes must be paid to cure all defaults, if any, under each Assigned Contract (the "Cure Costs"). If no amount or "$0" is listed on the Cure Amount Notice, the Trustee believes that there is no Cure Cost with respect to such Assigned Contract.

LA:259441

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

27.     Unless the Counterparty to an Assigned Contract, on or before the Sales and Assignment Objection Deadline, files an objection (each a "<u>Cure Amount Objection</u>") with respect to its scheduled Cure Cost, and serves such objection on: (a) counsel to the Trustee; (b) counsel to the Committee; (c) counsel to the Secured Lenders; and (d) the Office of the United States Trustee, then (i) the Trustee may assume and assign such Assigned Contract to the Stalking Horse Bidder or the Successful Bidder, as applicable, (ii) such Counterparty shall be forever barred from objecting to the Cure Cost and from asserting any additional cure or other amounts with respect to such Assigned Contract, (iii) the Trustee shall be entitled to rely solely on the Cure Cost; and (iv) such Counterparty shall be forever barred and estopped from asserting or claiming against the Trustee, the JIB Debtors, the Stalking Horse Bidder, or any other Successful Bidder or assignee of the relevant Assigned Contract, that any additional amounts are due or defaults exist under such Assigned Contract. Each Cure Amount Objection must also set forth (x) the basis for the objection, (y) the amount the Counterparty asserts as the Cure Cost and the basis therefore, with specificity, and (z) documentation in support of the Counterparty's alternative calculation of the Cure Cost.

28.     In addition, Counterparties to any Assigned Contract must file and serve on the parties identified in paragraph 27 above, on or before the Sale and Assignment Objection Deadline, any objections to the adequate assurance of future performance under the Assigned Contract (if and as assumed).

29.     Hearings on Cure Amount Objections, and on any objections to the adequate assurance of future performance under Assigned Contracts, may be held (a) at the Sale Hearing, or (b) on such other date that the Trustee determines in her sole discretion or the Court directs; <u>provided</u>, however, that if the subject Assigned Contract is assumed and assigned, the Cure Cost asserted by the objecting party (or such lower amount as may be fixed by this Court) shall be deposited and held in a segregated account by the Trustee or Trustee's Escrow Agent pending further order of this Court or mutual agreement of the Trustee, the Successful Bidder, and the objecting Counterparty.

30.     The Trustee's decision to assume and assign the Assigned Contract shall be subject to Court approval and consummation of the Sale. Absent consummation of the Sale, each of

LA:259441

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

1     the Assigned Contracts shall neither be deemed assumed nor assigned, and shall in all respects be

2     subject to further administration under the Bankruptcy Code.

3              31.      Except to the extent otherwise provided in the Stalking Horse Purchase

4     Agreement or such other purchase agreement as may be entered into with a Successful Bidder,

5     subject to any prepetition cure payments, the assignee of any Assigned Contract will not be subject

6     to any liability to the relevant Counterparty of such Assigned Contract that accrued or arose before

7     the closing date of the Sales, and the JIB Debtors shall be relieved of all liability accruing or arising

8     thereafter pursuant to section 365(k) of the Bankruptcy Code.

9

**IV.**

**DISCUSSION**

11     **A.**       **The Bidding Procedures (Including the Stalking Horse Bidder Protections) Are**

12              **Fair, Reasonable, and in the Best Interests of the JIB Debtors' Estates**

13              32.      Section 363(b) of the Bankruptcy Code and Bankruptcy Rule 6004 authorize a

14     debtor to sell assets of the estate other than in the ordinary course of business after notice and a

15     hearing. See, e.g., In re Quintex Entertainment, Inc., 950 F.2d 1492, 1495 (9th Cir. 1991). In

16     accordance with Bankruptcy Rule 6004(f)(1), sales of property outside the ordinary course of

17     business may be conducted by private sale or public auction. See Fed R. Bankr. P. 6004(f)(1).

18              33.      Moreover, once the Trustee articulates a valid business justification, "[t]he

19     business judgment rule is a presumption that in making a business decision the directors of a

20     corporation acted on an informed basis, in good faith and in the honest belief that the action was in

21     the best interests of the company." In re S.N.A. Nut Company, 186 B.R. 98 (Bankr. N.D. Ill. 1995)

22     (internal quotation, citation omitted); Official Committee of Subordinated Bondholders v. Integrated

23     Resources, Inc. (In re Integrated Resources, Inc.), 147 B.R. 650, 656 (S.D.N.Y. 1992); In re Johns-

24     Manville Corp., 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) ("a presumption of reasonableness

25     attached to a debtor's management decisions"). Indeed, when applying the "business judgment"

26     rule, courts show great deference to the trustee's decision making. See Summit Land Co. v. Allen

27     (In re Summit Land Co.), 13 B.R. 310, 315 (Bankr. D. Utah 1981). Thus, this Court should grant the

28     relief requested in this Motion if the Trustee demonstrates a sound business justification.

24

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

1    Here, the Trustee believes that her ability to select the highest and best bidder at an organized

2    auction enhances and benefits the marketing process by providing a motivation for bidders to submit

3    qualified bids with high market value.  The Bidding Procedures are designed to encourage

4    competitive bidding in an orderly manner to maximize value for the JIB Debtors' estates, their

5    creditors, customers, and employees.  The Bidding Procedures contain terms typical for a process

6    through which a Sale of this nature is consummated, and the adoption of the Bidding Procedures

7    represents a sound exercise of the Trustee's business judgment.

8         34.    The Trustee believes it is in the best interests of the JIB Debtors' estates,

9    creditors, customers, and employees to commence an auction process immediately to maintain a core

10   workforce and continuity of operations pending a sale of the JIB Debtors' businesses as a going

11   concern, calculated to maximize value for the JIB Debtors' constituencies.  In addition, the Sale

12   provides a realistic means to continue providing service to the JIB Debtors' customers with minimal

13   interruption and inconvenience.  Absent a Sale, the JIB Debtors may be forced to cease certain

14   operations by closing stores and wind down affairs, leaving employees scrambling to find future

15   employment and reducing the potential recovery of all creditors in these Cases.  For these reasons,

16   the Trustee has determined, based upon her business judgment, that the best option for maximizing

17   the value of their estates for the benefit of their creditors, customers, employees and other parties in

18   interest is through a Sale pursuant to the proposed Bidding Procedures.

19        **B.     The Sale Will Be Free of Liens Pursuant to Bankruptcy Code § 363(f)**

20        35.    The Assets may be sold "free and clear of any interest in such property" if: (a)

21   applicable nonbankruptcy law allows for such a sale; (b) the entity holding the interest in the

22   property consents; (c) the interest is a lien and the sale price "is greater than the aggregate value of

23   all liens on such property"; (d) "the interest is in bona fide dispute"; or (e) the entity holding the

24   interest "could be compelled in a legal or equitable proceeding," to accept a money satisfaction of

25   such interest."  See 11 U.S.C. § 363(f).  A lien "is a type of 'interest.' of which the property may be

26   sold free and clear."  See 3 Collier on Bankruptcy ¶ 363.06 (Alan N. Resnick & Henry J. Somme

27   reds. 15th ed. rev.).  As "[t]he language of section 363(f) is in the disjunctive . . . the sale free of the

28   interest may occur if any one of the conditions of section 363(f) has been met.  Id.

LA:259441

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

36.     Here, the Trustee seeks to sell the Assets free and clear of any and all liens pursuant to section 363(f), as one or more of the conditions set forth in section 363(f) will have been satisfied with respect to the applicable Sale.

**C.     The Trustee Should Be Authorized to Offer Stalking Horse Bidder Protections to Induce Qualified Bidders to Make Qualified Bids for the Assets**

37.     Sellers of assets often employ bidder protections to encourage bids.  Break-up fees and other arrangements, such as those contemplated here, are "important tools to encourage bidding and to maximize the value of the debtor's assets."  In re Integrated Resources, Inc., 147 B.R. at 659 (S.D.N.Y. 1992).

38.     Historically, bankruptcy courts have approved bidding incentives similar to the Break-up Fee and other overbid protections contemplated in connection with the Trustee's selection of a Stalking Horse Bidder under the "business judgment rule."  See, e.g., In re 995 Fifth Ave. Assocs., L.P., 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (bidding incentives may "be legitimately necessary to convince a 'white knight' to enter the bidding by providing some form of compensation for the risks it is undertaking") (citation omitted); See also In re Integrated Resources, Inc., 147 B.R. at 657-58) (establishing three basic factors for determining whether to permit break-up fees in bankruptcy: (i) whether "the relationship of the parties who negotiated the break-up fee [is] tainted by self-dealing or manipulation," (ii) whether the "fee hamper[s], rather than encourage[s], bidding," and (iii) whether the amount of the fee [is] unreasonable relative to [the] purchase price"); In re Hupp Indus., 140 B.R. 191, 194 (Bankr. N.D. Ohio 1992) (identifying certain factors to be considered in determining the propriety of bid protections); But see, In re America West Airlines, Inc., 166 B.R. 908, 912 (Bankr. D. Ariz. 1994) (concluding that the standard is not whether a break-up fee is within the business judgment of the debtor, but instead, whether (a) the break-up fee will chill the bidding and (b) the transaction as a whole will "[f]urther the diverse interests of the debtor, creditors and equity security holders alike").

39.     "It has become increasingly common in Section 363 sales of significant portions of an estate's assets for the prospective buyer to demand a breakup fee or other protection in the event that the Sale is not consummated."  In re Bethlehem Steel Corp., 2003 U.S. Dist. LEXIS

LA:259441

12909 (S.D.N.Y. 2003), quoting 3 Collier on Bankruptcy § 363.03[7] (15th ed. 2002). Courts which limit or deny such break-up fees do so not because they lack statutory authority, but because they find the fee or amount is not in the best interests of the various parties and/or the estate. Id.; see also In re APP Plus, Inc., 223 B.R. 870 (Bankr. E.D.N.Y. 1998); Calpine Corp v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.), 181 F.3d 527 (3d Cir. 1999).

40.     The Trustee believes (a) that the Break-up Fee and other Stalking Horse Bidder Protections are reasonable given the benefits to the estate of having a definitive agreement and the risk to the Stalking Horse Bidder that a third-party offer ultimately may be accepted and (b) that the Break-up Fee and other Stalking Horse Bidder Protections are necessary to preserve and enhance the value of the JIB Debtors' estates.

41.     Specifically, the anticipated Break-up Fee, which is equal to $2,500 per JIB Store, is reasonable in light of the Stalking Horse Bidder's projected efforts and necessary to encourage the submission of Qualified Bids to initiate the auction process.

42.     The other Stalking Horse Bidder Protections described herein are also appropriate under the circumstances. They are modest minimum overbid requirements given the magnitude of the JIB Debtors' Assets and the scope of their business operations, and the Trustee does not believe that they will deter serious competing bidders. Consequently, the Trustee believes the Stalking Horse Bidder Protections are in the best interests of the JIB Debtors' estates.

43.     Absent authorization of the Stalking Horse Bidder Protections, the Trustee may lose the opportunity to obtain the highest and best offer for the Sale. If the protections are not approved, a projected Stalking Horse Bidder may not commit to going forward with the Sale. Accordingly, the Trustee requests that the Court approve the Bidding Procedures and authorize the Trustee to offer the Stalking Horse Bidder Protections as necessary to induce Qualified Bidders to submit Qualified Bids for the Assets.

## V.

## NOTICE

44.     The Trustee is serving notice of this Motion (and all supporting documents) on (a) the Office of the United States Trustee for the Eastern District of California; (b) counsel to the

27

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

LA:259441

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

1  Committee; (c) counsel to JIB Corporate; (d) counsel to the Secured Lenders; and (e) all parties that

2  have requested special notice.  In light of the nature of the relief requested, the Trustee submits that

3  no other or further notice need be provided.

4          WHEREFORE, the JIB Debtors respectfully request that this Court enter an order,

5  substantially in the form filed contemporaneously herewith as Exhibit C, granting the relief

6  requested herein and such other and further relief as the Court deems appropriate.

7  Dated: December 30, 2009             WINSTON & STRAWN LLP

8

9               By:   /s/ Richard A. Lapping

10                  Richard A. Lapping
                 Attorneys for Chapter 11 Trustee

11                  BEVERLY N. MCFARLAND

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LA:259441