FILED
January 18, 2010
CLERK, U.S. BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA

0002354629

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

---oOo---

BEFORE THE HONORABLE CHRISTOPHER M. KLEIN, JUDGE

---oOo---

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| FOOD SERVICE MANAGEMENT, INC. | ) | Case No. 09-40066-C-11 |
| et al., | ) | |
| | ) | Jointly Administered with |
| Debtors. | ) | Case Nos. 09-40068, |
| | ) | 09-40212, and 09-40214 |

REPORTER'S TRANSCRIPT

OF PROCEEDINGS HELD ON

FRIDAY, DECEMBER 18, 2009

9:30 A.M.

---oOo---

REPORTED BY:                          SANDRA VON HAENEL
                                      CSR NUMBER 11407

```
1                    A P P E A R A N C E S

2

3   For the Chapter 11 Trustee:

4               WINSTON & STRAWN LLP
                101 California Street
5               San Francisco, California 94111-5894
                BY:  RICHARD A. LAPPING and MARCUS O. COLABIANCHI
6                    ATTORNEYS AT LAW

7

8   For the National Franchisee Purchasing Cooperative, Inc.:

9               LAW OFFICES OF STEPHEN R. WADE
                400 North Mountain Avenue
10              Suite 214
                Upland, California 91786
11              BY:  STEPHEN R. WADE
                     ATTORNEY AT LAW
12

13  For the Official Creditors' Committee:

14              KAYE SCHOLER LLP
                1999 Avenue of the Stars
15              Suite 1700
                Los Angeles, California 90067-6048
16              BY:  MARC COHEN
                     ATTORNEY AT LAW
17

18  For Jack in the Box, Inc.

19              PYLE, SIMS, DUNCAN & STEVENSON
                401 B Street
20              Suite 1500
                San Diego, California 92101-0619
21              BY:  PETER L. DUNCAN
                     ATTORNEY AT LAW
22

23

24

25                                        Continued...
```

```
1              A P P E A R A N C E S (Continued)

2

3   For Vistar Corporation:                    (Telephonic)

4              PACHULSKI STANG ZIEHL & JONES, LLP
               10100 Santa Monica Boulevard
5              11th Floor
               Los Angeles, California 90067-4111
6              BY:  JASON S. POMERANTZ
                    ATTORNEY AT LAW
7

8

9                      ---oOo---

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

                          I N D E X

WITNESS                 EXAMINATION        BY              PAGE

MICHAEL GABRIELSON      Direct        Mr. Lapping          19

                        Cross         Mr. Wade             39

                                      Mr. Cohen            58

BEVERLY McFARLAND       Direct        Mr. Lapping          67

                        Cross         Mr. Wade             91

                          ---oOo---


                     E X H I B I T S

TRUSTEE'S                                                 PAGE

1 through 23       Admitted for their full probative
                  value                                   94

4

**DIAMOND COURT REPORTERS - (916) 498-9288**

```
 1                  SACRAMENTO, CALIFORNIA

 2          FRIDAY, DECEMBER 18, 2009, 9:30 A.M.

 3                       ---oOo---

 4          THE COURT:  This is the time set for the evidentiary

 5   hearing on the trustee's motion for an order authorizing

 6   postpetition food supply agreement with Jack in the Box.

 7          We had a preliminary hearing last week and there was

 8   opposition, and there was concern, and so I said, all right,

 9   we'll take it on fair and square today.

10          So let's have entry of appearance, starting with

11   persons in the courtroom and the trustee's side of the

12   situation.

13          MR. LAPPING:  Good morning, your Honor.

14   Richard Lapping, Winston & Strawn.  With me is my associate

15   Marcus Colabianchi.  And also in the courtroom today is

16   Beverly McFarland, the trustee, as well as

17   Michael Gabrielson, the court appointed accountant for the

18   trustee.

19          THE COURT:  And also appearing in the courtroom is?

20          MR. WADE:  Good morning, your Honor.  Stephen Wade on

21   behalf of objecting party National Franchisee Purchasing

22   Co-op.

23          THE COURT:  National Franchisee Purchasing.

24          MR. COHEN:  Good morning, your Honor.  Marc Cohen,

25   Kaye Scholer, proposed counsel for the official creditors'
```

1    committee.

2         THE COURT:  And also?

3         MR. DUNCAN:  Good morning, your Honor.  Peter Duncan,

4    Pile, Sims, Duncan & Stevenson for Jack in the Box, Inc.

5         THE COURT:  Anybody else in the courtroom?

6         There is nobody else in the courtroom who wishes to

7    make an appearance.

8         I have a note that Ms. Pocklington is appearing by

9    telephone.

10        THE OPERATOR:  Your Honor, she didn't dial in.

11        THE COURT:  All right.  There is no appearance by

12   Ms. Pocklington at this point.

13        MR. POMERANTZ:  I'm here, your Honor.

14        THE COURT:  And the other is Mr. Pomerantz.

15        MR. POMERANTZ:  Yes, your Honor.  Jason Pomerantz,

16   Pachulski Stang Ziehl & Jones, on behalf of Vistar.

17        I got an e-mail from Ms. Pocklington.  She has two

18   young daughters, and I think there was an issue with one of

19   them at school.  So unfortunately she is not able to

20   participate right now.  I think she is going to try to join

21   when that gets resolved, I would think, but she may not be

22   available.

23        THE COURT:  Okay.  I'm familiar with that problem.

24        Okay.  It's the trustee's show, Mr. Lapping.

25        I guess I'd note one procedural thing.  I guess I was

6

1  told there was a rather long letter that came to the court

2  from your firm.  You take your victim as you find them.  I

3  tried to make my living in the district courts nationwide,

4  and every time I was in a district where judges read

5  letters, I really had the willies because I always thought

6  that, since I didn't send letters to judges, that a sandbag

7  was in process.  So I systematically do not normally read a

8  letter from a lawyer.

9       So if you want me to read something, you're going to

10  have to file it as a status report or something.

11       MR. LAPPING:  Thank you, your Honor.  I'll --

12       THE COURT:  That's just a, you know -- it's a pet

13  peeve of mine even 22 years later.

14       MR. LAPPING:  I'd say a letter is below 50 percent

15  likelihood of getting read sometimes but -- under the

16  circumstances, yes.

17       Your Honor, actually what the letter revealed is that

18  we received an email on Monday morning or Monday

19  afternoon -- I'm not sure -- sometime on Monday from Vistar.

20       MR. POMERANTZ:  Your Honor, could we ask Mr. Lapping

21  to speak up just a little bit.

22       MR. LAPPING:  Yeah.  I'll get a little closer to the

23  lectern.

24       THE COURT:  Is that better, Mr. Pomerantz?

25       MR. POMERANTZ:  That is.  Thank you, your Honor.

1    THE COURT:  We'll adjust the microphone, and he's

2 moved the microphone up closer to his face.

3    MR. POMERANTZ:  I appreciate that.

4    THE COURT:  Okay.

5    MR. LAPPING:  We essentially received an email from

6 Vistar, Vistar's counsel, to Mr. Pomerantz in fact,

7 indicating that no matter what happened at today's hearing,

8 Vistar was withdrawing from providing any distribution

9 services to these debtors and I believe is terminating its

10 relationship with other Jack in the Box stores that it was

11 supplying.

12    And so the point that we wanted to bring up was that,

13 as a practical matter, and probably even as a legal matter,

14 there are no -- there is no choice.  And at the last hearing

15 it was, I think, represented that, if we held this hearing,

16 there was a possibility that Vistar would wait around to see

17 what might occur and be in a position to resume supply if

18 the trustee was not able to get her contract with Jack in

19 the Box approved.

20    There were only two suppliers, and now there is only

21 one.  So, as a practical matter, the trustee, if the

22 business decision were being made today, it would be

23 imperative to keep the stores open and to have food

24 delivered by Jack in the Box.

25    That said, you know, obviously there has been a

challenge to the trustee's business judgment in the past,

and we're delighted to bring in witnesses today to address

that issue and to testify as to the process that she went

through.  We're very comfortable with that, and so we are

prepared to proceed.

We have filed a trial brief.  I don't know whether

you've seen that or not, but we did file one.  And I notice

that the co-op, Mr. Wade's client, has also served us this

morning with a trial brief that they have filed.

In addition, the creditors' committee has filed a

brief and raising some concerns.  And I think the principal

concern that was raised was whether if Vistar -- rather, if

the Co-op or its members could identify and obtain a second

supplier, alternative supplier, or maybe bring Vistar back

into the picture.

The contract with Jack in the Box as amended for

purposes of bankruptcy had a 90-day termination provision,

and they felt that -- the committee raised the question as

to whether that was too long a period of time.  The

agreement also terminates upon sale or upon a reorganization

plan by any party in interest.  It says in the agreement by

the debtor, "Jack in the Box confirms that any party in

interest" -- Jack in the Box has agreed to reduce that to 30

days.  So the committee has now -- the committee's concern

has been addressed.

1    So the final point that needs to be addressed is

2    essentially, I guess, a critique of the trustee's exercise

3    of her business judgment.

4        I also note that we have received no documents from

5    the objecting party and only their trial brief is on file at

6    this point and they have designated no witnesses.

7        Our first witness would be Mr. Michael Gabrielson.

8        THE COURT:  Okay.  Let me just canvass where we are

9    with everybody else.

10       Well, if I understand the comments of the unsecured

11   creditors' committee through its proposed counsel and that

12   the trustee, Vistar, and the co-op -- and the co-op being

13   the National Franchisee Purchasing Co-op -- and obviously

14   the co-op wants to preserve its position if it can, and so

15   they apparently did talk about a funding alternative, and as

16   you referred to, and the committee is worried about

17   potentially substantial claim for breach of executory

18   contract.  And that's, I gather, what you are referring to

19   as the 90-day termination provision with Jack in the Box

20   dropping to 30 days.

21       MR. LAPPING:  I think those are two different points,

22   your Honor.

23       The breach of the executory contract is an issue that

24   was raised by the co-op, and we did address that to some

25   extent in our trial brief and look at some damage

provisions.  In our view, the outer limit of damages that we can identify is $60,000.  We don't see that as a monumental claim as asserted by the co-op.

THE COURT:  All right.  Well, let's talk about the committee's view.  And maybe Mr. Cohen thinks that there is more at risk than $60,000 or whatever.

What's the position of the creditors' committee at this point?

MR. COHEN:  Thank you, your Honor.  Marc Cohen for the creditors' committee.

I think, as the comments that we filed indicate, just got organized and we moved very quickly as we could and we commend the three parties involved in making themselves available to address the committee the other day.  We appreciated it.

What we gleaned from that were several but related issues.  In terms of the reduction of the termination from 90 to 30 days -- and we thank the Chapter 11 trustee and Jack in the Box for making that accommodation -- because this has happened so quickly, we did not want to see a *fait accompli* happen because of the speed with which this was done.  And we felt that a 30-day termination at least gives the committee an opportunity to get its financial advisers meeting with Mr. Davis and looking at projections and anything it needs to do to see whether the -- supply

1   required reports to the Chapter 11 trustee, the disposition

2   of the stores primarily to or through Jack in the Box is the

3   best way to go.  So reducing the 90 to 30 days made sense to

4   us.

5        In terms of the breach claims and who is liable,

6   whether the estate is liable to Vistar or the estate is

7   liable to the co-op or the co-op is liable to Vistar -- and

8   all of these are just allegations that are going back and

9   forth -- we don't have our arms around that yet.

10       I do think the reduction from 90 to 30 does help to

11  the extent that, should it happen that the co-op or Vistar

12  come back in the picture, there may be mitigation of damages

13  that would follow.  So that's -- and the Court is right,

14  there is some connectivity.  But at this point we're just

15  trying to get at the facts.  We are pleased about the

16  reduction of time as I indicated.

17       One other point that Mr. Lapping failed to mention but

18  I think is acceptable is I believe, in the amendment that we

19  have seen, there wasn't a reference to 363 as opposed to

20  simply 365, and I believe that has been agreed to by Jack in

21  the Box as well, the other termination provisions triggered

22  by 363 sales as well as 365, assignments or rejections.

23       THE COURT:  National Franchisee Marketing, Mr. Wade.

24       MR. WADE:  Yes, your Honor.

25       First of all, I haven't seen a copy of the trial

1   brief.

2        Do you have a copy that you could provide me with?

3        Secondly, your Honor, I just this morning just about

4   five minutes before court have been apprized of the change

5   from 90 days to 30 days termination.  I believe that that

6   goes a long way towards mitigating or at least raising some

7   additional options for the estate and for the committee in

8   terms of the going forward basis.

9        Counsels indicated that they received a -- we all

10  received notification from Vistar indicating that,

11  regardless of the Court's decision today, that it was not

12  willing to resume deliveries, it did say as a result of the

13  termination by the trustee, not that it was terminating it,

14  but rather as a result of the trustee's termination it was

15  not willing to resume.  But with that gloss we are in a

16  position where there has to be deliveries and we understand

17  that.

18        Nevertheless, your Honor, I think that my review of

19  the exhibits -- and we intend to rely upon the exhibits and

20  witnesses that were designated by the trustee and we are

21  prepared to go forward on that.  I think that this

22  transaction -- I reviewed all the exhibits -- and I'm

23  anxious to hear how the trustee exercised business judgment

24  throughout this.  And regardless of what the ultimate

25  outcome is, I think the Court still has to make that finding

1    in order to go forward.  And because of that I'd like to

2    proceed with the evidentiary hearing.

3         THE COURT:  Well, all right.

4         Just to share what's in my brain about the court

5    reviewing the business judgment of the trustee is that it's

6    a pretty deferential review.

7         MR. WADE:  I understand, your Honor.  I think this is

8    a very unusual case and I think the facts will disclose

9    that.

10        THE COURT:  All right.

11        Are you ready to proceed, Mr. Lapping?

12        MR. POMERANTZ:  Your Honor, this is --

13        THE COURT:  Mr. Pomerantz --

14        MR. POMERANTZ:  I apologize --

15        THE COURT:  -- for Vistar.

16        MR. POMERANTZ:  I just have one statement.

17        First of all, your Honor, I don't think purposely, but

18   Mr. Lapping did mischaracterize slightly what occurred at

19   the last hearing.

20        If you recall, your Honor, my opponent Ms. Pocklington

21   made a statement to the Court which said that if there was

22   any chance of Vistar acting as a distributor, that the

23   longer there was a delay in the hearing, the less of a

24   chance that would be.

25        THE COURT:  I have a recollection of that.

1        MR. POMERANTZ:  But she never said Vistar could resume

2    or would resume being the distributor.  And that sort of --

3    I don't know whether Mr. Lapping sort of implied that or

4    not, but it is very clear that, based on the trustee's

5    decision to terminate, that Vistar could not -- I don't

6    think the Court would order it or could in these

7    circumstances -- but if your Honor said, "Vistar, you need

8    to start distributing tomorrow," it's impossible.  It cannot

9    be done.  There is no longer the employees, the fleet, and

10   for a variety of other reasons.  So I wanted to make that

11   statement clearly for the record.

12       The other thing, your Honor, that we received the

13   trustee's trial brief yesterday and did not have any

14   sufficient time to file a reply or response to that.  But

15   again, for the record, I don't think it's important here to

16   go into the specifics, but there are several misstatements

17   of fact that Vistar believes that are contained within that

18   brief, and if there is an opportunity to do so, whether this

19   hearing gets continued or as it relates to any claims that

20   Vistar may have, that we are reserving our right to refute,

21   and as far as just making the record clear in court, that we

22   believe that there are many misstatements contained within

23   that brief.

24       THE COURT:  I understand the position.

25       I have to say that I don't think that I'm in a

position to order Vistar to do anything.  I'm being asked to
say, well -- either to say the trustee's exercise of
business judgment appears to have been sound, or the
alternative would be for me to say the trustee's exercise of
business judgment was sufficiently unsound that I'm not
approving it.  But then if I said that, there'd be "now
what?" and I don't know the answer to that.

MR. POMERANTZ:  I agree with that, your Honor.

THE COURT:  And I'm mindful that people can always
make a deal and that there may be other distributors that
could be brought into the loop or Vistar could be persuaded
to, as a business proposition, to a back-up, although the
point that I think was being made was that there would be
significant transaction costs doing so because they would
have to undo the layoffs and other arrangements that have
been made in reliance on the termination of the agreement.

So the most I think I'm saying -- the worst I'm saying
to the trustee is, "You know, this wasn't a very smart thing
to do and I'm not going to say it was a good idea and I'm
not going to say it was a reasonable exercise of business
judgment."  That's the worst I'd say.  And then the trustee
would have to figure out, "Okay.  Well, where do I go from
here?"

The other thing I'd say is, "Well, it's within the
zone of the trustee's business judgment and the chips will

16

1    fall where they may and the liabilities are what they are."

2          So I think that's what's at stake.  So with that,

3    anything else from your standpoint, Mr. Pomerantz?

4          MR. POMERANTZ:  No, your Honor.

5          THE COURT:  And I'm not accepting any representations

6    of fact that's just thrown in a brief as fact.  There is

7    something called the Federal Rules of Evidence, that kind of

8    thing.  Okay.

9          With that, Mr. Lapping, ready for your first witness.

10          MR. LAPPING:  The trustee would like to call

11    Mr. Michael Gabrielson.

12          Oh, your Honor, just one point of order.  Mr. Wade and

13    I stipulated that the exhibits are all admissible based on,

14    I guess, business records and authenticity, but not -- we

15    would reserve rights with respect to hearsay objections with

16    respect to statements therein.

17          THE COURT:  So it's exhibits 1 through 23?

18          MR. LAPPING:  Yes, it is, your Honor.

19          MR. WADE:  Subject to objection based upon the truth

20    of the matters contained therein.

21          THE CLERK:  Could you raise your right hand.

22          MR. GABRIELSON:  Sure.

23                        ---oOo---

24                    MICHAEL GABRIELSON,

25    called as a witness on behalf of the Trustee, having been

17

first duly sworn, was examined and testified as follows:

---oOo---

THE COURT:  There is one other matter.  I think we talked of it, but it's my usual practice to invoke Federal Rule of Evidence 615, ordering witnesses excluded so that they cannot hear the testimony of other witnesses.

I can make that order on motion.  I think it's more credible.  People haven't had a chance to re-engineer their testimony based on what they've heard.  I cannot exclude a party who is a natural person.  I cannot exclude an officer or employee of the party who is not a natural person who is designated as its representative, the trustee, by its attorney, or a person whose presence is shown by a party to be essential to the presentation -- I would accept the proposition Mr. Gabrielson is necessary to Ms. McFarland -- or a person authorized by statute to be present.

So if there are any other witnesses --

MR. LAPPING:  Your Honor, we only have two witnesses designated, Ms. McFarland and Mr. Gabrielson.

THE COURT:  Are there going to be any other witnesses?

Mr. Wade?

MR. WADE:  No, your Honor.

THE COURT:  You're not going to have any witnesses either, Mr. Cohen?

MR. COHEN:  No, your Honor.

1      THE COURT:  Mr. Pomerantz?

2      MR. POMERANTZ:  No, your Honor.

3      THE COURT:  So it's just two witnesses.

4      Okay.  Then I won't worry about Rule 615.

5                        ---oOo---

6                   DIRECT EXAMINATION

7  BY MR. LAPPING:

8  Q.    Mr. Gabrielson, could you summarize your professional

9  background.

10 A.    CPA since 1986.  I have an MBA from Wharton in 1990.

11       I'm sorry.  Educational background?

12 Q.    Anything professional that's relevant to your

13 profession.

14 A.    Again, I've been a CPA since 1986.  I have worked with

15 Arthur Anderson, started in 1983 as an auditor.  Moved to

16 the tax division.  Went back to B school.  Came out working

17 at a boutique turnaround management firm.  Then I worked

18 later on with PriceWaterhouse in their turnaround litigation

19 support group, and then I've been on my own with my own

20 company since 1994, 1995.  And I specialize in the area of

21 bankruptcy, working for Chapter 7 and Chapter 11 trustees

22 doing a variety of duties related to the accounting and tax

23 returns and financial issues in cases.

24 Q.    Okay.  And you are the duly appointed accountant for

25 the Chapter 11 trustee in this case?

1    A.    Yes.

2    Q.    Could you talk to me about your role in this case as

3    you have stepped into it.

4    A.    Yeah.  My role as the accountant in these, the

5    four-debtor cases, is to prepare or assist in the

6    preparation of lots of the required reporting on the monthly

7    reports, budgets, cash-flow reports, look at tax returns,

8    assisting in the preparation of quarterly payroll and sales

9    tax returns, eventually income tax returns through the year

10   end.  Also been assisting on weekly conference calls with

11   lenders, preparing what's known as a store financial report

12   which is a detailed report on a store-by-store basis.  I've

13   received some disbursements to allow them to identify

14   basically the cash value of their collateral.

15         Also assisting in managing and monitoring the cash

16   flow of the business, whittling down the bank accounts to a

17   few accounts that can be managed effectively, and dealing

18   also with some problem issues.  We've had a number of

19   bounced checks when we arrived, in the payroll accounts,

20   also having to do deal with hundreds of those items and

21   other issues that arise during the case.

22         And I work a lot with the accounting department.

23   There is a 15-person accounting department that's

24   responsible for the day-to-day operations of the business.

25   And, again, I kind of oversee the work that they're doing

1  and as their work assists me in the reporting that I need to

2  do to the court and other parties in interest.

3  Q.    Do you spend a lot of time at the corporate

4  headquarters of the debtors?

5  A.    I'm there typically four days a week.

6  Q.    When did the -- at some point did the issues related

7  to Vistar come to your attention?

8  A.    Well, there is -- you know, being my office is in the

9  accounting department, so I dealt with the treasury

10 function, dealt with wire transfers for purchasing various

11 items, and in the accounting department in writing checks

12 and payroll.  And Vistar was a big part of it because the

13 company -- the relationship, at least at that point when we

14 arrived, was one where they were having to prepay --

15              (Microphone feedback is heard.)

16         THE WITNESS:  Is that me?  I'm sorry.

17         THE COURT:  Step a little bit away from the

18 microphone.

19         THE WITNESS:  We had to -- the company was prepaying

20 either a day or two in advance for purchases.  When the

21 company bought approximately 2.4 million dollars' worth of

22 food, this was the major vendor of the businesses combined,

23 and so --

24 Q.    Over what period is that, the 2.4 million dollars?

25 A.    Over a month.  That's a monthly period.  So it was

something around a little over $500,000, maybe five-fifty,

five-twenty-five a week.

And so they had to prepay, I think, daily, six times a

week.  It might have been actually maybe a two-day

pre-order, but they had to order two days before and -- and

provide payment by wire.

And when we first walked in the door, it was basically

a race that seemed like every day.  Because of the

pre-order, the orders would be delivered, there would be a

demand for cash, because they wouldn't deliver unless the

order came in a certain time the day before.

There was one particular instance where, I think,

several hundred -- at least over a hundred thousand dollars

had been wired for a delivery to be made, I guess, the next

day or two, and apparently there was a change in the order

by a couple of hundred dollars, adding some items, and it

was a frantic runaround trying to get that stuff delivered

because it was too late to do a wire.  Someone had

volunteered to drive 40 miles with a cashier's check.  It

just seemed like a very inefficient and tedious way to

operate the business.  And that's kind of what we saw

walking in the door.

Q.    Did that change at some point?

A.    I think, after a couple of days, maybe a couple of

weeks, we tried to bring a little sanity to the process by

trying to move from a two-day pre-order to a two-day arrear

purchase, which is that they would provide us with bills and

that we would pay them two days after to try to avoid a lot

of these issues that were going on.

And then it took several more weeks, I think at least

a month, I think, with the trustee talking to them to try to

move from the two days to get to a week. Again, with a

major vendor like this, we would like to have a little bit

more ease of terms, you know, in order to have a more

efficient and productive way to pay the bills and to order

the goods without having to do a lot of this work.

The person who was head of treasury pretty much spent

the majority of her day, you know, dealing with just this

one vendor in reconciling the books to be reconciled on the

account, keeping multiple spreadsheets where she had to just

input basic information and keep track of and do

reconciliations, I think, at the end of the week. And,

again, it comprised, seemed like, the majority of her day.

Q.    And what was her name?

A.    This is Vickie Kemp.

Q.    Okay. And did you talk to anyone at Vistar directly

about the problems you were experiencing?

A.    I believe there were times with Brad Boe, I believe,

was either in a meeting or at court or something. I believe

the trustee had talked to him on a number of occasions

1    regarding that or -- I don't want to speak for her, but I

2    believe it was brought to their attention.  And, obviously,

3    with the phone calls, you know, to them, dealing with these

4    wires, I think we had talked about is there a way to make

5    this a better process.  And I think that's what led to the

6    two-day arrear process in a conference call where they

7    agreed to do that.

8    Q.    And were there any other issues that you noticed with

9    respect to the Vistar accounting or deliveries?

10   A.    Yeah.  I mean, the thing to recognize, when we walked

11   in the door, there was a lot of things to get done.

12         You know, the debtor had a variety of issues to deal

13   with, a number of issues.  We were working, you know, 14-,

14   15-, 16-hour days to deal with them, and this is just one of

15   them.

16         At some point, I think it was a couple of weeks in,

17   that one of the main area managers whose name is -- I'm not

18   quite sure, but I think it's Bailpal, B-a-i-l-p-a-l, or Bal,

19   I think we called him, B-a-l -- and he sent me an email at

20   one point and just kind of out of the blue, basically saying

21   that, you know, I want to bring to your attention that

22   Vistar was basically hiding a charge within a thing called

23   distribution charges.

24         They were basically charging a dollar or two dollars

25   per case, and I think a case is just a small -- I haven't

                                                              24

1  seen one, so I have no idea.  I assume it's just a tray of

2  goods.  And apparently it can't be that big because, you

3  know, thousands of these things were delivered each month.

4  But they were making this charge and they were adding this

5  thing called distribution charges which he believed were in

6  the thousands of dollars each week, and that they accounted

7  for, you know, a decent percentage of each particular bill.

8       And I believe at some point I shared that with the

9  trustee or I believe maybe Bal had talked directly with the

10  trustee about that as well, and the trustee, I believe,

11  talked to Mr. Boe at Vistar regarding that item to find out

12  what it was.

13       MR. WADE:  Your Honor, I would move to strike the last

14  sentence as lack of personal knowledge and hearsay.

15       THE COURT:  Mr. Lapping?

16       MR. LAPPING:  Your Honor, it's really a question of

17  what the professionals working for the trustee are reacting

18  to, and so whether it's true or not, the information is

19  supplemented with recall.

20       THE COURT:  The objection is overruled.

21       THE WITNESS:  Excuse me.

22       There was a -- and part of the information related to

23  this -- I believe it was the IDI, which was the initial

24  debtor interview of Abe Alizadeh where he testified -- he

25  was testifying in the IDI that -- he explained, I believe,

1  what that charge -- what those items were, that there was a

2  one-dollar or two-dollar-a-case charge that was being

3  applied that was going against, I believe, a debt that was

4  owed to Vistar previous to the bankruptcy filing.

5       And this led us to actually review what that was at

6  some point.  We did an audit per se of their invoices to

7  figure out exactly what the distribution charge looked like

8  and applying these one or two dollar charges to see exactly

9  how much they added up to.

10 Q.    BY MR. LAPPING:  Can I direct you to Exhibit 20 in

11 your folder.

12 A.    Yes.

13 Q.    Is this -- can you explain what this Exhibit 20

14 represents.

15 A.    The accounting department, and particularly

16 Karen Rushing who is the franchise accounting manager, led

17 the effort to put together this summary based on actually

18 Exhibit 21, which is an extract of detail for one particular

19 period, so it's a summary of that information.

20      But what they did is actually a fairly painstaking

21 process because they needed to access all the invoices from

22 the date of which there was -- I believe there was a

23 forbearance agreement or some agreement at which time this

24 promissory note or this debt was established in some kind of

25 a formal plan between the debtor and Vistar that would be

paid off over some period of time.  So they needed to gather those invoices in order to look at the distribution charge and then apply a one or two dollar evaluation or analysis to see exactly how much it added up to.

If I can just briefly talk about that.  To get the information, it was my understanding that they had to go -- there was an online system that Vistar or Roma -- and I'm not sure of the relationship, if they're one and the same or not -- but they literally had to go in, find the invoice, they would have to email the individual invoice to their own email in-box in order to print the invoice out to use it.  And we are talking -- we have 70 stores, maybe two or three deliveries a week -- hundreds of invoices.

And it literally took days to get the information.  And not only that, hundreds of invoices could not be found on their system, and it took days of communication between our staff and Vistar to locate where the invoices are.  But eventually they got all the information and they brought that into this analysis where they -- and if you look at, I guess, Page 20, they just draw some things outs.

Q.    You're referring to Exhibit 20, at Tab 20?

A.    Correct.  Yes, at Tab 20.

On the left, the Total Invoice Amount basically represents the total purchase for the period.  If you look at August, you see that there was 2.3 million, which is

approximately the monthly purchase amount.

September is broken out between prepetition and postpetition periods which were the 18th of September.

And if you look, for instance, at August, August had -- or actually if you look at July, July total invoices were 1.6 million. And if you scan across that line to the second to the last number which is in the bold, 40,568.64, that's the actual distribution charges on all of these invoices that they tallied.

And, again, I don't know whether this agreement was reached in July. I don't believe it was July 1st, but presumably these charges started sometime after that agreement, so that the 40,000 doesn't represent the full one-month tally related to the 1.6 million, I believe.

In other words, there is some period of time presumably that the July invoices had no distribution charges of any number because this deal hadn't been reached yet, but the charge in that alone was $40,000.

If you look at November, by which time it appears that they stopped making those charges, based on 1.9 million of sales, which is larger than the sales in total for July, the distribution charge is only $4,000. And if you look at the months in between, look at August and September and October, fairly sizeable charges that were prepared.

In total, it would appear that, if you look at the

last two lines, it says "Pre Petition" and "Post Petition,"
that the debtor was charged almost $260,000 between the date
of this agreement in July and the September 18th filing
date, in essence, somewhere around two months.

And then, for the one month of October that those
charges continued, was another $121,000 that appears to have
been charged related to this prepetition debt.

Q.    Did you do an investigation to understand whether
these charges were really coming out at around a dollar per
case or per SKU?

A.    Yes.  And that's really the exhibit under Tab 21 which
I gather is Exhibit 21.

Q.    Yes.

A.    And this is -- well, again, Exhibit 20 is really a
summary of the information that's basically by invoice.

Exhibit 21, again, is just an extract.  This is just
for the month of August.  The far left side represents the
name of the particular corporation.  CVF is for Central
Valley Food, FSM is for Food Service Management, and so
forth.  And it lists the store number, the invoice date, the
invoice amount, and then it shows the distribution charges
per the invoice, and then the distribution charge based on
calculating one case or the number of cases times a dollar
or two dollars.

And it's interesting.  First of all, there is a column

that has very few numbers in it.  That is called "Case

Charge at $1," which appears to be the sixth column,

actually right in the middle.  And so those were the charges

at a dollar.  And it's interesting that all the invoices

there seem to be before the 5th of August, because you'd

expect, if there was something random about this, there is

something strange about it.  Your numbers would be odd if

you saw, say, a one-dollar charge, say, August 26th if

everything else is a two-dollar charge.

And it seems like, it would appear from here that, as

of a certain date, they went from charging one dollar per

case to two dollars and stuck with that.

If I could just -- as an example, if you look at the

first item, there is an invoice for $3,891.65, there were

134 cases, because that's indicated on their bill.  And if

you apply the one-dollar charge, that $134 compared to the

total distribution charge of $145.29, if you look at the far

right column and you do the calculation of the 134 divided

by the 145, it turns out that that case charge will

represent 92 percent of the, quote, unquote, "Distribution

Charge."

And if you look down that far right column, you'll

notice that percentages stay somewhere in the high 90s for

the most part, actually the majority.  And what that's

saying is that by applying this one or two dollar amount

consistently, this calculation draws up and it represents all but a couple of percentage points in this distribution charge.

If this, in fact, was some randomness and this actually did occur, you would not see each example providing the same exact calculation. In other words, if this wasn't being done, you'd see an instance where there is a distribution charge of $5 and, you know, 300 cases, and the calculation would work. But each and every one of these, with the exception of some credits of like two or three cases where, of course, the percentage is going to jump all over the place because the number is very small, it appears to be the case that that's what was done here.

Q. You mentioned some difficulties with getting invoices in order to do your analysis. In general, in terms of the reports that you were trying to do, did you have -- was the situation with Vistar impacting your ability to do that?

A. Yeah. It appears that daily, before we arrived, every time they would provide the information for doing the payment, they did it daily or every two days, they would send a report that would show the total by corporation so that the right corporation was paying the right amount. And they also had an adjoining spreadsheet that would list the orders per store.

One of the most important reports that I'm preparing

now is what I call the Store Financial Report. it provides
the detail by store for all the sale receipts -- cash,
credit card; all the disbursements -- payroll, Vistar, which
is again our biggest vendor; rent; marketing; royalty, all
the various percentages by store so that the banks or the
lenders which have various interests and various collateral,
hence the different four corporations, can pretty much track
the cash that we have, what does it relate to each of the
corporations.

    And I had been using information, this information, to
provide a separate spreadsheet of the Vistar purchases by
store, which is essential for that report, and that
basically all ground to a halt on the 15th of October when
they stopped -- unilaterally just decided to stop providing
the information.

    I asked Vickie Kemp, who was basically dealing day to
day with Vistar about it, and she called and said they just
said it was too time consuming, they didn't really have the
staffing to do it, and they just stopped.  And then I talked
to either the trustee, I believe, or talked to Vickie who
somehow was able to patch through to Brad Boe who set up a
conference call a couple of days later, maybe a day later,
with the accounting people at Roma, Vistar, and we talked
about -- and that's kind of where I asked him, you know,
what the capabilities were.  And, in essence, they said that

they could resume getting the information, but they couldn't

do it directly and nor could we just directly go on and get

that summary. They would have to make a special query

within another group located in Colorado, or Denver,

somewhere else, to do it. So it was something that would

have to go up the line, something that they weren't capable

of doing.

And I basically said, "This is kind of strange for a

company like this, that most creditors" -- because I've

dealt with a number of bankruptcies. You typically will

call up and say, "Can you get us a statement, something that

shows the balance due, something that just lists the

invoices and the amounts that would have been purchased and

then the payments that have been made and applied," so you

kind of have a running balance of the detail, because that

would be very helpful. And they just said that they just --

they're not set up to do that.

And so it was a couple of days later that I was

provided with a number of batch reports that I think that

Brad somehow got somebody to do or maybe they sent it up the

ladder, I'm not exactly sure, but to get us some of the

information to do that.

But, you know, it was a little concerning, because you

know, I had been working on this report to provide this

information, and I didn't really have a sense as to whether,

1   you know, was it going to continue, was it eventually going

2   to be stopped again for another reason.  So I didn't really

3   have a lot of faith that -- or at least there was a concern

4   that, you know, that maybe this wasn't something that was

5   going to happen a lot.  Maybe we would have to spend a lot

6   more time and effort to have to do all that ourselves.

7   Q.      Let me direct your attention to Exhibit 19.

8           Can you walk us through what Exhibit 19 represents.

9   A.      I was thinking of framing this when it happened, more

10  out of desperation than anything else.

11          This is a -- the actual computer information is

12  something that I do.  This is part of the Store Financial

13  Report.  This is a separate tab that relates to inputting

14  all the per-day purchases and related information for just

15  Vistar.  And this feeds up into the main lead report that

16  includes all the other various expenses.

17          And I had put the input in for these various days, and

18  this just covers the period from the 18th of September to

19  the 11th of October.  And, again, they stopped on the 15th,

20  so this is probably the work I did leading up to that.  And,

21  you know, I'd spent a number of hours working on this

22  report, and I gave it to Vickie Kemp to take a look at --

23  primarily for her just to look and make sure I didn't make

24  any bonehead mistakes and put things in the the wrong date

25  or maybe transpose a number.  And she came back at the end

1  of a long day.  I mean, it was in the morning, I believe,
2  and I didn't get this back till the day, and this is what it
3  looked like.  And I -- you know, you almost want to pull
4  your hair out of your head, because I thought I'd put
5  everything in right, but it seems like 90 percent of the
6  numbers were wrong.
7        And she said, well, she had a separate report from
8  Vistar from which she corrected the information.  And, you
9  know, we looked at the totals, you know.  We supposedly, on
10  this first page from Kobra, bought 340,511.  She had
11  hand-scratched in there's only 335,837.64.  But then below
12  that she says we paid 338,743.99.  So my view is, you know,
13  pick your number.  Then below, you see for Food Service
14  187,295, and it was 186,009 and so on and so forth.
15        And the information in the numbers in the computer
16  stuff were orders.  The corrections were deliveries.  So it
17  seems like every delivery was completely different than
18  every order.  And so, you know, it was just very troubling
19  looking at this.  You know, I didn't know which number to
20  really use to report to the creditors.
21  Q.    And did this situation with the orders, order
22  reconciliation, did it at least persist throughout the
23  period that Vistar was delivering to the trustee?
24  A.    Yeah.  I mean, there's various reports you get.  You
25  know, you'd like to think you can get some report that you

1    can look and say, "Okay. I understand." I mean, I do a lot

2    of my own work because I have a lot of faith in what I do

3    and I know everything is correct -- or at least, hopefully,

4    you know, when my name is on the report.

5          But, you know, various things. I mean the batch

6    reports that -- let me put it this way. At some point, I

7    think I mentioned that we went to a weekly -- we paid one

8    week's invoices at the beginning of the following week. And

9    so the reports we were getting on a store basis, they were

10   hard copy. They weren't anything we could actually sort,

11   which wasn't good, but it's what we had. And each of the

12   reports was supposed to have settlement purchases for that

13   week. They would all be due, say, the Tuesday of the

14   following week.

15         And I looked at some of these reports, and some of the

16   reports had four or five invoices that were for the prior

17   period that presumably had already been paid, and some had

18   invoices that weren't due till the next week because they

19   were items on the following Monday that somehow were picked

20   up on a report for being paid on Tuesday. They should have

21   been in the next week's report to be paid a week later.

22         So the idea of just having a very simple report that

23   you can say, "This is the amount that needs to be paid next

24   week." You had to sit and do three reconciliations of that

25   same document to figure out what the right number would be.

1          Additionally, there were some batch reports.  There
2    was a series of eight batch reports that Brad Boe had
3    emailed Division they should provide me copies of, and the
4    Division was just data of invoices.  And, say, on the 24th
5    of a date there would be an invoice for negative $8,320 --
6    and I'm just giving an example -- and you're wondering why
7    would there be an invoice for negative 8,000.  And then you
8    look a week later, there's the same invoice in a positive
9    amount.
10         Now, typically when you have a credit, it occurs after
11   something, not before something.  So to have something on
12   the 10th that's a negative and then on 24th, two weeks
13   later, it's a positive, it couldn't be coincidence.  And
14   part of, you know, going back to doing that store finance
15   report process, I'm looking at this thing and going, do I
16   just assume that these both cancel out and give them zeros
17   or show them as a positive and negative?
18         Again, you know, when you're working long hours trying
19   to put these things together, the last thing you need are
20   things that you don't really understand and can't figure
21   out.  Again, this was part and parcel for a lot of the
22   documents I saw.
23   Q.   So, in a very few words, how would you characterize
24   the accounting and deliver systems at Vistar as you dealt
25   with them?

A.    Well, I mean, they weren't very helpful.  I mean, they
created -- I mean, the easy thing to say is it just seems
that they created more work than needed to be done.  And I
understand the 70 stores making a number of orders, and I
understand that there was apparently a very tenuous
relationship with the debtor prior.  But, you know, to run a
business, especially this is your major creditor -- major
vendor -- excuse me -- you know, it just was not very easy.
It was very, very difficult.

Q.    Did you share this information with the trustee?

A.    We would talk often about things, and she would
understand times when I had some frustration on my face, and
I'm sure there's a number of times that we talked about
various things, maybe talked about the surcharges on several
occasions.  I'm sure when Bal sent that email to me, I'm
sure I talked to her about it.  And then, you know, then she
would tell me her conversations with regard to trying to get
rid of them and, you know, the IDI, and then talking --
other conversations she had, asking what this was and trying
to find out what it was.

Q.    Okay.

A.    I'm sorry.  Did I answer the question you were asking?

      MR. LAPPING:  That's fine.

      I think that's all we have for this witness, your

Honor.

1    THE COURT:  Cross-examination?

2    I guess, Mr. Wade, do you want to go first?

3    So you step to the lectern.

4    MR. WADE:  Yes, your Honor, just a few things.

5                        ---oOo---

6                   CROSS-EXAMINATION

7    BY MR. WADE:

8    Q.    Now, it's true that Vistar was in arrears in payments

9    from the debtor before the petition was filed; is that

10   correct?

11   A.    I would presume so, whether it would be a promissory

12   note or not, yeah.

13   Q.    And in your experience in representing bankruptcy

14   trustees, when a debtor goes in bankruptcy and they're in

15   arrears with their suppliers, is it customary that the terms

16   be COD or even payment in advance when they're going into

17   bankruptcy?

18   A.    In some occasions -- I mean, I think the interesting

19   thing about this case is that it seemed like it was pretty

20   well known that, you know, the problem with this case wasn't

21   about this group of Jack in the Boxes were somehow

22   unprofitable.  It's pretty well known that they made, you

23   know, $11 million in 2008.  They made, you know, several

24   million dollars.  It is a business that is hard to lose

25   money in, quite honestly.  But that the owner was taking all

1   that money, not only that money, he was taking all the tax

2   money and every other nickel that he could find, he was

3   using it for his other empire.

4       And when the curtain came down on the bankruptcy case

5   and the trustee is involved, it should have been fairly well

6   known that that wasn't going to happen anymore, that money

7   was not going to be syphoned out and in fact the company was

8   going to be, you know, generating cash flow and presumably

9   profit going forward, especially in light of a lot of these

10  old debts would be paid right now because of the bankruptcy

11  case, so the business would actually be cash positive.

12      So, in this particular instance, we then agreed to a

13  conference call because these are, I think, people of all

14  lights were invited to understand how the business was

15  going.  So, in this particular case, I did understand to a

16  point, but, again, it wasn't really helpful to have your

17  main creditor -- you know, again, you're buying literally

18  34 percent of your product -- to kind of carry this on, you

19  know, beyond a couple of days of the trustee being there.

20  Q.   So, when you say you could understand it to a point,

21  you say you could understand the payment-in-advance terms

22  that existed when the trustee took over?  You could

23  understand that to a point, is that what you're saying?

24  A.   Well, I think once someone actually reads and

25  understands what's going on and sees a pattern of, you know,

1   the trustee is not going to buy things that she can't pay

2   for, because she would have to make a decision to close

3   things down right away.  So I could understand it as you're

4   meeting and discussing and saying that's where we're trying

5   to move things.  But, again, there seems still to be this

6   fairly difficult relationship between the company and

7   Vistar, kind of these things going on.

8        You know, it always seemed like, you know, I don't

9   know how to describe it, but there didn't seem to be any

10  release of that tension.  Everything always had to be

11  pleaded with, it sounds like, you know, "Can you move us on

12  two-day terms?"  It takes a while.  "Can we go to one-week

13  terms?"  And there is just a sense that, you know, that

14  we've been a problematic debtor before and somehow that

15  wasn't going to change with the changed circumstances.

16  Q.    That was the impression that you got from your

17  dealings with Vistar?

18  A.    I think --

19  Q.    Or that's the impression you got from the trustee?

20  A.    No.  I think with Vistar with, you know, with, again,

21  you know, you're on a phone call and someone says, "We can't

22  deliver $300 of goods without a check.  I have no authority

23  to deliver that unless you pay us."

24  Q.    And did you have such a conversation with a

25  representative from Vistar?

A.     Well, I was sitting in when there was, I think, a

phone call and Vickie said everyone was in a panic, running

around trying to figure out how they were going to wire

something at 5 o'clock for $800 after they had already

spent, you know, a hundred thousand dollars in morning, and

wondering how they were going to have the goods.

       So I think I was standing there when that was

happening and they were describing what the problem was and

how to solve it.

Q.     Do you know when that occurred approximately?

A.     It would have been within a couple of days of us being

there, I believe.  So probably that first week.

Q.     But as a result of requests by the trustee, changes

were made by Vistar in the terms of payment; is that

correct?

A.     Eventually I think they did.

Q.     I think you testified that, after a couple of weeks,

they changed to payments two days in arrears as opposed to

payments in advance.  Is that correct?

A.     Yes.

Q.     And then subsequently, about a month later, I think

you testified that Vistar changed it to one week in arrears;

is that right?

A.     Correct.

Q.     Once -- looking just at the payment terms issue, that

1  is, one week in arrears, you were in charge of watching all

2  the money coming in and the money going out, the cash flow;

3  is that correct?

4  A.    Correct.

5  Q.    A month into the case, did the estate have sufficient

6  cash flow to be able to pay on one-week terms?

7  A.    Yeah, I believe so.

8  Q.    This is a cash business.  You don't have accounts

9  receivable that are collected late?

10  A.    We've got some credit cards that take a couple of days

11  to come in.  But that's generally correct, yeah.

12  Q.    But there was no -- the one-week terms did not create

13  impediment in the estate's cash flow, did it?

14  A.    I'd have to go take a look.  It wasn't that we were

15  thinking, oh, we need more than one-week terms in order to

16  pay the bill.  That wasn't an issue.  There was obviously --

17  this business has a large -- it has basically a fairly

18  consistent inflow, but it's not consistent outflow.

19      At the beginning of the month, there is 700,000 of

20  rent that has to be paid.  On the 14th or on the 15th, there

21  is 700,000 that has to go out in Jack in the Box payments.

22  On the 24th, there's $650,000 that has to go out to the

23  sales tax people.  And every week there is 400,000 that goes

24  out in payroll on a Friday.

25      So the numbers are large back and forth.  The first

1  week or two, you know, it -- for the first, of course,

2  couple of weeks, I can't pinpoint the date, but there was

3  still difficulty in managing the cash flow per se.  So it

4  wasn't, I think, as clear as, yes, the cash flow, we are

5  sitting with millions of dollars in the bank.  It was a

6  little more, I think, tenuous than that.

7  Q.    In the beginning?

8  A.    In the beginning, correct.

9  Q.    But about after a month or so, that worked its way

10  through, and you had sufficient cash flow to meet seven-day

11  terms?

12  A.    Put it this way, I wasn't really comfortable with cash

13  flow probably until about a month ago.

14  Q.    Which would have been, I guess, toward the end of

15  November?

16  A.    I'm always worrying about cash, so it's hard for me to

17  ever say I'm comfortable.

18  Q.    Aren't we all.

19        Turning your attention to Exhibit 20, the recap.

20  A.    Yes.

21  Q.    When was that prepared?

22  A.    This was prepared sometime in -- I know that we tried

23  getting it started -- I know it was sometime in November,

24  probably around mid.  I think it was started earlier than

25  that, but rounding up -- it's probably early November,

because rounding up the invoices took a while.  Then there
was delay because they literally looked at one or two
corporations and found nothing on their review.  If you were
looking for 200 invoices, they found 15.

And so there was, I think, five or six days, I
believe, going back and forth with Vistar trying to find out
where the documents are so we can get our own invoices.  And
then it was -- and I forget when they were able to resume.

You have to understand, there's a lot of work that we
do in the accounting department at various times between
accounts payable and the payroll and a lot of things, so
it's not like the people are sitting around and they just
jump on things.  But it's fair to say, starting in early
November, and it concluded sometime around mid- -- maybe a
little bit after mid-November, I believe.

Q.    And this was prepared as a response to something that
someone in the accounting office had noticed, these
additional distribution charges that were showing up on the
invoices; is that right?

A.    Yeah.  Well, again, I don't know if he was the area
manager, Bal.  He was high up.  And I don't know if he's
like the district manager or an area manager.  But he sent
me an email kind of like, you know, you should know about
this.  It was one of these, "Oh, here's something
interesting," you know.  "Did you guys realize this was

1  going on?"  It was one of those kind of emails.  And we had

2  been talking about it, and that's kind of where my -- I

3  didn't really spend time dealing with it per se.  We knew

4  were were eventually going to try to get around with it, and

5  we were hoping it wasn't a huge amount of money, but we had

6  a sense that it could possibly be based on what they said.

7  Q.    Based upon what who said?

8  A.    Based upon what Bal had said about the charges coming

9  through.  Then when Abe was giving his testimony at the IDI,

10  explaining that, you know, these were these charges, and we

11  understood there were, you know, 40-, 50-, 60,000 cases

12  involved at a buck or two bucks each, you know, we're

13  starting to talk about real money.

14  Q.    Was the issue of distribution charges brought to the

15  attention of Vistar?

16  A.    I believe so.  I talked to the trustee, and she

17  mentioned on several occasions she'd talked to Brad Boe

18  about stopping them and the fact that they weren't stopping

19  them until some point later on.

20  Q.    Do you know when that -- the trustee indicated she had

21  that conversation?

22  A.    I know it was, you know -- I know it was at least as

23  far as when his IDI was, because I believe she prompted the

24  questions.  I believe she, in particular, asked Abe about

25  those charges.  Because I believe, prior to that, she had

1    talked to Brad Boe who gave her an explanation.  She wanted

2    to see if that was, at least in her mind, true or not.

3         But it could have predated that as well.  I wasn't

4    privy to her -- and when she talked to Brad, she didn't tell

5    me everything she did.  So it could have been earlier.  She

6    would have to tell you.

7    Q.    And the Exhibit 20 indicates that the distribution

8    charges stopped in November; is that correct?

9    A.    Yeah.  They could have possibly ended sometime near

10   the end of October.  I don't have the October detail here.

11   But they did not happen in November.

12   Q.    And you don't know why they were terminated in

13   November?

14   A.    No one ever told me.  I can make an assumption, but no

15   one ever told me why they were stopped or that they stopped.

16   Q.    Only that this Exhibit 20, which was prepared early or

17   mid-November, no longer reflected them; is that correct?

18   A.    That's correct.  I presume they looked at the

19   invoices.  And the distribution charges, as you can see,

20   based on a million nine, $4,000, I think, is something like

21   a fifth of 1 percent.  So they -- presumably they saw it

22   went to $5,000, they probably saw -- or $2,000, they

23   probably saw distribution charges of like $3 and figured the

24   practice had stopped.

25   Q.    Now, you testified that Exhibit 20 was prepared in the

47

1  beginning and early, and completed by mid-November.  Is that

2  to the best of your knowledge?

3  A.    What I said was it was probably sometime after

4  mid-November that it was completed.  And I believe it

5  started sometime in early November with, you know, fits and

6  starts getting the information.

7  Q.    The first column, "Total Invoice Amount," for the

8  month of November, shows 1.9, 1,943-some-odd dollars; is

9  that correct?

10  A.    Yes.

11  Q.    Do you know if that was the total amount invoiced by

12  Vistar in the month of November?

13  A.    It seems a little low, but I don't.

14  Q.    Did you ever have an understanding as to how these

15  case distribution charges were credited by Vistar?

16  A.    I have never seen their books or anything with regard

17  to that, so I have no idea.

18  Q.    Now, you testified that you had some problems getting

19  information from Vistar.  Is it correct to say that your

20  essential problem was that you wanted a statement that

21  showed a summary of deliveries and credits and an

22  outstanding balance?  Is that essentially what you wanted?

23  A.    No.  I mean, I think on the one hand you wanted a

24  system that you could actually easily access to get

25  information without having to go through some tedious

1    functions to get it, that we wanted to --

2    Q.    Let me stop you there.  Let me stop you there.

3          A system that you could access, you mean an online

4    computer system reflecting your account at Vistar; is that

5    right?

6    A.    Well, we know they had an online system, but a system

7    where you could actually, you know, go on and, for instance,

8    batch information in Excel, so that you could actually

9    format it and have it add and subtract and do things.

10         The system appeared to be limited to just being able

11   to print out hard-copy invoices, but only if, again, you

12   emailed individually.  And, again, you're dealing with

13   thousands of invoices that you would email.  I mean, we all

14   deal with email and attaching documents and sending them and

15   opening them.  And just imagine having 5,000 emails sent to

16   yourself, to try to open these things up and try to print

17   them and use them.

18         And I looked at -- more at the amount of time that was

19   spent doing this stuff when there is other systems out there

20   that allow you to bring information in computer form.  And

21   part of the issue was, again -- and again, when I had the

22   conference call with the accountants, that the sense that

23   they were fairly limited, that these were special requests.

24   Rather than most business have, you know, basic information

25   you get, there would have to be a special area to get this

49

information.

And then when I did get some of the information it, to some degree, wasn't very helpful. It didn't give answers. It just provided more work to figure out answers.

I mean, my job is to try to get as good information as I can so that we can use it. And in most businesses, you try to do, you know, less work you can, get better information.

I mean, I just am doing the monthly operating report right now and I got a report that was supposed to be a list of the outstanding checks, and it missed about 70 checks, and it's got like 200 on it. So, you know, I sent it back and said, "Can you fix this, because it's not really helpful?" I mean, I need to get stuff that's actually a helpful document.

So, you know, my criticism is that just a lot of the information often wasn't very helpful or accessible, I mean, just what Accounting wanted, that's all.

Q. Was the information inaccurate that you received from Vistar?

A. Well, it's a good question. I mean, a report that showed negative invoices two weeks before a positive invoice, I've never seen that before. I've been doing this for, I don't know, 20 years. I've never seen a credit before the charge two weeks in advance. I have no idea what

1   to make of it.

2       I spent hours on the phone talking to people, saying,

3   "Can you explain this to me?" or -- "that's not" -- again,

4   "that's not helpful."  I'm spending more time trying to

5   figure out something that seems like it might -- you know,

6   should be accurate at the beginning.

7   Q.    Turning your attention to Exhibit 19.

8       Exhibit 19, absent the interlineations, was prepared

9   by whom?

10  A.    What was the word you used?

11  Q.    Absent the interlineations, the writing, the

12  handwriting.

13  A.    Oh, that was prepared by me.

14  Q.    Before the handwriting?

15  A.    Yes.  I tried to think of any other way.

16  Q.    And what information did you rely upon to create the

17  numbers that are in Exhibit 19?

18  A.    The computer numbers?

19      Are you talking about the handwritten or the computer

20  numbers?

21  Q.    No, the computer numbers.

22  A.    Those were -- Vickie Kemp would have to do a

23  spreadsheet where she took the -- well, I had mentioned

24  earlier that there was a -- when we had to do a payment,

25  Vistar would send a spreadsheet of the orders by store and

51

1    by corporation.  It was, I believe, the store information on

2    that tab that they stopped doing on the 15th of October,

3    that she would accumulate that and just copy it over, and

4    provide a spreadsheet for me which I used to do this.

5    Q.    Well, I thought you testified that one of them was

6    represented -- information based upon orders.

7    A.    That's correct.  That's the document that she sent me.

8    Q.    That's -- and that's what you call the computer

9    numbers?

10   A.    Correct.

11   Q.    And it's based upon what --

12   A.    Correct.

13   Q.    -- the debtor ordered from Vistar?

14   A.    Correct.

15   Q.    And the interlineations reflect deliveries; is that

16   correct?

17   A.    That's right.  Purportedly what they represent, yes.

18   That's what I understood they represented in a separate

19   batch that they sent us.

20   Q.    And was there any -- did you ever make a determination

21   as to why there was a difference between ordered product and

22   delivered product?

23   A.    I didn't, but presumably, you know, there are --

24   sometimes the order -- the delivery is different than an

25   order, and that's normal in business.  It's just the extent

1  of this, which is, seems like, every other number, if not

2  70 percent of the numbers never matched up.  So it seemed a

3  little odd.  Now, obviously it wasn't helpful in doing my

4  report knowing that most of the numbers were different

5  between the two.  It was a little indicative, I think, of

6  what was going on here.

7  Q.    Indicative how?

8  A.    Well, you have an order, and the order seems to be

9  different, in some degree, small amounts and, some degree,

10  larger amounts from what was actually delivered.

11  Q.    And, again, you've indicated that the problems that

12  you had in terms of getting reporting, even when you were on

13  seven-day payment terms, I believe you testified that it was

14  difficult, since there was no simple combined statement that

15  you received, again, indicating purchases during that

16  seven-day period, credits, et cetera, and balance owed to be

17  paid within the seven days.

18        Is that correct?

19  A.    Well, what I was saying is that I believe, prompted by

20  the fact that they stopped the information reporting on the

21  15th, these were the weekly reports they were now sending, I

22  think, the substitute for that.  And I believe those

23  statements were also showing basically the weekly purchases

24  to paid the next week.

25        And I'm looking at them and I'm seeing invoices from

different periods.  Now, one week has an invoice for the
26th, then the next week's invoices summary also has that
same invoice for the 26th.  And, again, I'm looking, saying
this really isn't helpful.  Looking at it from an accounting
point of view, I have to jump through hoops to figure it
out.  I can't just look at something and say, "This is
clean; I understand it."  I have to do three other
reconciliations.

The whole idea of reports is to get something that's
useful.  To get something that has additional pieces and
missing pieces, and then I have to do a separate analysis
just to reconcile back to that, it's not helpful.

Q.    Did you bring this to the attention of anyone at
Vistar?

A.    I don't think so, no.

Q.    Did you ever ask for a change in the statement?

A.    Quite honestly, it was very frustrating.  I didn't.  I
just kind of looked at it and said, I mean, "This is
something else."

I'm just trying to -- what I typically do is just take
an account and trudge through.  I do the other analysis.  I
take it and say, "Okay.  I can ignore this," and make a note
to ignore that, and to add this.  Sometimes it's easier just
to do it than to try to get it fixed sometimes.

Q.    Did you ever approach anyone at Vistar regarding

1  making changes in any of the manner in which they provided
2  information to you?
3  A.    Yeah, that was that conference call after they stopped
4  reporting stuff on the 15th of October.  We had a conference
5  call, then I -- there was like two or three people on the
6  line and we talked about what would they -- could you get me
7  the information, and they said, "Yeah.  We'd have to do a
8  special query."  I'm like, "Okay."
9      Then I just asked, "Well, can't we just get like basic
10  stuff, you know?  You have a system.  Can't we just -- you
11  know, can't we get like computer-generated information, a
12  spreadsheet, because there are so many invoices and stores?"
13  And she says, "Well, we don't do that here.  It's got to go
14  up the ladder somewhere."
15  Q.    And that was the only time that you directly
16  interacted with Vistar, anyone from Vistar regarding
17  accounting information; is that correct?
18  A.    I believe so, I mean, directly.  I know the accounting
19  staff dealt with them daily or weekly.  Because, when we did
20  the audit process of the surcharges, they had to be in
21  contact with -- I don't know if it's Helen Moyer.  But they
22  were in constant contact with them, saying, you know, "Can
23  you find those hundreds of invoices we don't have?"  You
24  know, "Where are they?"
25      Then she'd send an e-mail back saying -- I don't what

55

1  they emailed about, but somehow they would have to work

2  together.

3       So, obviously, there were conversations back and forth

4  between our accounting department and them dealing with all

5  this.

6  Q.    Were you involved in the decision to begin taking

7  supply from Jack in the Box Corporate?

8  A.    No.

9  Q.    Not at all?

10 A.    Well, we -- I mean, obviously the trustee was -- we

11 were talking about what was going on, problems with Vistar,

12 but I wasn't in the process that said, "Hey, let's change."

13 Q.    Did you participate to the extent of looking at how

14 dealing with Jack in the Box might solve some of the

15 accounting problems that you were experiencing?

16 A.    At some point we had a conference call, I think, later

17 on with them just to talk about their capabilities.  And I

18 think we were talking with their invoicing and data person.

19      So there were a number of people from Jack in the Box

20 who had a conference call some date.  I don't know,

21 somewhere later on, that they were just discussing some of

22 the issues.  And I said, "Well, obviously I'd like to talk

23 about, you know, the accounting side and getting records."

24      And, I mean, we already use their system.  They have a

25 very sophisticated system for all the invoicing for royalty,

marketing, rent, and IS charges, CAM charges, everything.
So they have a system that can easily pull down information,
can be batched into computer formats.  And the accounting
department was well aware of the capabilities of that
system and this would just be part and parcel.  But I wanted
to understand and talk to the person, so I just wanted to
delve in as far as the accounting assignment would be
concerned.

Q.    And did you ever do that?

A.    Yeah, we had that conference call.

Q.    And what was the result of your inquiries with them?

A.    They said, you know, "We're here if you need to talk
to us to get anything."

       I mean, right now we are in the process, since they
threw out 21-day terms according to the -- I guess the
conversations they had.  So, you know the majority of the
world you have 21-day terms without having to blink an
eyelash.  And so our actual first payment is not due till
sometime later next week.  So we are in the process of just
easily downloading their invoices, batching the information,
putting summaries together, and paying them.

       MR. WADE:  Thank you.

       Nothing further, your Honor.

       THE COURT:  Mr. Cohen.

                     ---oOo---

```
 1                        CROSS-EXAMINATION

 2   BY MR. COHEN:

 3   Q.    Mr. Gabrielson, turning to Exhibit 20, I think the

 4   Recap of Vistar Distribution Charges.

 5   A.    Yes.

 6   Q.    I'm just trying to understand the chart and the

 7   implications of the chart.

 8         The last three columns it states: "Total Case

 9   Charges," "Actual Distribution Charges," and "Non-Cash

10   Distribution Charges."

11   A.    When you say "Non-Cash" you mean "Non-Case?"

12   Q.    Non-Case Distribution Charges.

13         Third column from the end, "Total Case Charges," what

14   does that mean?

15   A.    That means, if you take the number of cases on the --

16   on the analysis on the next page, and you look at the

17   invoices that were at a dollar and then the invoices that

18   charge two dollars, and you add those up.  So, in other

19   words, if you had 15,000 cases that were charged two

20   dollars, that would be 30,000.  And let's say that there are

21   6569 cases at a dollar, you add those together, and that's

22   what gets you the 36,569.

23         So, this is adding the cases multiplied by the one or

24   two dollars and coming to a sum.

25   Q.    And what does "Actual Distribution Charges" mean?
```

A.    These are the distribution charges included on their

invoices, the actual amounts they charged on invoices.

Q.    And the "Non-Case Distribution Charges," the last

column?

A.    That was just what was left over, that was not

explained, presumably, by the case charges.  So it's

presumed it would be the regular distribution charges, if I

can call it that.

Q.    So, in terms of what was disturbing you and disturbing

the Chapter 11 trustee, it was the amounts that would be

found in the "Actual Distribution Charges" column?

A.    Well, there's multiple dimensions.  I mean, when the

person originally brought it to our attention, you know, if

it was a $50 item, then maybe I would have said, you know,

"It's not a big deal."  I mean, anything that you're paying

postpetition, presumably against prepetition stuff, is a

problem whether it's a dollar or two dollars.  But the fact

that it turned out to be significant obviously is troubling.

Q.    But the larger numbers under "Actual Distribution

Charges," as opposed to the much smaller numbers on the

"Non-Case Distribution Charges" under those columns, that's

what was disturbing to you and to the Chapter 11 trustee was

the dollar- or two-dollar-a-case charges?

A.    Well, I think what I said was, what was disturbing,

that it was happening.  I don't know if it really equates to

1    whether this is 40,000 or 2,000 or 6,000 or a million.

2    Q.    But Non-Case Distribution Charges, the 3999 in July

3    and the 6720.32 in August, those were the typical

4    distribution charges?

5    A.    Looking at November, if you see where I had no other

6    case charges was 4368.  It turned out to, I think, about

7    .02, 0.2 percent, so the numbers seemed fairly small.  I

8    didn't really inquire as to what exactly makes up these

9    things,  maybe extra deliveries or something along those

10   lines.

11        I'm not exactly sure what makes up the regular number,

12   but it's typically fairly small.  If you have a $300

13   invoice, it presumably is, you know, $1.50 --

14   Q.    I'm just trying to understand --

15   A.    -- 49 cents.

16   Q.    I'm just trying to understand what the issue was or

17   what the complaint was.

18        The typically, then, when a food distributor makes

19   up -- it will charge a distribution charge for delivery?

20   A.    I don't have that knowledge.

21   Q.    Then, looking back pre- and postpetition, in July, the

22   Actual Distribution Charges were 40,568.64, and then in

23   August, 148,157.32, those were both prepetition imposition

24   of actual distribution charges?

25   A.    Well, yeah, that is what it is as they say.

Q.   And the September prepetition, the next one down, that
was also an imposition of the distribution charges for a
prepetition period --

A.   Well, when you say --

Q.   -- prior to the petition.

A.   When you say "distribution charges," are you talking
just the title "Distribution Charge," the number that's on
the invoice?  Or are you asking my opinion were these
distribution charges?

Q.   What -- again, what I'm just trying to -- I'm not
taking a position.  I'm just trying to understand.

     Let me withdraw that question and rephrase it.

     Before and after the bankruptcy, then, there were
imposition of these actual distribution charges; is that
correct?

A.   Correct.

Q.   And the complaint by the trustee of the imposition of
these charges was it wasn't that Vistar was now asserting
these charges as a result of the Chapter 11, they were
charging these amounts pre-bankruptcy as well?

A.   Yeah.

Q.   It would appear that the practice of charging
prepetition, which presumably there is no problem with
unless there is preferences, which is, again, more of a
legal issue, not an accounting issue.

1      THE COURT:  If I understand the testimony so far, the

2    term "distribution charge" is, of course, not defined.  And

3    it appears, the inference is that it was a bundle of

4    different charges, some of which are the kind of thing that

5    add up to $4,368.39 in November, and some of which are a

6    flat charge of one or two dollars a case, and that implies

7    that within distribution charges there are sub-charges.

8      MR. COHEN:  Yeah.

9      THE COURT:  Flesh that out.

10     MR. COHEN:  What I'm trying to flesh out is that one-

11   or two-dollar-a-case charges were being imposed in July and

12   August and the first half of September as well as in the

13   second half of September and October and then seems to fall

14   off in November.

15   Q.    That's correct?

16   A.    Yes.

17   Q.    Okay.

18         Now I want to focus on this pre- and postpetition at

19   the bottom here.

20         Just help me understand what is the implication of the

21   breaking out on the total case charges between the

22   prepetition and postpetition.

23         Does this have to do with pre- -- postpetition period,

24   or does this have to do with imposing charges for

25   prepetition amounts?

A.    I think the latter.  And I've been dealing with

bankruptcy for 20 years.  I would not pretend to be an

attorney, so I won't give any legal advice, but my layman's

assessment as an accountant dealing with bankruptcy is that

you break out payments that were made prepetition, alleged

prepetition debts, and you would want to break out

postpetition payments out of prepetition debts.  They have

different characterizations in the core as far as what's

acceptable and what's not acceptable.

Q.    Well, I'm not commenting on that, but I'm just trying

to understand.

A.    That's why we made the distinction between the pre and

the post.

      I told -- they originally provided something that gave

just the monthly.  So I said, "You probably want to break it

out between pre and post, because the pre could be perfectly

fine.  If that's an agreement and it's prepetition and

they're paying off a debt, that's fine.  But once it's

postpetition, typically companies will stop that practice if

it's, in essence, a prepetition debt.

Q.    I guess to put a point to it then, of the $380,921 in

that column of "Total Case Charges," $259,422 related to

prepetition period?

A.    Yes.

Q.    And of that asset amount, was that amount, that

1  259,422 paid postpetition?

2  A.    That's a very good question.

3  Q.    Well, based on --

4  A.    If I may answer your question.  These were separated

5  by invoice date, and the invoice date was not the payment

6  date.  But I would have to look at the history starting --

7  so I'm not exactly sure what the relationship -- obviously,

8  we walked in October 2nd, so I'm not exactly sure what the

9  relationship was, say, for those first 18 days of September.

10      I presume, and it's only a presumption, that they were

11  prepaid.  And if they were prepaying -- if you are

12  prepaying, then presumably some of those postpetition

13  purchases -- again, this is assuming, just using a

14  methodology -- it is possible that some of the

15  postpetition -- some of the prepetition -- hang on a second.

16      Some of the postpetition invoices might have actually

17  been paid prepetition if they were paying two days in

18  advance.  I don't know what the methodology was for payment

19  then, but it is possible, because these are based on invoice

20  date, not payments date, they weren't having, I believe,

21  21-day terms, that they had an invoice dated, say, September

22  1st, and it wasn't paid, obviously, with the bankruptcy

23  filing.  So must have been a postpetition payment of a

24  prepetition bill presumably at that point.

25      So I guess there might be some dollars involved in

1  between there, and I'm not smart enough to figure it out
2  sitting here.
3  Q.   Well, all I'm trying, and I'm not taking a position,
4  but on behalf of the committee, I'm just trying to
5  understand.
6       I've understood two things you've said so far.  One
7  was that the accounting seemed to be off, sometimes small
8  numbers, sometimes large numbers.  That's the Exhibit 21.
9  And that these case charges were imposed, which I think
10 you've indicated existed before you guys got into the
11 picture.  Whether it's a good or a bad practice, I'm not
12 commenting, but they did exist before.
13      The third thing I thought you had indicated was that
14 there was sort of almost a two-for-one kind of business
15 going on where prepetition debt was being paid down by
16 postpetition charges.  And I thought what this portion of
17 Exhibit 20 was and I'm trying to understand, that that's not
18 necessarily the case.
19 A.   I think what this is just showing is that, if you look
20 at the invoices that were prepetition and we assume they
21 were all paid prepetition, there are these charges that were
22 added to the invoices after -- at some point after this
23 agreement that there were would be these payments against
24 whatever notes were put into some kind of a promissory note
25 or some other kind of instrument, and that these payments,

65

```
 1   this pattern continued irrelevant of the bankruptcy for some

 2   period of time afterwards, and this is just summarizing the

 3   totals for invoices that predated the bankruptcy and the

 4   payments that were post.

 5        What we do know is that these invoices postpetition

 6   were paid.

 7        MR. COHEN:  All right.  Thank you.

 8        THE COURT:  All right.  Mr. Cohen has no more

 9   questions.

10        Mr. Pomerantz?

11        MR. POMERANTZ:  No questions, your Honor.

12        THE COURT:  No questions.

13        Mr. Lapping, redirect.

14        MR. LAPPING:  No redirect, your Honor.

15        THE COURT:  All right.  I have no questions.

16        The witness may step down.

17        Your next witness, Mr. Lapping.

18        MR. LAPPING:  Your Honor, is this an opportune moment

19   for a five-minute break?

20        THE COURT:  Sure.

21                  (A recess is taken.)

22        THE COURT:  All right.  Mr. Lapping, your next

23   witness.

24        MR. LAPPING:  Our next witness would be

25   Beverly N. McFarland.
```

```
1        THE CLERK:  Can you raise your right hand for me.
2                        ---oOo---
3                  BEVERLY N. MCFARLAND,
4    called as a witness on behalf of the Trustee, having been
5    first duly sworn, was examined and testified as follows:
6                    DIRECT EXAMINATION
7    BY MR. LAPPING:
8    Q.    Could you please state your name and business address
9    for the record.
10   A.    My name is Beverly N. McFarland, and my business
11   address is 9848 Beckenham Drive, Granite Bay, California
12   95746.
13   Q.    Ms. McFarland, could you describe -- how do you
14   characterize your occupation?
15   A.    Well, as far as what I am personally, I'm an asset
16   manager and I own an asset management company, Beverly
17   Group, Inc.
18   Q.    And how did you get into this line of work?
19   A.    Back in 1971, I worked for lenders, and I worked for
20   several.  Amongst them I was an officer for Home Savings of
21   America in the Commercial and Industrial Department.  My
22   territory was the Oregon border to Bakersfield and Napa to
23   Reno.  And my job was to make loans and originations on
24   commercial and industrial real estate.
25         And then I was hired by State Savings and American
```

1   Savings to do restructures and workouts, and something they

2   called the Real Estate Investment Department. And what that

3   was is one of the original workout departments.

4       And through that affiliation I met many federal

5   agencies and individuals and began to petition federal

6   contracts. And I did over $7 billion in federal contracts

7   during the S&L banking crisis of the '70s and '80s.

8   Q.   Have you ever been the trustee or a receiver of an

9   operating business?

10  A.   Numerous.

11  Q.   Could you give us some examples?

12  A.   Certainly. In this court, I had the largest marina in

13  the Tahoe basin, Tahoe Boat Company, and we had 350 boat

14  owners and 120 dockominium owners and people that lease,

15  rent, or purchase. And there were issues with old employees

16  and the State of California, et cetera.

17      And another very large business I managed was the Taco

18  Bell Company under the Northern District, and it was 27 Taco

19  Bell stores and in locations from the Oregon border to the

20  East Bay Area, and it included real estate in the same

21  territories as well as Hawaii.

22  Q.   You used a term that I think that the court reporter

23  and I might not have heard, "dockominium"?

24  A.   Dockominium is a dock that goes into the lake, and

25  people purchase the right to put their boats there. And

it's like a condominium concept with an association, and
that dockominium is purchased for whatever period of time.

Q.    And in your -- in the Taco Bell case, for example, did
you encounter some of the issues that you're encountering in
this case?

A.    Many.  But there was -- there was criminal behavior in
that case and so this debtor went to jail.  So it was a
little more serious.

Q.    Okay.

      You became the appointed trustee -- I think your
appointment date was September 29th.  And on October 2nd,
you posted your bond.  And at that point in time what were
your priorities?

A.    Well, from my experience, my priorities when I walked
in the door of that case -- and I thought about it long
before -- were threefold.

      Number one, and they are of equal importance:
employees, money, and just generally food, because that's
the basis of this entire business.

Q.    And have you been -- have you found this case to be
challenging or time consuming?

A.    It's very time consuming.  And every case is
challenging, but I feel I have the expertise of 38 years'
business experience.  And having managed basically probably
20 different businesses of varying sizes, I'd say that is a

1    challenge I felt very well equipped to handle.

2    Q.    Okay.  This particular -- today we're talking about

3    Vistar, obviously.

4          When did the Vistar issues first come to your

5    attention?

6    A.    As far as dates are concerned, almost immediately,

7    because I told you that one of my important issues when I

8    walked in the door was food.  So a natural question would

9    be, "Who are our food suppliers?"  So I would say

10   immediately.

11   Q.    And how did you go about determining who your food

12   supplier was?

13   A.    I interviewed Abe Alizadeh and people within the

14   accounting department the first day of our -- first day that

15   I was in the offices of the debtors, which was October --

16   the afternoon of October 2nd after a hearing in the morning.

17   Q.    Okay.  And what did you learn in those conversations?

18   A.    I learned that the food supplier was Vistar, and Abe

19   talked about his relationship with them and that he had

20   formed a co-op and he was the chairman.  And he had also,

21   you know, had interaction with an association and that they

22   had had problems with Vistar but, you know, he had hung in

23   there.  And, you know, it was just general conversations of

24   what his opinions were versus operations.  He was not

25   particularly -- I would say he was not particularly skilled

1   as to exactly the mechanics about the operation.  It was

2   just general.

3   Q.     And did it come to your attention that there were

4   issues with the invoicing or accounting with Vistar at any

5   point?

6   A.     Yeah, fairly quickly, because the first month of

7   operations before -- while Mike and I were getting organized

8   and attempting to sort out what was there, we took a look at

9   how the wires were going out daily.  We started interviewing

10  people, because there were so many -- we were so troubled by

11  it and it was so burdensome.  And so I interacted with every

12  single wire transfer, and I signed that wire transfer after

13  I looked at the various food orders.  And Michael would also

14  confirm.  So we kind of had a double check, because it was

15  very, very troublesome and burdensome that we were wiring

16  all this money every single day.

17         And it came to my attention that one day there was

18  some type of a special promotion with Jack in the Box and we

19  failed to wire $500.  And Vistar told us that we, you know,

20  that we had to have that check in a cashier's check driven

21  to Modesto.  And I literally put my foot down and said,

22  "Excuse me, but this is not -- this is not logical, it's not

23  something we are going to do," and so we didn't.  So they,

24  you know -- we wired it as soon as we could.

25  Q.     Did you have any discussions with -- well, let me ask

1    you about the -- there has been some discussion that we've

2    heard in Mike Gabrielson's testimony about this delivery

3    charge or surcharge.

4          When did that issue become a part of your

5    understanding or, you know, become a problem?

6    A.    We noticed these charges fairly quickly on the bills,

7    And they were perplexing.  And so I called Brad Boe and

8    requested that he have a meeting with me, and I think which

9    occurred the first week that I was appointed.  Somewhere in

10   the vicinity of October 8th or 9th.  And he did come to the

11   office.

12         And the clarification of that charge -- probably phone

13   calls prior to that, I can't quite recall -- were we are

14   charging an administrative charge because this account has

15   been very burdensome and Mr. Alizadeh has in some cases done

16   as many as several transactions a day to meet the food cost.

17   And so this is burdensome to our company, and so we are

18   charging this dollar a crate for that purpose.

19   Q.    Do you know what -- who is Brad Boe?

20   A.    Mr. Brad Boe represented Vistar.  He was my main

21   contact.

22   Q.    And did you have any conversations with Mr. Alizadeh

23   concerning these charges?

24   A.    Yes, I did.  And he said that, you know, that really

25   wasn't necessarily fair, but that's the way it was.  And,

1   you know, they had -- they had troubles getting money

2   together and so, you know, he was rather noncommittal on it,

3   but I think he understood that it was an administrative

4   charge and accepted it.  And I didn't.

5        And so I asked Mr. Boe to stop the charge.  I said,

6   "I'm a trustee."  I said, "I'm going to pay you.  And if I

7   can't pay you, I can't order the food.  And so I'm not sure

8   what the purpose of you continuing to charge me is."  So the

9   charge continued.

10       And then I had been, from the very beginning, looking

11  for all the contracts within the company.  And there were

12  almost none, because most of them had expired or they were

13  nonexistent because the creditors had basically canceled

14  them.  So original contracts were very difficult to find at

15  the office.  We reserved an entire drawer where we asked

16  everyone to bring the contracts in.  It turned out all we

17  needed was a thin folder.

18       And so I was trying to search for anything relating to

19  the food.  I mean, this is our largest vendor, and one would

20  have thought there would be a huge file on them, whatever.

21  All that was present was the accounting.  I did not find a

22  file except a loan file on Vistar.

23  Q.   Is that Exhibit 2 or Exhibit 3?  If you can take a

24  look at them.

25  A.   I did not find Exhibit 1.

1   Q.    Exhibit 1 is the Distribution Agreement?

2   A.    Correct.

3         And I could not find the Enrollment Form, which is

4   Exhibit 4, and so I requested staff to dig deeper.

5   Q.    Wait a minute.

6         Did you find Exhibit 2, the Roma Food's --

7   A.    No.  No, I did not.

8   Q.    How about -- okay.  Go ahead.

9         Did you keep looking then?

10  A.    We kept looking.  And the way we found them is we

11  began to review the loan files and set up original loan

12  files, because the loans were files or just pieces of papers

13  stuffed in red folders.  And so we needed to identify the

14  secured versus the unsecured debt.  So Betsy Butler, my

15  assistant, came in and she had this document, this

16  Distribution Agreement, and -- no.  Let me see.  I'm sorry.

17  It was the Enrollment Form.  And she said, "Look what I

18  found," and it was stuck in a loan document somewhere.

19        And so I took a look at it and I noticed that it was

20  signed by Mr. Alizadeh personally.  So I said, "Well, okay.

21  So that's his thing."  So I didn't pay too much attention to

22  it because it was not my document.

23  Q.    Okay.  Did you ever run down any documents that, in

24  your mind, suggested the delivery charge was a payment of

25  past due debt?

A.    Yes.  It was typical that Mike and I would have
meetings throughout the day.

Q.    Mike?

A.    I'm sorry.  Mike Gabrielson and I would have meetings
throughout the day, and would have meetings or questions
with the accounting staff, particularly Karen Rushing, who
was the primary person.  And one day she handed me -- she
said, "I found something that you'd find interesting," and
she handed me a promissory note.

Q.    Is that Exhibit 3?

A.    Just a moment, please.

      Yes, it was Exhibit 3, and it was unsigned.  And so I
said, "Please find me a signed copy."  So I put people on a
very stringent mission.  "Go through these files and find me
a signed copy."  We went to the loan file for Vistar and we
found nothing.  And so we never did find a signed copy.

      But what this says is that they were charging a dollar
a case to be paid by the makers or the co-op, and to reduce
a debt was the essence of this agreement.

      And so we took a look again at the bills, and the
bills clearly stated that we were being charged not one
dollar but two now, and this agreement was effective July
16, 2009.  And so I quizzed Vistar about it, and they said,
"This is an administrative charge."

Q.    Who at Vistar told you that?

A.    Brad Boe was my -- Brad Boe was my primary link.

And then by May, at the IDI hearing, because I had
this document and I understood what was going on, and
Michael had done all of this accounting, and we knew that it
was being charged, and asked them to stop again.  They
didn't.  They continued to charge.

And that at the IDI meeting in the hallway at a break,
Mr. Brad Boe and the counsel that works for you,
Mr. Lapping, Dave Honig and I were in the hallway, and I
said in front of Mr. Honig to Mr. Boe, "By the way, these
charges, are they in the payments?  Are you charging us
postpetition interest for a prepetition debt?"  And he said,
"Oh, no.  These are payments for the administrative charges
only," so I dropped it.

So I went back into the IDI hearing where Ms. Hotze
was questioning the debtors, and I asked him the questions.
"Would you please explain these administrative charges."
And Mr. Alizadeh confirmed that it was in payment of a --
that some of them were in payment of charges that he had
incurred for administrative, but the others were in payment
of a promissory note dated this date.

And I said, "Did you ever sign this note?"  And he
said, "I don't remember."  He said, "I don't remember
signing this promissory note" when he was asked.  He didn't
remember others either.

1    Q.    So at some point did you discuss with Mr. Gabrielson

2    some of the other problems that he was having in the

3    accounting area with Vistar that he testified to earlier

4    this morning?

5    A.    Regularly.  You know, I would go in and have other

6    things within my structure of the work I was attempting to

7    accomplish to get his attention, and it was -- he dedicated

8    a humongous amount of work to just reconciling Vistar.  And

9    that led me to request Accounting and Michael, as well as

10   the lady that did the wire and direct transfers to Vistar,

11   to start collecting these invoices, and I wanted a complete

12   reconciliation.

13         And so that's -- Michael Gabrielson did not seem to

14   remember that.  I'm the one that asked for that

15   reconciliation.

16   Q.    Did you at some point become -- begin to consider

17   changing your food vendor?

18   A.    Well, I like to leave my options open, because the

19   most critical part of this business is to make sure that

20   food is assured every day to serve the restaurants.

21         So, early on in the case, I'd say the first week of

22   October, Jack in the Box personnel, particularly

23   Mr. Lenny Comma, who was there soon-to-be-CEO, I believe

24   January 1, he called as a courtesy and offered his

25   assistance along with many other people, basically people

1  from Distribution, people from Franchising, people from

2  Marketing, people from Food Supply, and the -- and I said,

3  "Please tell me your services," and -- because I really

4  wanted to compare to make sure we were getting a fair value.

5       And so I discussed all the Jack in the Box services.

6  It wasn't just limited to food.  And I discussed a

7  considerable amount with Mr. Comma.  He sent me a list of

8  contacts.  And it was a reasonable thing to do, I thought, a

9  prudent thing to do.

10 Q.    Did you do a price comparison or ask someone to do a

11 price comparison?

12 A.    Yes, I did.  Because of the problem we were having

13 with the accounting and things were not able to be

14 reconciled in a timely manner -- I would ask Michael

15 Gabrielson, "Okay.  Give me a reconciliation of Vistar."  He

16 said, "Yeah, I'd like to, but we're still working on it,"

17 was typically what would happen.

18      And so I requested one evening before I left --

19 Michael didn't even know I had done it at that point -- but

20 I was looking at some financials for the week, and it

21 occurred to me, this just can't got on.  And so I asked him,

22 I asked -- probably asked Vickie Kemp to talk to Mike in the

23 morning -- I was going somewhere, I wouldn't be in -- and

24 please commence a reconciliation of not just Vistar.  But

25 I'm going to ask what do we have from the standpoint of

1  pricing, if anything, with Jack in the Box.  Well, we didn't
2  have anything at that time.  So I made a call to someone at
3  Jack in the Box -- and excuse me.  I'm not exactly sure who
4  it was -- and they sent to me the food pricing.
5      And so I gave that to -- I asked it to be sent them in
6  spreadsheets that we could sort.  They did that, and we
7  began to compare Jack in the Box's price -- food pricing to
8  Vistar's.  It took a long time because there -- it is not
9  apples and apples.  Some of the food was delivered
10 differently, different increments, but we did the best we
11 could.
12 Q.    What did you conclude about the differences in prices
13 between Jack in the Box and Vistar?
14 A.    With consideration to the fact that it wasn't exactly
15 apples and apples, it was about $200 difference a month in
16 Jack in the Box's favor.  And then Jack in the Box, when I
17 told them that later, said, "Well, I think you will find at
18 the end of the year it's more like $10,000," but we have no
19 history there.
20 Q.    10,000 lower than --
21 A.    Yes, that is correct.
22 Q.    So, at what point did you seriously begin to consider
23 switching to Jack in the Box, if there was a point?
24     Did there come a point where you started a process to
25 switch, or how did it work?

A.    It was an evolution.  I'm not of the business mind

that I make snap decisions on anything at all, and so all

this research led up to -- led up to the final decision at

the end of November.

     But what's led to that decision is I received

complaints from directors and area coaches that inventory

was -- that they ordered was not received, that they were

unloading their own trucks for some reason.  Things that had

happened in the past were not continuous now, but to

whatever magnitude, it was still troublesome.  And I began

to worry -- okay, so what happens if we don't get these

deliveries of food?

     And I am familiar with what happens from my Taco Bell

case.  You have to put people in cars and pack things in

freezers and distribute them to other stores to keep things

going.  So I began to have reservations, because things were

not going well.

     And I tried to negotiate with them, as Mr. Gabrielson

said, to cut back this funding every day.  And then we went

to three times a week.  And then it was promised to me

weekly, and that took far too long, a couple of weeks or

more to implement that.  And the only way it got implemented

is I called someone at Treasury at Vistar, because Brad Boe

would not give me any names, although I absolutely insisted,

and all I could leave is a message.

1    And so from the standpoint of my decision to change to

2    Jack in the Box, nothing was absolutely official until the

3    end of November.  And what I did do, because I began to be

4    very wary is -- I would assume one of the questions I'll be

5    asked by someone is, "Well, you know, why didn't you give us

6    notice?"  Well, you know, from my experience in business

7    like this, since food is our major commodity that we sell

8    and Vistar was not easy to deal with and were quite nervous

9    all the time for whatever reasons I don't know, I was afraid

10   that, if I gave them notice, they would immediately stop

11   delivering or give me a notice of stopped delivery, and that

12   was very worrisome.  So I ran both of these at the same time

13   through part of the month of November.

14        And I talked to Jack in the Box around the middle of

15   November, I believe, to the best of my knowledge, and I

16   said, "I'm not real sure that this is something I'm going to

17   do, but would you please tell me, if I have an emergency and

18   Vistar does not deliver food, would you consider delivering

19   it for me so that we can keep the brand going and the stores

20   open?"

21        And so they connected me with Mr. Carl Nank, who was

22   the food supply person, and they said, "Yes, we would be

23   glad to do that.  Don't worry.  We are as concerned about

24   the brand as you are."  So that's how that occurred.  But it

25   was definitely an evolution.

1   Q.    So did Mr. Nank come out and do some kind of a

2   presentation for you on how the supply would work?

3   A.    Not Mr. Nank, but some of his personnel did.

4         We held a seminar for employees, and about a hundred

5   people, on November 24th.  And by that time, between the

6   accounting, the relationship, the lack of quality service we

7   were getting, the inventories that were inaccurate, the

8   deliveries to the stores that we could not rely on a hundred

9   percent getting what we ordered, I felt it best to have the

10  employees listen to what Jack in the Box would do as well as

11  myself.

12        So we invited them to present a seminar on

13  November 24th, and about four of the men came out and did

14  that.  And it wasn't just for them.  The seminar was global.

15  It covered the employee/employer issue.  It covered

16  marketing.  It covered a presentation by me as to what is

17  the status of the bankruptcy, and it was for managers, area

18  coaches, directors and the like.

19  Q.    So that was the Monday before Thanksgiving?

20  A.    The Monday before Thanksgiving, yes.

21  Q.    And then at some point did you agree with Jack in the

22  Box on a cut-over date in December?

23  A.    Yes, I did.  It was December 7th was what we agreed

24  to.

25  Q.    Do you know why that date was selected?

A.     Um, the date was selected because it seemed to be a logical cutoff date, and they needed time to gear up.  There is something called the back office computer that had to be set up and -- with them as well as us.  And we also needed time to transition our people and to make sure that there would be smooth delivery as of the date that we started. And so they worked hard and diligently with that.

Q.     And did you -- during this period of time, I take it, did you have any conversations with Vistar during that week before Thanksgiving?

A.     We had conference calls with counsel and the co-op. Let's see.  Was it the co-op?  With counsel.  And particularly the day before Thanksgiving, it was a very long conference call.

And that conference call resulted in them giving us an edict and a proposal, and it was a proposal that required indemnifications and burdensome things to the estate, which I promptly rejected.  And they told us that, in the event I did not sign that by 5 o'clock the day before Thanksgiving, they would not deliver food anymore.

So I said fine.  Whatever happens.  And I immediately called Jack in the Box and I said, "We have a crisis. Either I'll shut down 70 stores -- there is a strong potential we will not get food."

So Jack in the Box jumped through hoops, our employees

1  jumped through hoops.  Everybody got on -- got on -- became

2  on fire and we had to order food.  The area coaches, the

3  directors, everyone had to jump to attention to assure that

4  we did not have to shut down on Thanksgiving weekend.

5  Q.   But ultimately Vistar relented and agreed to provide

6  deliveries?

7  A.   They did, sometime later on that day.  But by then it

8  was just too -- I mean, the work had already been done, and

9  we continued because we did not trust what they said.

10  Q.   Okay.  So all of this, your testimony and discussions,

11  seems to deal with Vistar.  At what point did the co-op come

12  onto your radar screen as being somehow involved in this

13  process?

14  A.   Well, they were somewhat in the background, because

15  Abe talked about them frequently, that he started the co-op,

16  that he was the chairman of the co-op and he was stepping

17  aside, and I would be getting letters from the Association

18  of the co-op asking that he be put back in place.

19  Q.   Can I ask you to look at Exhibit 5.  And is that one

20  of those letters or the letter?

21  A.   Yes, sir, it is.

22  Q.   And what does this letter -- what was your reaction to

23  this?

24  A.   Well, it says, "our fellow franchisee board member."

25  And by this time, Abe had told me he was no longer involved

1    with any of this, so I was quite surprised.  And they wanted

2    him to be the operator for the restaurants, and not me.

3         And so I told -- Abe wanted to know if I got this

4    letter, and I said, "Yes, I did, and the answer is no."

5    Q.    So -- and did you ask Abe or anybody -- did you talk

6    to anybody from the co-op on the telephone or have any

7    contact with someone there?

8    A.    Yes.  A Dave Woodward, Woodard.  Woodard I believe his

9    name is.

10   Q.    Okay.

11   A.    And he called and others, and they asked me to -- this

12   was after our seminar on the 24th, and the word obviously

13   got out that we were seriously considering changing.  We did

14   not have documents signed with Jack in the Box yet.  We had

15   nothing formal in place.  But the co-op and Vistar and

16   everyone called, "Would you please reconsider."

17        Well, things had gone too far awry at that point, so I

18   did not reconsider.

19   Q.    Let me direct your attention to Exhibit 6 and actually

20   look at it.

21        Does this refresh your recollection as to a telephone

22   call that you had with Dave Woodruff?

23   A.    Yes, it did.  This is one of -- we had other telephone

24   calls.  He was pleasant to speak with.  And one of the

25   problems we had is the -- is Abe said that there was an

agreement. And I said, "Okay, then give it to me." Well,
nobody had the agreement. We could find it nowhere in the
office, even though we had already searched for original
agreements. And so I was told, I believe it was probably by
Abe, that, "Oh, please, you know, just call Dave Woodward,"
and he would give me a copy of this agreement.

So I was busy in conference calls or something, and I
asked Betsy Butler, my assistant, to call and get a copy of
this agreement. So evidently Mr. Woodward attempted to
email this, but it appears that the emails were going to Bal
who was the former director who was no longer with the
company, and so I never got the agreement. So I called and
called, and finally I did get the agreement on the
particular date of this.

Q.    And is that agreement Exhibit 4?

A.    Yes, it is.

Q.    And Exhibit 4 is a three-page document, and I direct
your attention to the third page, paragraph 9.

A.    Yes.

Q.    Do you see the reference there to Schedule A attached?

A.    Yes.

Q.    Did you ever get a copy of Schedule A?

A.    I asked for that copy. We searched all over the
office. I asked Abe. We never got it from anyone.

        No. The answer is no.

Q.    Okay.

A.    You have to understand that the records of the debtor were in complete disarray.  And it took us a period of time just to reconnoiter in a businesslike manner employee records, financial records, contracts.

      The only records that appeared to be in really, really good order in the company was a wall of binder individually assembled for each Jack in the Box.  Outside of that, we found no completely organized documents, so it isn't surprising that we did not find these documents.

Q.    So, as a trustee, in making this decision to switch over to a new supplier, can you summarize your analysis and thinking on that subject?

A.    At what point in time?

Q.    At the point, say, in mid-November, once you -- or whenever you feel like you made the -- when you crossed the Rubicon and weren't coming back.

A.    Understand, I am not the kind of a trustee that would cross the Rubicon and never come back until I am absolutely positive that the business decision is according to the standards that I operate as a trustee.  And we gave them every opportunity.  Michael had conference calls with them. I had conference calls asking them to stop their charges; in constant conversation with the area coaches and directors.

      I mean, I meet with the directors frequently and/or

the area coaches, and I hear the problems that were going on with Vistar, and we tried to reconcile them, we tried to work within them. And we did this for a period of time and then even more period of time. I feel I gave them every opportunity. And, you know, we couldn't get the records. We couldn't get the documents. Their accounting system was not something that we could easily pull up documents and reconcile. And so I began to think in, I would say in November that I really need to consider what our alternatives are here.

And so it was a progressive thing. And I was just as leery of Jack in the Box as I was Vistar, because, I mean, what if we had the same problems with them. Because Abe had told me horror stories about supplies with Jack in the Box. And the fact of the matter is he said that they were very, very much more expensive and they would control us if I went back there.

And so I had conversations in this evolutionary process. And so taking it all under my hat and evaluating it, by the middle of November, I was thinking what if they shut us down like they did him, and they threatened to do that a couple of times and, you know, where would I be? Seventy stores would be without food, and my main purpose in this business is to keep this business going unless I determine it should shut down and convert the case.

1    So I would say, by the end of November, it was pretty

2    clear.  And I asked Jack in the Box to give me copies of the

3    contracts at that point so I could take a look, and I shared

4    them with counsel, but we still didn't having anything

5    definitive.  And my conversations with Carl Nank, who was

6    the head of Supply at Jack in the Box, he said, "Well, why

7    don't you just take the contract and tell us what you can

8    and can't do."  The contract was somewhat burdensome, so we

9    agreed finally after conversation and conference calls that

10   we would do these contracts in the form of addendum, and

11   this was -- gosh, this was probably the day before

12   Thanksgiving.

13       And then, by the end of the month, we had started

14   crafting -- it was obvious by then that we needed to change.

15   The deliveries were not going well, and I was very concerned

16   about deliveries.  So we began to work on the contracts, but

17   not until the end of the month.  And we still don't have it

18   confirmed because it's before the Court.

19   Q.    Now, you're aware that on December 2nd, that the

20   co-op's counsel approached you through counsel to postpone

21   the cut-over to Jack in the Box on December 7th to a

22   different date?

23   A.    Yes.

24   Q.    And did you authorize counsel to approach Vistar about

25   postponing that?

1   A.   We thought about that, and we talked about the 16th of

2   December.  We talked about Jack in the Box, and we discussed

3   it with Jack in the Box too.  They agreed.  They were very

4   cooperative.  We weren't signed up yet.  And Vistar wrote an

5   email back and said no.

6   Q.   Okay.

7   A.   Or maybe it was a conversation you had with them.  I'm

8   not sure.

9   Q.   Well, we'll let the exhibits speak for themselves.

10  A.   Okay.  Thank you.

11  Q.   And in this process, did you have a sense that Jack in

12  the Box was soliciting you to switch over from Vistar to

13  Jack in the Box?

14  A.   Jack in the Box never solicited me to switch anything,

15  either to their NCR program or food.  I was the one that was

16  inquiring because I needed knowledge to make a business

17  decision.  And so at no time did they -- did they ever say,

18  "Beverly, we think you should change with us."  They did not

19  try to ferret me away from Vistar at all.

20       In fact, I can honestly say I don't believe they said

21  any disparaging remarks about Vistar.  It was just my -- you

22  know, my inquiry to them, "What are your services?"

23       MR. LAPPING:  I think that's all we have at this

24  point, your Honor.

25       THE COURT:  Cross-examination, Mr. Wade.

```
 1                    CROSS-EXAMINATION

 2   BY MR. WADE:

 3   Q.    Ms. McFarland, turning your attention to Exhibit 9.

 4   A.    Yes.

 5   Q.    I'm sorry.  It's the previous -- Exhibit 8.

 6   A.    What page, please.

 7   Q.    Do you recognize the first page of Exhibit 8?  Well,

 8   actually, the entire Exhibit 8.

 9   A.    My time slips.

10   Q.    Okay.  And there is an indication, MGO.  Does that

11   refer to you?

12   A.    Yes.  Our time slips are set up MGO or Assistant or

13   some -- I am MGO, managing general officer.

14   Q.    All right.  So is it correct to say that Exhibit 8

15   reflects, I think you said, your time slips.

16         Is that correct?

17   A.    That's correct.

18   Q.    It's a record that you keep of what you do relative to

19   a certain case on a certain day; is that right?

20   A.    That's correct.

21   Q.    And are these prepared by you contemporaneous with the

22   performance of the services?

23   A.    I had a discussion -- the answer is no.

24         I had a discussion with the UST after a couple of days

25   into the case, and I was able to set up my computer through
```

1  five in the morning until nine or whenever I would get in

2  the office.  But I could not carry a computer around with me

3  throughout the entire office, and so -- because I was in

4  meetings with employees and dealing with a crisis all day

5  long.  So I asked the UST's permission for me to do bulk

6  billings and then I could -- and I could generally say what

7  I did all day long.  And they approved that procedure for

8  me.

9        So I would do my time slips either in the midday or at

10 night when I would get home.

11 Q.   But essentially on a daily basis; is that right?

12 A.   To the best of my knowledge, yes.  Practically

13 speaking, if I was at the office till 9 o'clock at night, I

14 might have done those time slips the next morning.

15 Q.   I understand all about time slips, believe me.

16       And do these time slips, to the best of your

17 knowledge, accurately reflect at least the major activities

18 that you undertook that day?

19 A.   I would say so, yes.  I might have forgotten some

20 things, but, you know, yes, I would say so.

21       Generally, every single day, seven days a week

22 initially, I didn't really even charge for all the hours

23 that I spent, but it reflected management, organization,

24 crisis, money, what you would expect in a business of this

25 type.

```
1    Q.    And I think you testified earlier that the food supply
2    was one of the major issues in the case; correct?
3    A.    Well, it was one of the major issues.  I said there
4    were three and they were all equal.
5    Q.    But that was certainly one of the three major
6    issues --
7    A.    Yes.
8    Q.    -- in the case.
9          I noticed that the first entry in your time sheets
10   that has any relationship to Vistar is on 10/29/09.
11         MR. LAPPING:  Objection.  The document speaks for
12   itself.  There is an entry on October 8th.
13         THE COURT:  I don't think the document has been
14   admitted yet.
15         MR. LAPPING:  We agreed to admit the documents, your
16   Honor.
17         THE COURT:  I think you agreed that they were -- you
18   agreed, in effect, to their authenticity, but not to their
19   admissibility, on the basis of reserving -- there was
20   something about not giving up anything on hearsay, and I
21   didn't take that as admitted.
22         Should I admit all the documents?
23         MR. LAPPING:  We would move to admit all the
24   documents, your Honor.
25         MR. WADE:  No objection, your Honor.
```

1      THE COURT:  No objection.

    2      Mr. Cohen?

    3      MR. COHEN:  No objection, your Honor.

    4      THE COURT:  Mr. Pomerantz?

    5      Is he still there?

    6      THE CLERK:  Operator?

    7      THE COURT:  Anybody else?

    8      Is Mr. Pomerantz there?

    9      THE CLERK:  Operator?

   10      THE OPERATOR:  I'm here.

   11      THE COURT:  Is Mr. Pomerantz out there on the

   12  telephone line?

   13      THE OPERATOR:  His line is open.

   14      THE COURT:  All right.

   15      Very well.  Exhibits 1 through 23 are admitted for

   16  their full probative value.

   17      THE WITNESS:  Sir, back to your question.

   18      THE COURT:  You'll have to refresh my recollection on

   19  the question.

   20      THE WITNESS:  Yes.

   21      THE COURT:  There was a question and there was an

   22  objection that the document speaks for itself.

   23  Q.    BY MR. WADE:  Exhibit 8.

   24  A.    Yes.

   25  Q.    Do you know when the first reference to any

conversations or meetings you had relative to the Vistar
supply agreement?

A.    If you look at October 5th, in the middle of that
paragraph it says, "Meeting with accounting department and
Gabrielson re: accounting matters, food orders and wire
transfers, other immediate cash," da, da-da, da-da.

      This isn't the first time Vistar was addressed.  They
fell into the realm of accounting, money.  So even on the
very first day, we talked about, you know, the food
supplier.  So I would suggest you look at the second
paragraph of  October 5th.

Q.    And then on October the 8th, you have an entry for a
meeting with Brad Boe of Vistar.

A.    That's correct.

Q.    Do you recall that meeting?

A.    Yes.  He came to my office, and we talked about his
service, we talked about some of the issues, the problems.
It was more or less a get-to-know meeting at that point.
This was only the 8th.  It was, of record, less than about a
week.  Not even a week.

Q.    And at the time you had that meeting with Mr. Boe
reflected on October the 8th, had you had any of the
problems arise which you testified gave rise to your
decision to make a switch of food suppliers?

A.    The problems weren't new to me.  They were ongoing

problems.  The ones that I stated earlier, the cumbersome

deliveries, the fact that our employees were unloading

trucks, the reports I had from employees of concern that

they had stopped service for them at other times.  And so,

you know, I was trying to meet with Mr. Boe to figure out an

ease of relationship with him.

Q.    But were you aware of those delivery problems and

billing problems and the other related problems on October

the 8th when you met with Mr. Boe?

A.    We were investigating those problems at that time.

Q.    So you were aware of them?

A.    We were investigating.  We were aware and were

attempting to confirm.

Q.    When was the first time -- when was the first time you

talked with anyone at Vistar concerning the issue of the

so-called administrative or distribution charges?

A.    I can't remember the exact date, but, I mean, it was

pretty early on in my appointment, after we discovered -- it

was what are these charges?  The first one I asked was Abe.

"What are these charges?"

And he said, "Well, they've been tagging on

administrative charges to us."

And then I talked with Vistar about it, and Brad Boe

was going to be in contact, but I can't recall the exact

date, but it was very early on upon discovery.  You know, "I

want you to stop charging this," I told him very clearly.
And he explained that this account had been extremely
management intensive and that he needed to charge that.  And
I said, "I'm a trustee.  You are going to get paid or I
cannot order food.  And so, therefore, you know, you do not
need to charge this any more than you need to continue to
require me to fund money by a wire transfer or whatever
means every single day."

        And he disagreed.  He was very kind, very polite about
it.  But over the next couple of weeks, he agreed to a
three-time-a-week delivery, but the charges continued.  And
so again I approached, you know, "What are these?  You've
got to stop this."  And it was always, "Okay.  We will."
But they didn't until November.

Q.     So I think you testified under direct examination, at
the IDI, you had a discussion with Brad Boe regarding these
charges.  Do you recall that?

A.     Yes, I do.

Q.     And do you recall if that's the first direct
discussion you had with anybody from Vistar regarding that?

A.     Regarding what?

Q.     Regarding the distribution charges?

A.     You mean the ones from the -- there's two sets of
charges here.  There was one per crate, that was the
administrative.  And there is one relating to a promissory

1   note.  Which one are you asking?

2   Q.    Well, if you turn your attention to Exhibit 20.

3   A.    So you're asking about --

4   Q.    Have you seen that document before?

5   A.    You are asking about the charges for the promissory

6   note, I'm assuming.

7   Q.    Well, I'm asking for the charges that Vistar indicated

8   were administrative or distribution charges that you spoke

9   about with Mr. Boe.

10  A.    Correct.

11       I asked him in the hallway at the IDI meeting, and

12  that -- as I stated earlier, and that it was just a casual

13  break, and Mr. David Honig, the lawyer from Winston & Strawn

14  was with me, and I said, "Brad," I said, "I understand I've

15  been handed a promissory note and that promissory note says

16  that there are charges and they are postpetition charges for

17  a prepetition note that appears to have a date of July of

18  2009."  And he said, "No, no, no.  Those are -- those are

19  administrative crate charges, and I discussed it with you."

20  And he denied that they were -- they were postpetition

21  payments on a prepetition note.

22       So I went back into the room, and it was my turn to

23  question Mr. Alizadeh, and I asked him those questions.  And

24  he confirmed the part about the administrative charges and

25  he confirmed the part that he signed a note.  He didn't

1    remember the dates.  He didn't remember signing it.  He
2    didn't -- excuse me -- he didn't confirm he signed the note.
3    He did not remember signing any notes.  And -- but he did
4    say that he recollected making a deal with Vistar that they
5    would add another dollar on, and that would assist in paying
6    back this $180,000-something note, which is in Exhibit --
7    let me see what exhibit number this is.
8           MR. LAPPING:  It's exhibit 3, your Honor.
9           THE WITNESS:  That's correct.  It's Exhibit 3.
10   Q.    BY MR. WADE:  So would it be correct to say that at
11   the time of the IDI, in your conversation with Mr. Boe that
12   you just described occurred, Mr. Alizadeh's testimony at the
13   IDI regarding the nature of this additional one-dollar
14   charge, at that time did you form an opinion as to whether
15   or not the charges that Vistar was making were indeed
16   collection of a prepetition obligation?
17   A.    I'm not a lawyer, so I'm not going to make that
18   charge.  But it was -- it appeared from our accounting that
19   they were being charged for something.  And since the dates
20   of the note corresponded with the dollar amounts on the
21   charges, a business person could assume that that was the
22   case.
23   Q.    And you did assume that?
24   A.    I asked for further investigation, which is why we
25   started the reconciliations.

1    Q.    Asked for further investigation from your staff; is

2    that correct?

3    A.    From my staff, yes.  And they asked that investigation

4    and information from Vistar.

5    Q.    And did -- is Exhibit 20 the result of the

6    investigation that your staff did for you?

7    A.    Yes.  And the majority of that work was done -- you

8    know, the research was done by staff, but the

9    reconciliation, I believe, was done by Michael Gabrielson,

10    the accountant for the trustee.

11    Q.    And do you recall when the Recap of Distribution

12    Chart, which is Exhibit 20, when you first saw that?

13    A.    I'm sorry.  I don't.  It was in November.

14          You've got to understand the volume of documents I

15    review every day.

16    Q.    I understand.

17          Do you recall when the IDI occurred?

18    A.    I could look at my time slips.  I believe it was

19    November -- let's see.

20          If you will give me a moment, I'll tell you.

21          The IDI occurred on November 2nd, and then it was 10

22    o'clock in the morning to the best of my recollection, and

23    it was at the office of the U.S. Trustee.

24    Q.    Now, Exhibit -- turning your attention to Exhibit 9,

25    do you recognize that?

100

```
 1   A.    My time slips?

 2   Q.    Yes.

 3   A.    Yes.

 4   Q.    And that's your time slips, in essence, for the month

 5   of November of 2009?

 6   A.    That's correct.

 7   Q.    On November 4th, 2009.

 8   A.    Yes.

 9   Q.    And again that's under the heading "MGO," your time?

10   A.    Correct.

11   Q.    There is an entry there that says, "comparison of JIB

12   food cost versus Vistar cost."

13   A.    That's correct.

14   Q.    What does that represent?

15   A.    I began to do research to see if we were paying fair

16   value for what we were getting because of all the issues and

17   problems we had with this accounting.  So I had called Jack

18   in the Box to ask for their supplying food costs, and it

19   took a little bit to get it because of, I guess, their

20   confidentiality issues.  But they gave it to me, and when

21   I -- and I don't remember exactly the date I got it or if

22   this represents that this is when we started the comparison,

23   but in order to start the comparison, what I told

24   Vickie Kemp to do that evening, that I testified earlier, is

25   I wanted her to set up spreadsheets with both of the
```

companies, and to the best of her knowledge, to be able to

compare apples and oranges, because the two companies do

categorize their food separately.

So she commenced to set up spreadsheets for me at that

time.  That was not complete at that time.  It was a very

long process.

Q.    So you're saying that you're not sure whether the

entry on 11/4 represents an entry wherein you actually

conducted a comparison that had been prepared, that you had

requested of JIB food cost versus Vistar food cost, you

don't recall whether that was or not?

A.    I do recall that was a commencement of that exercise.

That was not the completion of that exercise.

Q.    And it commenced with a request by you that such a

comparison be prepared?

A.    I had asked Vickie Kemp to call Jack in the Box

initially.  She was unsuccessful.  So the commencement of it

would have been starting with Vistar to get their portion

and set up their spreadsheets first and then apply Jack in

the Box's food on top of that in separate columns.

So it's a -- it took her many days to do this.  But

understand, I wasn't involved with that complete process

every minute.  I gave direction, this is what I wanted, and

it was up to Michael Gabrielson, our accountant, to

implement that.

```
1   Q.     Turning your attention to the time sheet entry on
2   Exhibit 9 for 11/7/2009.
3   A.     Yes.
4   Q.     Particularly the language that reads as follows:
5   "Several emails on other insurance issues; JIB requirements
6   re: food safety; questions and suggestions from directors
7   regarding supplies.  JIB emails re: corporate invoices and
8   backup requested."
9         Do you recall what specifically that entry relates to
10  regarding your decision to make the change to Jack in the
11  Box?
12  A.     Give me just a second to take a look.  I have to
13  change my glasses.  I can't read very well.
14  Q.     Sure.
15  A.     Okay.  The part that probably is the most relevant is
16  "cannot obtain adequate response from Vistar in order to
17  confirm inventories delivered."
18        I would say any prudent businessperson would start to
19  wonder what am I doing with the creditors' money if I can't
20  even confirm inventories.
21        And so it's not that I already made a decision to
22  change, but I certainly began to intensely consider
23  alternatives at this point.  To the extent that I needed
24  information, I was going to seek that information, which I
25  did do.  But it was still informational at that point.
```

1    Q.    But by this point, the IDI had already occurred;
2    correct?

3    A.    Yes.   November 2nd.

4    Q.    And Mr. Alizadeh had already testified that this
5    dollar-a-case charge that was being collected was, in fact,
6    payment on a promissory note that was prepetition; correct?

7    A.    I believe he testified both ways, that it was an
8    administrative charge and a prepetition payment of a
9    postpetition debt.

10   Q.    But at least part of it was a prepetition payment on a
11   postpetition debt; correct?

12   A.    I believe so, yes.

13   Q.    Did that disturb you as a trustee?

14   A.    It would disturb any trustee, of course.

15         I notified the UST, you know, called it to her
16   attention, and we said, "You need to stop this.  You need to
17   stop this now."

18         And so, you know, we were already in the process of
19   trying to reconcile this to find out exactly how much money
20   had been collected by them.

21   Q.    Turning your attention to your entry on 11/12/09, the
22   initial entry, "Reviewed and responded to emails from JIB
23   employees, various counsel re: insurance, employee requests,
24   Vistar issues."

25         Do you recall what Vistar issues you reviewed at that

                                                              104

1    time?

2    A.    There were so many, sir.  It's not, you know, on my

3    radar screen to say this specific one.  I was tracking what

4    was going on.  It was my job to do that.

5         As far as exactly what issues, I can't recollect.

6    Q.    Okay.

7         And, again, the following day's entry on 11/13/09,

8    beginning with, "Conference calls with JIB supply chain

9    personnel" --

10   A.    Yes.

11   Q.    -- "re: review of options for purchase of food for

12   stores."

13   A.    Yes.

14   Q.    And then following that, "Reviewed typical JIB supply

15   contract."

16   A.    Yes.  That was just their generic.  It wasn't for me

17   particularly.  In fact, I got that from Lenny Comma, I

18   believe.  I asked him -- and remember, I said earlier in my

19   testimony, I wanted to see and compare this.  And, you know,

20   it seemed like a logical thing to do, to me.

21   Q.    And so it was by the 13th that you had that typical

22   supply contract, that generic Jack in the Box supply

23   contract; correct?

24   A.    I believe so.

25   Q.    And you were still at that time in the process of

1   reviewing the decision to make a change; is that correct?

2   A.      That's correct.  But I must tell you, I never looked

3   at that contract at that point.  You know, I set it aside. I

4   said, "This is my to do list."  But it wasn't of urgent

5   nature at that moment.  So that contract sat there.  And I

6   called Lenny to thank him for sending it to me, Mr. Comma,

7   but I didn't focus on it at that point.

8   Q.      But you made a time entry saying you reviewed typical

9   JIB supply contract; is that right?

10  A.      Well, cursory.  A cursory review is not an indepth

11  analysis.

12  Q.      Turning your attention to your entry on 11/16/2009.

13  A.      Yes.

14  Q.      In about the middle of the entry it says, "Reviewed

15  Vistar agreement with A. Alizadeh and discussed with

16  counsel."

17  A.      Correct.  That was the agreement that Mr. Alizadeh

18  signed personally, which is Exhibit number -- that's the

19  Enrollment Form.  That's the one I was speaking of.

20          And I said, "Why did you sign this, Abe?"

21          And he -- and they said, "Where is the exhibit?"  And

22  he says -- and I said, "Where's the original?"  Well, he

23  didn't know any of that.

24          And he told me again the story of why he formed the --

25  why he formed the co-op and participated in the Association,

1  but I never got any documents from him.  And I did discuss

2  it with him.

3  Q.    So, on November 16th, on your entry, "Reviewed Vistar

4  agreement," you don't mean Vistar agreement, you mean

5  Vistar -- by that I mean the Vistar supply agreement,

6  Exhibit 1, instead you mean the Enrollment Form?

7  A.    I do, yes.  That's all I had.  I didn't have the other

8  one yet.

9  Q.    You didn't have the Vistar agreement?

10  A.    Let's see.  Where -- tell me --

11  Q.    Exhibit 1.

12  A.    I'm sorry.

13  Q.    By the middle of September, you still hadn't seen the

14  Vistar agreement?

15  A.    Just a minute, please.

16        Refresh my memory what date was the entry we're

17  looking at here.  I've lost my place.

18  Q.    November 16, 2009.

19  A.    Okay.  Let's see.

20        I believe it coincided -- let me go back.  Just a

21  moment, please.

22        Okay.  That coincided with my phone call to confirm

23  that I had -- Abe said that there was another agreement I

24  did not have.  And that coincided with my phone call back to

25  the co-op to see if I could get the co-op agreement which I

1    still didn't have at that moment.

2         So I did get it that day.  Remember, I said that I did

3    not have that document, and they were having trouble with

4    emails, and they felt it was going to Bal who was a

5    terminated employee at that point.  And so Abe encouraged me

6    to get that document and -- that we did not have.

7    Q.    Turning your attention to the entry on 11/17/09,

8    towards the end, the entry beginning, "problems with

9    Vistar."

10   A.    Okay.

11   Q.    "Meetings throughout the afternoon while waiting for

12   the hearing with the parties to the case to discuss cash

13   collateral budget, restructure analysis in process, NFS sale

14   terms and problems with Vistar."

15        Do you know what problems with Vistar you were

16   referring to?

17   A.    They relate to the continuing problems with

18   accounting, reconciling inventory and -- you know, I mean,

19   Michael and I had these discussions frequently.  And I had

20   discussions with Accounting frequently to see how they were

21   doing, if it was getting any better with the area coaches,

22   how are the inventories coming in.  We were getting -- we

23   would receive inventories we didn't order or we would get

24   too much.

25        And the crowning glory of all that problem issue was

1   the last week of Vistar's service to us, we would order one

2   batch of buns, as an example, and get seven or eight.  Or

3   one package, one crate of cheese, and get several.  We had

4   the distinct feeling we were being dumped on with inventory.

5       And it showed up in our -- Michael Gabrielson did

6   not -- did not testify to this, but it showed up on our bill

7   as being somewhat more than we anticipated.  And so we began

8   to investigate that and discovered that the inventories had

9   been sent to us.

10  Q.    When you say "dumped on" -- when you say "dumped on

11  inventory," what do you mean by that?

12  A.    If we ordered -- well, this is just an example.  This

13  is not specific.  This is just an example.  If we ordered

14  one crate of buns, we might have got nine.  If we ordered

15  one crate of cheese, we got several.  And it showed up

16  because Mike said, "Look at this bill.  Look at what we've

17  got here."

18      And so we had -- by the time we went back and began to

19  reconcile that, we could not -- we got the information from

20  the area coaches, but we had paid part of that bill already.

21      That was an example.  The inventories were not

22  accurate throughout our -- my entire tenure.

23  Q.    When you say the inventories were not accurate, you

24  mean the inventories that Vistar supplied were not accurate?

25  A.    That's deliveries.

1    Inventories versus the deliveries were not accurate.

2    Q.    Did you come to believe that you were being -- that

3    the estate was being billed by Vistar for goods that it did

4    not receive?

5    A.    In some cases, yes.

6          As Michael testified, Michael Gabrielson testified,

7    you know, I was briefed.  I am not the one that did those

8    analyses, but I was briefed by staff and by area coaches and

9    by our directors that, you know, that sometimes we had to

10   make adjustments.

11   Q.    Turning your attention to Exhibit 19 for a moment.

12   A.    Yes.  This is not my chicken scratch.

13   Q.    Have you seen that document before, with or without

14   the handwritten chicken scratchings?

15   A.    I did not see the document before the chicken

16   scratching, and I do clearly remember Michael Gabrielson

17   coming in, pulling his few hair out from his head, and

18   saying, "Look at this."

19   Q.    And what did -- what conclusions did you draw from

20   your conversation with Mr. Gabrielson in the review of

21   Exhibit 19 regarding Vistar and this inventory dumping that

22   you've testified to?

23   A.    Mr. Gabrielson is a forensic accountant.  I've worked

24   with him for approximately eight years.  And I've learned

25   that one thing that he is highly skilled at is advising me

1   on numbers.  And these numbers were inaccurate.  And he went

2   through some examples with me.  And, you know, I take him at

3   his word that what he sees here and what he reviewed with

4   this employee was accurate.

5        I'm sorry.  Does that answer your question?

6   Q.    I don't think so.

7   A.    Okay.  Well, try it again then.

8   Q.    You testified previously that Vistar was dumping

9   product.  That is, you would ask for one case of buns, they

10  delivered nine cases of buns --

11  A.    Uh-huh.

12  Q.    -- that there was a discrepancy between what was

13  ordered and what was delivered.

14       Did you -- did your review of Exhibit 19 confirm that

15  suspicion?

16  A.    This was before that.  This was delivered to me before

17  that.  I'm speaking of the last week that Vistar offered us

18  service.

19       When I'm saying we had inventory dumped on us, it was

20  the last week they did service.

21  Q.    Okay.

22       Back to Exhibit 9, your time sheets again, the entry

23  on 11/18/2009, specifically the entry, "Email from UST re:

24  questions on problems with Vistar and co-op."

25  A.    Yes.

1  Q.    Do you recall the contents of that email?

2  A.    I believe it pertained to the charges.  And Abe is

3  stating that -- I can't recall every minute, and that's not

4  an exhibit to this -- but it related to the charges and it

5  related to the fact that Abe denied being a part of the

6  co-op but his name was all over it.  And he offices next to

7  me, so I can hear him talking occasionally on conference

8  calls with them.  So, you know, I was trying to understand

9  what this was.

10      But the problems with Vistar that were my most

11  concerning at that point, in addition to their service, was

12  obviously these charges, and that's what I discussed with

13  the UST.

14  Q.    And you received an email from the U.S. Trustee with

15  the trustee's questions regarding this?  Is that what this

16  entry reflects?

17  A.    No.  I sent an email to them.

18  Q.    Well, following, it says, "Prepared email with

19  explanation," indicating that you may have prepared a

20  responsive email.

21      Does that refresh your recollection?

22  A.    Well, I don't believe there was a responsive email

23  other than thank you for the information.  I don't recall

24  that they asked me questions.  They might have, but I don't

25  recall that.

Q.    And then the last entry that day, "Telephone conversations to and from Mr. Gabrielson regarding discussions of many financial issues to resolve including audit of Vistar's additional charges."

A.    Yes.

Q.    Do you recall the substance of that conversation with Mr. Gabrielson as it relates to Vistar?

A.    It was the audit of Vistar's additional charges.

Q.    You were still very concerned about these additional charges?

A.    Oh, obviously.

Q.    Turning your attention to the entry on your time sheet, Exhibit 9, for 11/23/2009, specifically about two thirds of the way down, beginning, "Conference call with R. Lapping, D. Honig and M. Gabrielson re: call with Vistar this afternoon.  Conference call with Vistar et al. re: food service issues discussed."

A.    Yes.

Q.    Just that portion of it, do you recall what was discussed in the conference call with Vistar on the 23rd of November?

A.    They were trying to ascertain that I had already made an absolute definitive decision to change, and we gave them an opportunity to explain, to discuss.  And we gave them no commitment in that conference what our decision was one way

1    or the other to the best of my recollection.

2         We had our seminar scheduled the next day, and Jack in

3    the Box was to give us a proposal as to how they would

4    service us if we entered into a contract.  So it was a -- it

5    was a discussion that really went nowhere.

6    Q.    Well, I think the following entry says, "Meeting with

7    JIB distribution personnel re: summary of their service and

8    procedures."

9    A.    That's correct.

10   Q.    That's the seminar that you indicated?

11   A.    Yes, sir.

12   Q.    So that occurred on the same day.

13   A.    No.  The 23rd was the conference call, and the 24th

14   was the seminar.

15   Q.    Well, according to Exhibit 9, under the heading of

16   11/23/09, you've lumped those two together on the same day,

17   in fact, immediately following each other.  Conference call

18   and --

19   A.    I'm sorry.  Which entry?

20   Q.    11/23/2009.

21   A.    Yes.  Okay.  We had a meeting with Jack in the Box

22   distribution personnel, summary of their services and

23   procedures.

24        Okay.  That was a -- let's see.  Wait a minute.

25        The 24th was our seminar, but it would be logical that

                                                              114

1 we had this conference call or meeting with JIB, because we

2 had to make sure of what they were going to talk about to

3 our hundred people. So it's not really done as an entry.

4 It was preparation for a seminar.

5 Q.    Okay. Let's go back to the conversation that's

6 reflected in your time slips for 11/23, that conference call

7 with Vistar.

8       Who initiated that conference call? Who requested

9 that, do you recall?

10 A.    I don't recollect. I think it was --

11 Q.    At some point --

12 A.    Sir, I think it was probably counsel, because it was a

13 counsel-to-counsel call initially. I believe it would have

14 been Mr. Lapping or Mr. Honig.

15 Q.    At some point did you or your representative advise

16 Vistar that they should cease all deliveries effective the

17 6th of December?

18 A.    I don't recall exactly if it was ever put that way. I

19 believe at that point we most likely said we have now

20 elected, after our seminar, to -- right after the seminar I

21 believe that I contacted them. We had another conference

22 call with them on the 25th of November, and at that point, I

23 believe, we did tell them that we were going to switch to

24 Jack in the Box as of the 7th, the morning of the 7th. Yes,

25 to the best of my recollection.

1    But we had not been definitive prior.  By "we," I mean

2  my staff, Mike Gabrielson, counsel.

3  Q.    Okay.  Turning your attention to 11/24/09, there is an

4  entry, "Hosted and attended seminar all day with 75 managers

5  including JIB personnel."

6  A.    Yes.

7  Q.    So that's the day that you had actually conducted the

8  seminar?

9  A.    That's correct.  And as I say, all the these other

10  items were on that same agenda.

11  Q.    And then the entry on 11/25/09, "Conference call with

12  trustee's counsel and M. Gabrielson re: results of seminar,

13  JIB's participation and potential change in food service due

14  to numerous problems with Vistar's inventory, delivery,

15  accounting, including excess charges in payment of

16  prepetition debt.  Conference call with Vistar personnel and

17  trustee, M. Gabrielson and trustee's counsel re: discussed

18  Vistar's service, listened to Vistar's terms and conditions

19  for continuation of their food service."  And then,

20  "Reviewed motion to be filed in the court re: commencement

21  of JIB food contract."

22  A.    Yes.

23  Q.    So that --

24  A.    What is your question?

25  Q.    To the best of your recollection, is that the

116

1  conversation wherein you advised Vistar that you would be

2  making the switch effective on the 6th?

3  A.    I think they had a pretty good idea by then, but I'm

4  sure that that is when we did it, because we had to confirm

5  that the food would be delivered by Jack in the Box at that

6  time.

7  Q.    Why do you think they had a pretty good idea by that

8  time?

9  A.    Because I'm a very open person.  I didn't hide the

10  fact I was investigating them.  I didn't hide the fact that

11  I was investigating the possibility of other food

12  alternative sources.  And so Abe sits next to me in the next

13  office, and it's kind of like the game of telephone when

14  you're in high school, and his sisters work for me.  So I

15  would say that I'd have to be very, very careful about

16  privacy, and I feel that openness was appropriate.

17      And I thought maybe Vistar would come forward and say,

18  "Okay.  How can we do better?"  But that really never

19  happened.

20  Q.    And also on the 25th of November, you have the entry

21  that you reviewed the motion re: commencement of the JIB

22  food contract.

23      That motion was actually filed that day; isn't that

24  correct?

25  A.    Well, I didn't file it, but I'm assuming if it says

1   so, it was.

2       I'm going to make one change in my time slips as a

3   result of this testimony. I'm going to see if I can make

4   the letters twice as large so I can see them.

5       MR. LAPPING: Font change.

6   Q.  BY MR. WADE: Let me go back over one more issue.

7   A.  Surely.

8   Q.  You testified that very early on, almost immediately

9   after you came in, and you met with Mr. Alizadeh, and at

10  that time he told you about the co-op; is that correct?

11  A.  He told me how he set it up, yes. Actually, it was

12  even -- let's see -- the day that I filed my bond was

13  October 2nd, and we all met at the office of the United

14  States Trustee, I believe, that morning before the hearing.

15  And so we were chatting back and forth about the semantics

16  of setting up the case. So he might have even mentioned it

17  then. I don't recollect.

18  Q.  By "the hearing," you mean the --

19  A.  First --

20  Q.  -- initial hearing at which you were appointed the

21  trustee?

22  A.  I was appointed trustee on the 30th of September, but

23  my bond was filed on the 2nd, so I could not do that job

24  until my bond was filed.

25  Q.  And you testified that, very early on, Mr. Alizadeh

1    talked with you about the co-op and his role in forming it.

2         Did he tell you what the co-op did?

3    A.    Well, he did a lot of things.  It was mainly support

4    for the franchisees was his emphasis.

5    Q.    Did he tell you that the debtors' stores were members

6    of the co-op?

7    A.    He never mentioned that particular statement to the

8    best of my knowledge, no.

9    Q.    Did Mr. -- did he ever mention that he was a member of

10   the co-op?

11   A.    Oh, yes.  Of course.

12   Q.    Do you know if Mr. --

13   A.    He was the chairman.

14   Q.    Do you know if Mr. Alizadeh had any stores besides the

15   70 Jack in the Boxes that are the subject of these

16   proceedings?

17   A.    I have no knowledge.

18   Q.    So you didn't understand that Mr. Alizadeh was telling

19   you that these stores were members of the co-op?

20   A.    No, I didn't.

21         And then when I -- I told you I asked when I finally

22   found that agreement, "Where is the addendum that's supposed

23   to have more?" or "What is this addendum?"  And he had

24   pledged to find it for me but never did.

25   Q.    Did mr. Alizadeh in that initial conversation advise

1 you that the co-op had a purchasing relationship with

2 Vistar?

3 A.    No.  No.  To the best of my knowledge, no.

4 Q.    When did you first come to understand that there was a

5 purchasing relationship between the co-op and Vistar?

6 A.    Probably when I received the documents.  But, you

7 know, I didn't pay much attention to these documents.  The

8 Enrollment Form was signed by Mr. Alizadeh personally, and

9 the co-op agreement was signed by him as chairman.  And so I

10 had more to do than review his documents and his

11 commitments.

12 Q.    Turning your attention to that Enrollment Agreement,

13 Exhibit 3.

14 A.    Yes.

15       MR. LAPPING:  It's Exhibit 4.

16       MR. WADE:  I'm sorry.  Exhibit 4.

17 Q.    And specifically to paragraph 9.

18 A.    Yes.

19 Q.    "I have listed on Schedule A attached hereto the unit

20 number and address of all Jack in the Box restaurants owned

21 by me or by a corporation which I control."

22       Didn't you believe that Mr. Alizadeh was signing this

23 on behalf of the corporations that he controlled?

24 A.    I had no idea.  He signed it personally, and there was

25 no exhibit.  How do I know what he attached?

1      He said he owns lots of restaurants, sir.  He could

2 have had any of those restaurants attached.

3 Q.    To your knowledge, he owns additional Jack in the Box

4 restaurants that were not part of this estate?

5 A.    No.  I don't know what he owns.  I know he owns Crush

6 and Orbit -- oh, not Orbit.  I don't know what restaurants

7 he owns or what he would have referred to in this.

8 Q.    But this refers to Jack in the Box restaurants,

9 Exhibit 4, doesn't it?

10 A.    Okay.

11 Q.    You also said that you didn't pay much attention.  You

12 testified that when someone reviewed the loan file -- I've

13 forgotten who it was -- that they found Exhibit 1, that is,

14 the Vistar supply agreement with the co-op.

15 A.    No.  We never found the Distribution Agreement.  That

16 was provided by the co-op itself to me, remember.

17      The Distribution Agreement which is Exhibit 1 are you

18 speaking of?

19 Q.    Yes.

20 A.    That was supplied by the co-op.  That was not supplied

21 by Abe or anyone else.  That was supplied on November 16th,

22 finally, via email.  And I believe it was Dave Woodard --

23 Woodward, Woodard, whatever his name is.

24 Q.    And so until the middle of November you had no idea of

25 what the terms of any agreement that the estate had with

1    dealing with Vistar for food supply?

2    A.    One could assume that.  I mean, I didn't see the

3    agreement.  How would I know?

4    Q.    So you were just doing business with Vistar until the

5    middle of November without knowing the basis under what you

6    were doing business with?

7           MR. LAPPING:  Objection.  Argumentative.

8           THE COURT:  Sustained.

9           MR. WADE:  I have nothing further, your Honor.

10          THE COURT:  Mr. Cohen?

11          MR. COHEN:  Nothing, your Honor.

12          THE COURT:  Mr. Pomerantz, are you out there?

13          MR. POMERANTZ:  I am, your Honor.  Nothing here.

14          THE COURT:  Anybody else?

15          All right, Mr. Lapping.  Redirect?

16          MR. LAPPING:  No, your Honor.  We are fine.

17          THE COURT:  I have no questions.

18          Ms. McFarland, you may step down.

19          THE WITNESS:  Thank you.

20          THE COURT:  Any other evidence, Mr. Lapping?

21          MR. LAPPING:  Your Honor, I guess I would just quickly

22   walk you through what these other exhibits, when they're

23   here, what they stand for.

24          THE COURT:  Is this in the nature of argument or just

25   presentation of evidence?

1      MR. LAPPING:  I'd like to segregate the two.

2      Why don't I wait and you can entertain whether or not

3  I have argument or not.

4      THE COURT:  Anybody else have any further evidence to

5  present?

6      Mr. Wade?

7      MR. WADE:  Nothing further, your Honor.

8      THE COURT:  Mr. Cohen?

9      MR. COHEN:  No, your Honor.

10     THE COURT:  Mr. Pomerantz?

11     MR. POMERANTZ:  No, your Honor.

12     THE COURT:  I keep noting that Jack in the Box is in

13  the corner.

14     No interest there either.  All right.  Okay.

15     Do you want to take a break and argue it, or you do

16  you want to argue it now?

17     MR. LAPPING:  I have about five minutes, your Honor.

18     THE COURT:  Okay.

19     Go.

20     MR. LAPPING:  Well, first of all, Exhibit 10 is simply

21  the eve of -- the Wednesday before Thanksgiving, back and

22  forth over the brinksmanship.

23     Exhibit 11 is the emails back and forth over the

24  decision by Vistar to continue delivery.

25     Exhibit 12 is the appearance on our radar screen of

123

Mr. Wade and his client on December 2nd, including a response by my partner, Mr. Honig, indicating that we would get back to him.

Exhibit 13 is our request for a copy of the co-op agreement which we had then again received the Enrollment Form without any attachments.

Exhibit 14 is my request to Vistar that we have them continue deliveries until December 16th to accommodate the request made by the co-op. And at the top of that is the Vistar email indicating that they were no longer in a position to do that.

Exhibit 15 is simply a communication by Jack in the Box that came into the trustee's possession referencing the co-op and our decision to terminate the Vistar arrangement.

Exhibit 16, already, I think, in evidence is an attachment to the trustee's declaration is the text of the supply agreement.

17 is the text of an amendment which essentially changes terms of the supply agreement to adapt it to the bankruptcy environment.

18 is the communication from Vistar indicating that, no matter what we did today, Vistar would still remain unable to service these accounts.

Exhibit 22 is simply communication that the co-op has its agent for service of process located at the premises of

the debtor's corporate headquarters.

23 is a copy of the transcript of the December 9th hearing.

Your honor, in our trial brief we pointed out a couple of things. One is that obviously the standard, whether you look at this under 1108, whether you look at this as a decision to reject that has not been formally in front of the Court, or you look at it under 363 under the use of property, that the standard is essentially the same in all these cases -- the business judgment rule.

And we cite a Ninth Circuit case that indicates that, as many other cases have, that as long as there is an absence of whim, caprice, or bad faith, that there is a presumption that the trustee has acted appropriately in exercising her business judgment rule.

I think the evidence today has handily demonstrated that the presumption is there and then some.

THE COURT: All right.

Mr. Wade?

MR. WADE: Your Honor, I think that what's transpired since the last hearing, particularly Vistar's determination that they will not resupply regardless of the Court's decision today changes the situation significantly from where we were at the last hearing.

Moreover, I think the intercession of the creditors'

committee which places a 30-day termination provision to Jack in the Box agreements that doesn't lapse through the pendency of the case also weighs heavily in favor of the determination that it's within sound business discretion.

Lastly, I think that we've received more today than we probably needed, but I would point out that we have received nothing in the moving papers indicating why this decision was made. And it was most troubling to me and my client there was a complete absence of testimony as to why the decision, which could well have ramifications to the estate, to my client, to a number of other parties, why it was absent of that.

Based upon what has been provided today, I would submit the matter to the Court.

THE COURT: Mr. Cohen, creditors' committee.

MR. COHEN: Thank you, your Honor.

We never indicated in our papers that we were challenging the trustee's business judgment. We wanted to understand what happened. I think we do.

We are gratified that the Chapter 11 trustee and Jack in the Box have changed the termination provision along the lines that we had suggested given the expedition that has taken place. And, again, some of the things I saw in the documentation, that's objectionable, but we have no problem with the trustee.

1    THE COURT:  And with the exercise of the trustee's

2    judgment?

3    MR. COHEN:  Right.  But that's your decision, not

4    mine.  But I understand the bar.

5    THE COURT:  All right.

6    Mr. Pomerantz.

7    MR. POMERANTZ:  Yes, your Honor.

8    We -- Vistar, views this as the Court set out early on

9    during this hearing, where it's a dispute between the co-op

10   objecting to the trustee's exercise of business judgment,

11   debtor's distribution agreement with Jack in the Box.

12   We -- again, we dispute some of the facts that were

13   stated by the trustee and Mr. Gabrielson, but I didn't bring

14   someone to testify because, here, that's not really at issue

15   as to whether those are accurate or not as to Vistar and any

16   dispute that the trustee and Vistar may have with each

17   other.

18   Therefore, we have no further comments with respect to

19   the position that your Honor is going to make with respect

20   to the trustee's motion.

21   THE COURT:  You get the last word, Mr. Lapping, the

22   usual form of argument, if you want to say anything.

23   MR. LAPPING:  We'll submit, your Honor.

24   THE COURT:  All right.

25   Well, I'm asked to review the exercise of the

127

trustee's business judgment in shifting from Vistar to Jack
in the Box on the matter of supplying food.

The matter came up to me with a motion, in effect, to
approve the trustee's action which occurred on very short
notice and circumstances that caused a considerable amount
of uncertainty and concern, particularly by the co-op, that
is, National Franchisee Purchasing Co-op, which obviously
would be severely impacted by the shift of the trustee from
Vistar to Jack in the Box.

As I indicated at the preliminary hearing, the
standard is the exercise of business judgment.  Nobody has
taken a contrary position, that is, there is some other
standard that is applicable.

When this first arose, there was a relative lack of
information about the overall situation, who had said what
to whom, and how the situation has developed had not been
explained in detail.  And besides that, the creditors'
committee had only just been formed and had not actually
succeeded in getting counsel who could have a chance to get
up to speed now, and so I set the hearing for today on the
premise that I was only looking at the exercise of business
judgment.

What I've heard, and I'm not going to make
particularly detailed findings of fact, but what I've heard,
from the trustee's perspective, there was considerable

128

reason for discomfort in dealing with Vistar. And the
testimony of Mr. Gabrielson I generally believed, and
likewise, Ms. McFarland. It was perfectly credible to me
that she walked in and said I have three basic problems in a
case of this nature and one of those problems is food,
assuring a timely supply of food. In the food business, it
is particularly important that there be a reliable, timely
supply of food to fast food restaurants. And it was
referred to early on in the first hearing, the setup of the
co-op arose at the time of a very famous situation where
Jack in the Box food, apparently supplied by Jack in the Box
itself, had been contaminated and caused a major dislocation
in the business of Jack in the Box for, I suppose, quite a
while. But that was a situation that came up perhaps 20
years ago, 18 or 20 years ago, but it's still well
remembered in the industry.

From the perspective of the trustee and
Mr. Gabrielson, Vistar was very difficult to get information
out of. For whatever reason, the day-to-day operation of
the relationship was made to be onerous from the standpoint
of the trustee.

It is a somewhat unusual situation in Chapter 11 in
recent years that you have an operating business that's, in
fact, making money. The issue from the outset was not
revenues exceeding expenses, it was that the net revenues

1    were drained off before the bills were paid.  And that was

2    one of the reasons, or the suspicion of that was one of the

3    reasons that I ordered the appointment of a Chapter 11

4    trustee, in effect, on the first day of this case.  The case

5    was filed on Friday.  I ordered it on a Monday, and it was

6    the first-day hearing.

7         So it should have been a somewhat different

8    relationship than what one sees in a Chapter 11 that's in

9    danger of having been nearly dead on arrival.  These do not

10   appear to have been such cases.

11        The trustee worked with Vistar over the space of about

12   a month and a half.  Presumably, Mr. Gabrielson found it

13   very difficult to get reliable, timely information from

14   Vistar about what was being supplied, what was not being

15   supplied, what the bills were, trying to reconcile matters.

16   It's pretty clear those need to be reconciled and ought to

17   be on a daily basis.  That's ordinary prudent business

18   practice.  Somehow, that was not happening.

19        Ms. McFarland developed discomfort with truthfulness

20   of representations that Vistar was making.  She testified a

21   couple of time on the proposition that she was told that

22   these so-called distribution charges that she was talking

23   about was merely an administrative fee due to the extra

24   burden of the problems of having to deal with these

25   particular Jack in the Box restaurants.  But yet she turns

around within a matter of minutes, gets information at the
initial debtor interview being presided over by the United
States Trustee, information from Mr. Alizadeh that at least
a portion, and perhaps a substantial portion of those were,
in fact, on payment of prepetition debt.  And Exhibit 3, the
promissory note, is apparently the link to that.

And it's perfectly normal that a business person who
hears from the person that they're dealing with that
something is purely an administrative charge is actually
business overhead for having the headaches in dealing with
you is told that and then walks in and the other person who
has knowledge of the transaction says, "Oh, no.  This is a
payment of a promissory note," that certainly would give a
reasonable business person discomfort about the veracity of
the supplier, and further undermined the relationship.

The trustee worked with Vistar for a period of about
six weeks, and as the discomfort arose, it was natural to
consider other alternatives.  Jack in the Box was there.
She explored what the situation would be if there was a
shift.  She was considering that.  That apparently led to
some brinksmanship, as it's been referred to, a couple of
days before Thanksgiving.

And at some point, the key decision was made by the
trustee.  She described it when she came in for a status
report shortly thereafter on the case generally.  She said

1  that she'd had to make some difficult decisions and that the

2  costs may be about the same, but there were other issues to

3  take into account for business reasons, and so she had to

4  make a hard decision.

5      I look at the situation and through the testimony that

6  I've heard today, and I cannot say that it was an exercise

7  that was not within the range of the appropriate business

8  judgment of the trustee in charge of the case.  Whether in

9  the long run it's the correct decision, whether it causes

10  more harm to the estate in the end than having not made a

11  move is something to be resolved for the future.

12      But it's a decision that I would expect that many

13  sound businesspeople would have made, and it's certainly not

14  something that, from the standpoint of the Court, is

15  undermined as I indicated.

16      As I indicated, there is enough lack of information --

17  everybody agrees about that -- because of the absence of key

18  records on the part of the debtor to know what all of the

19  consequences are and what all the liabilities may or may not

20  be.

21      The trustee is comfortable that the liabilities to the

22  estate are relatively low.  That may or may not turn out to

23  be the case.  There is nobody who is now in a position to

24  contend that it was an inappropriate decision or reached a

25  decision that is not within the trustee's business judgment.

DIAMOND COURT REPORTERS - (916) 498-9288

1    I am mindful that Jack in the Box has sensibly, I

2 think, provided for a 30-day termination, so that if there

3 is still some opportunity for the co-op to resurrect some

4 other relationship that would be satisfactory to the trustee

5 and economic long-term interest of the debtor, that theory

6 is possible and whatever comes to pass, who knows.

7    But I am not going to tell the trustee, I am not

8 telling the trustee that there was any violation of the

9 trustee's obligations to exercise reasonable business

10 judgment based on the record that's been presented to me.

11    So, what, your motion is granted, Mr. Lapping?  What

12 is it?

13    MR. LAPPING:  That would be the end of the -- that

14 would be the coda, your Honor.

15    THE COURT:  Well, you've made a motion, so I've got to

16 rule on it.

17    MR. LAPPING:  That is exactly what this day is here.

18    THE COURT:  Mr. Cohen?

19    MR. COHEN:  And the order will include the amended

20 revised supplement to the distribution agreement?

21    MR. LAPPING:  Yes, it will.

22    THE COURT:  Why don't I have you draft the order,

23 Mr. Lapping.  Ordinarily -- a one-sentence order I can

24 draft.  I can handle something to that extent.  But since

25 Mr. Cohen correctly points out that maybe it should be a

1   little more than that, maybe you prepare it, Mr. Lapping,

2   and you approve it as to form, Mr. Cohen.

3       Mr. Wade, do you want to approve it as to form?

4       MR. WADE:  No, your Honor.

5       THE COURT:  Mr. Pomerantz?

6       MR. POMERANTZ:  I'd like to review it, your Honor.

7       THE COURT:  You can see it.

8       MR. POMERANTZ:  I think -- the judge found that the

9   trustee exercised her business judgment, granted the motion.

10  I'm all right with that, but much more than that, I'd like

11  to review it.

12      MR. LAPPING:  We'll keep it simple and focus on

13  getting the motion granted.

14      THE COURT:  The only two signatures I'm looking for

15  are Mr. Lapping and Mr. Cohen.  I guess, Jack in the Box,

16  likewise.

17      MR. DUNCAN:  That would be fine, your Honor.

18      THE COURT:  Do you want to look at it?

19      MR. DUNCAN:  I'm the one that drafted the amendment,

20  so I don't need to see it.

21      THE COURT:  Okay.  All right.  Then I'll --

22      MR. POMERANTZ:  Your Honor --

23      THE COURT:  Mr. Pomerantz?

24      MR. POMERANTZ:  Is that order going to have in there

25  that the terms were reduced to 30 days from 90 days, or is

1    that just going to be in the agreement?

2         MR. LAPPING:  I'm sorry.  I was --

3         THE COURT:  Mr. Pomerantz was asking if the order is

4    going to point out that the Jack in the Box termination is

5    reduced from 90 to 30 days.

6         MR. LAPPING:  Yes.  We'll attach a copy of the actual

7    agreement to the order.

8         THE COURT:  So the agreement together with the

9    modification?

10        MR. LAPPING:  Right.

11        THE COURT:  So you can do the order then.  Say the

12   transaction reflected by Exhibit A and B, or Exhibit A as

13   modified by Exhibit B is determined by the Court not to

14   violate the trustee's business judgment obligations or is

15   determined to be consistent with the trustee's duty to

16   exercise business judgment.

17        I'll leave it to you.

18        MR. LAPPING:  It will be artfully drafted, your Honor.

19        THE COURT:  All right.

20        When I look at your bill, I'll see how many billable

21   hours it was.

22        And with that, is there anything else?  Any

23   oh-by-the-ways?

24        MR. LAPPING:  Nothing further.  Thank you, your Honor.

25        MS. McFARLAND:  Thank you, your Honor.

1      MR. WADE:  Thank you, your Honor.

2      MR. COHEN:  Thank you.

3      THE COURT:  We are adjourned.

4                  (Proceedings adjourned.)

5                      ---oOo---

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                      REPORTER'S CERTIFICATE

2                          ---oOo---

3    STATE OF CALIFORNIA   )
                           ) ss.
4    COUNTY OF SACRAMENTO  )

5

6             I, SANDRA VON HAENEL, certify that I was the

7    official Court Reporter, and that I reported verbatim in

8    shorthand writing the foregoing proceedings; that I

9    thereafter caused my shorthand writing to be reduced to

10   typewriting, and the pages number 1 through 136, inclusive,

11   constitute a complete, true, and correct record of said

12   proceedings:

13             COURT:    United States Bankruptcy Court
                         Eastern District of California
14
               JUDGE:    THE HONORABLE CHRISTOPHER M. KLEIN
15
               CAUSE:    In re: FOOD SERVICE MANAGEMENT, INC.
16
                         Case No. 09-40066-C-11
17
               DATE:     Friday, December 18, 2009
18

19             IN WITNESS WHEREOF, I have subscribed this

20   certificate at Sacramento, California, on the 15th day of

21   January, 2010.

22

23                            /s/ Sandra von Haenel
                              SANDRA VON HAENEL
24                            CSR NUMBER 11407

25
```